## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ANDRETTI SPORTS MARKETING LOUISIANA, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 15-2167** |
| **NOLA MOTORSPORTS HOST COMMITTEE, INC., NOLA MOTOR CLUB, LLC, and LANEY CHOUEST** | **SECTION: "G"(3)** |

### ORDER

In this litigation, Plaintiff Andretti Sports Marketing Louisiana, LLC ("Andretti") alleges that it is owed money under a contract it entered into with Defendant NOLA Motorsports Host Committee, Inc. ("NMHC").[1] Andretti alleges that Defendants NOLA Motor Club, LLC ("NOLA Motor") and Laney Chouest ("Chouest") are also liable to it under Louisiana's single-business enterprise and alter-ego doctrines.[2] Pending before the Court is NOLA Motor and Chouest's "Rule 12(b)(6) Motion to Dismiss, and Alternative 12(e) Motion for More Definite Statement."[3] Having reviewed the motion, the memoranda in support, the memorandum in opposition, the record, and the applicable law, the Court will grant the motion in part and deny it in part.

### I. Background

#### A.    *Factual Background*

In its complaint, Andretti alleges that this action arises out of a Racing Services Agreement entered into by Andretti and NMHC, a non-profit formed on June 26, 2014.[4] In 2014, Andretti

---

[1]  Rec. Doc. 1 at p. 1.

[2]  *Id.*

[3]  Rec. Doc. 23.

[4]  Rec. Doc. 1 at pp. 1, 10.

entered into negotiations with Chouest to bring the Verizon IndyCar Series to NOLA Motorsports Park for the first ever Indy Grand Prix of Louisiana ("Event").[5] NOLA Motor owns and operates NOLA Motorsports Park, which is a racing and events facility located outside of New Orleans.[6] Chouest is the sole member of NOLA Motor.[7]

Andretti alleges that Chouest represented, on numerous occasions during the negotiations, that he "personally stood behind the Event" and would make sure that its obligations were fully funded for the first year of the Event.[8] On July 6, 2014, Andretti and NMHC entered into the Racing Services Agreement.[9] Andretti alleges that it was advised that NMHC was formed because the State of Louisiana had agreed to help fund the Event and the State required grant money to be received by a non-profit.[10] According to Andretti, NMHC agreed to pay Andretti $1,322,050 annually for its management fee as well as for the event and service costs, regardless of the success of the race.[11] Under the Agreement, Andretti was to provide management services for races to take place in the years 2015, 2016 and 2017.[12]

---

[5] *Id.* at p. 4.

[6] *Id.*

[7] *Id.* at p. 3.

[8] *Id.* at p. 7.

[9] *Id.* at p. 13.

[10] *Id.* at p. 7.

[11] *Id.* at p. 14.

[12] *Id.* at p. 8.

On August 19, 2014, NMHC entered into a Cooperative Endeavor Agreement with the State of Louisiana to allocate $4.5 million of state funds for the Event.[13] Andretti alleges that approximately $3.4 million of the money provided by the State of Louisiana went to capital improvements in NOLA Motorsports Park and that this "deprived NMHC of needed capital to fulfill its financial obligations."[14] The Event took place on April 10-12, 2015.[15] It is alleged that there are no funds to pay the balance of Andretti's management fees or the event and service costs.[16]

**B.     *Procedural Background***

On June 16, 2015, Andretti filed a complaint against NMHC, NOLA Motor, and Chouest (collectively "Defendants"), alleging claims of breach of contract, unfair and deceptive trade practices, unjust enrichment, and fraud.[17] Andretti alleges that NOLA Motor and its sole member, Chouest, are liable under Louisiana's single business enterprise, alter-ego, unjust enrichment, and fraud doctrines.[18] On June 24, 2015, Andretti filed its "First Amended Complaint" to allege the citizenship of parties identified in its original complaint.[19]

On July 30, 2015, Defendants NOLA Motor and Chouest together filed a "Rule 12(b)(6) Motion to Dismiss, and Alternative 12(e) Motion for More Definite Statement."[20] The same day,

---

[13]  *Id.* at pp. 5–6.

[14]  *Id.* at p. 6.

[15]  *Id.* at p. 9.

[16]  *Id.*

[17]  *Id.* at p. 1.

[18]  *Id.*

[19]  Rec. Doc. 12.

[20]  Rec. Doc. 23.

Defendant NMHC filed a "Motion to Dismiss Under Rule 12(b)(6) for Failure to State a Claim."[21] On August 25, 2015, Andretti filed oppositions to both motions.[22] NOLA Motor and Chouest filed a reply memorandum, with leave of Court, on September 2, 2015.[23] The Court heard oral argument on both motions on September 2, 2015. Here, the Court considers only NOLA Motor and Chouest's motion to dismiss.

## II. Parties' Arguments

### A.  *NOLA Motor and Chouest's Arguments in Support of Their Motion to Dismiss*

NOLA Motor and Chouest move to dismiss Andretti's claims for breach of contract, unfair and deceptive trade practices, unjust enrichment and fraud.[24]

#### 1.  Breach of Contract

NOLA Motor and Chouest first move to dismiss Andretti's breach of contract claim, asserting that Andretti is precluded from making the argument that NOLA Motor and Chouest are liable under a single business enterprise or alter ego theory due to the terms of the Racing Services Agreement.[25] NOLA Motor and Chouest contend that, in the Agreement, Andretti conceded that NMHC is "not an affiliate of NOLA Motor Club, LLC or any entity associated with the NOLA Motorsports Park."[26] Furthermore, they contend that Andretti likewise sought its own provision that

---

[21] Rec. Doc. 25.

[22] Rec. Doc. 29; Rec. Doc. 30.

[23] Rec. Doc. 35.

[24] Rec. Doc. 23.

[25] Rec. Doc. 23-1 at p. 7.

[26] *Id.*

4

Andretti is not an affiliate of other entities with which it has some association and, therefore, the provisions should be enforced for both parties.[27]

NOLA Motor and Chouest additionally argue that although Andretti claims that it relied upon verbal statements by Chouest that he would "back" or "guarantee" the Event, the Racing Services Agreement specifically states that by entering the agreement, Andretti was doing so without relying on any other written or oral assurances or course of conduct.[28] NOLA Motor and Chouest also assert that the Agreement provides that it constitutes the complete agreement between the parties.[29] Furthermore, NOLA Motor and Chouest contend that Andretti stipulated in the "integration provisions" of the Agreement that it would not consider the Agreement amended or modified in any way by any other written or oral statement, assurance or course of practice, unless the modification was in writing and signed by each duly authorized representative of Andretti and NMHC.[30]

NOLA Motor and Chouest assert that this claim is "clearly a contrivance after Andretti failed to make the Event a financial success, which left [NMHC] unable to make the payments Andretti desires."[31] They contend that Andretti recognized and accepted that the Event may not turn a profit from which Andretti could be paid and that the Agreement, in fact, had a provision precluding NMHC from terminating the Agreement if Andretti ran a deficit during the Event's first two years.[32]

---

[27] *Id.* at p. 5.

[28] *Id.* at pp. 5–6.

[29] *Id.* at p. 6.

[30] *Id.*

[31] *Id.* at p. 8.

[32] *Id.*

NOLA Motor and Chouest contend that it was Andretti's responsibility to manage the cash flow and ensure that there would be sufficient money to timely pay all costs.[33]

Furthermore, NOLA Motor and Chouest argue that Andretti's claim must fail because the single business entity and alter ego theories require proof of a legal relationship, and no legal relationship exists between themselves and NMHC as neither NOLA Motor nor Chouest are shareholders, members, directors, or officers of the committee.[34] NOLA Motor and Chouest additionally maintain that the single business enterprise theory only applies to corporations and, therefore, the breach of contract claim against Chouest should be dismissed.[35]

Finally, NOLA Motor and Chouest contend that Andretti has failed to plead sufficient facts under either the single business enterprise or alter ego theories.[36] They assert that the general rule is that a "member of a corporation shall not be personally liable for any obligation of the corporation."[37] They contend that the Supreme Court of Louisiana has established five factors for courts to consider when determining whether to apply the alter ego doctrine: "(1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings."[38] NOLA Motor and Chouest argue that Andretti has only pled one of the factors,

---

[33] *Id.*

[34] *Id.* at p. 9.

[35] *Id.* at pp. 9–10.

[36] *Id.* at p. 10.

[37] *Id.* (citing La. Rev. Stat. § 12:219.A).

[38] *Id.* (citing *Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164, 1168 (La. 1992)).

undercapitalization, and that the allegation is "totally belied" by the agreement itself.[39] They assert that NMHC fulfilled its obligation to have $1 million in funds available to it in order to fund the Event and even taking Andretti's allegations as true that $3.4 million was used on track modifications, NMHC still complied under the agreement to have $1 million available for the Event.[40] Furthermore, they argue that despite Andretti's claims that Chouest undercapitalized NMHC, it has not alleged any duty Chouest had to capitalize NMHC at all.[41]

Addressing Andretti's claim under the single business enterprise theory, NOLA Motor and Chouest argue that courts have listed 18 factors that will support a finding of a single business enterprise:

> (1) corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control; (2) common directors or officers; (3) unified administrative control of corporations whose business functions are similar or supplementary; (4) directors and officers of one corporation act in the interest of the corporation; (5) corporation financing another corporation; (6) inadequate capitalization; (7) corporation causing the incorporation of another affiliated corporation; (8) corporation paying the salaries and other expenses or losses of another corporation; (9) receiving no business other than that given to it by its affiliated corporations; (10) corporation using the property of another corporation as its own; (11) noncompliance with corporate formalities; (12) common employees; (13) services rendered by the employees of one corporation on behalf of another corporation; (14) common offices; (15) centralized accounting; (16) undocumented transfers of funds between corporations; (17) unclear allocation of profits and losses between corporations; and (18) excessive fragmentation of a single enterprise into separate corporations.[42]

---

[39] *Id.*

[40] *Id.* at pp. 10–11.

[41] *Id.* at p. 11.

[42] *Id.* at p. 12 (citing *Lee v. Clinical Research Ctr. of Fla., L.C.*, 2004-CA-0428 (La. App. 1 Cir. 11/17/04); 889 So. 2d 317, 322; *Green v. Champion Ins.*, 577 So.2d 249, 257–58 (La. App. 1 Cir. 1991)).

NOLA Motor and Chouest assert that Andretti has pled "precious few" of the 18 factors that would support the application of that theory.[43]

NOLA Motor and Chouest also address allegations made by Andretti regarding various connections between the Defendants. NOLA Motor and Chouest contend that the fact that Defendants lobbied for the involvement and financial contribution of the State of Louisiana provides no basis for liability to be imposed.[44] In addition, they argue that Andretti's allegation that Chouest "appointed" the five principals of NMHC is "nonsensical" because officers are appointed by a company's Board of Directors, and Andretti fails to allege that Chouest is even a director on the Board.[45] NOLA Motor and Chouest also maintain that, contrary to Andretti's assertion, the fact that Frank Csaki served as an accountant for NMHC and also holds the position of accountant for NOLA Motor cannot serve as the basis for liability because "[i]f volunteering was the basis for liability because it led to piercing corporate veils, host committees would cease to exist and the city would never host another major sporting event."[46] NOLA Motor and Chouest also assert that the connections alleged by Andretti that NMHC and NOLA Motor share the same lobbyist and real estate agent are "quite remote."[47] NOLA Motor and Chouest finally address Andretti's contention that Chouest and Chouest-related entities benefitted from the Event, stating that "substantial rent is overdue by [NMHC] to NOLA Motor," which is "hardly a benefit."[48]

---

[43] *Id.*

[44] *Id.* at p. 13.

[45] *Id.*

[46] *Id.* at p. 14.

[47] *Id.*

[48] *Id.* at p. 15.

## 2.     LUTPA

NOLA Motor and Chouest also move to dismiss Andretti's claim under the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), arguing that Andretti's actual claim is simply a breach of contract claim and that the case law is clear that LUTPA is not a substitute for such a claim.[49] NOLA Motor and Chouest argue that neither the breach of contract, nor Chouest's alleged unfulfilled promise to provide a guarantee of payments to Andretti, rise to the level of egregiousness necessary to constitute a claim under LUTPA.[50] In support, they cite a case from another section of the Eastern District of Louisiana, *Administrators of the Tulane Educational Fund v. Biomeasure, Inc.*,[51] a Middle District of Louisiana case, *Shaw Industries, Inc. v. Brett*,[52] and a Louisiana First Circuit Court of Appeal case, *Belle Pass Terminal, Inc. v. Jolin, Inc.*[53] Second, citing *Nursing Enterprises, Inc. v. Marr*,[54] a Second Circuit Court of Appeal case, they contend that to state a claim under LUTPA, Defendants' actions must have been taken with the specific purpose of harming competition, which Andretti does not allege.[55] Third, NOLA Motor and Chouest contend that Andretti does not plead the special relationship required for a LUTPA claim.[56]

---

[49] *Id.*

[50] *Id.* at pp. 16, 18.

[51] No. 08-5096, 2011 WL 3268108 (E.D. La. 2011) (Vance, C.J.).

[52] 884 F. Supp. 1054 (M.D. La. 1994)

[53] 618 So. 2d 1076 (La. App. 1 Cir. 1993).

[54] No. 30, 776 (La. App. 2 Cir. 8/19/98); 719 So. 2d 524.

[55] Rec. Doc. 23-1 at p. 15.

[56] *Id.*

NOLA Motor and Chouest also move to dismiss the claim for treble damages, arguing that, under LUTPA, treble damages are only awarded in cases where the party engages in an unfair or deceptive method, act, or practice after being put on notice by the Attorney General.[57] They contend that those requirements are not met in this case.

### 3.    Unjust Enrichment

NOLA Motor and Chouest also move to dismiss Andretti's claim for unjust enrichment. First, citing *II Fire Records, L.L.C v. Clouden,*[58] a Louisiana Fourth Circuit Court of Appeal case, and *Threadgill v. Orleans Parish School Board*, a case from another section of the Eastern District of Louisiana,[59] they assert that unjust enrichment is not available when Plaintiff has another remedy, here a breach of contract claim.[60] Second, they contend that Andretti cannot allege the essential element of unjust enrichment that defendants were "enriched without cause."[61]

### 4.    Fraud

NOLA Motor and Chouest move to dismiss Andretti's fraud claim on the grounds that Andretti cannot plead the two essential elements of "duty to accurately disclose the information" and proximate cause.[62] Citing *Becnel v. Grodner*,[63] a Louisiana Fourth Circuit Court of Appeal case, they contend that Andretti has not pled a duty that Chouest had to guarantee the Racing Services

---

[57] *Id.* at p. 20 (citing La. Rev. Stat. § 51:1409).

[58] 2006-0763 (La. App. 4 Cir 1/31/07); 951 So. 2d 1272.

[59] No. 02-1122, 2013 WL 5560906 (E.D. La. Oct. 7, 2013) (Vance, C. J.).

[60] Rec. Doc. 23-1 at p. 21.

[61] *Id.*

[62] *Id.* at p. 22.

[63] 2007-1041 (La. App. 4 Cir. 4/2/08); 982 So. 2d 891, 894–95.

Agreement.[64] They assert that, even if Chouest at one time stated he would guarantee the Racing Services Agreement, which he denies, "negotiations obviously changed" and Andretti signed the Racing Services Agreement without that guarantee.[65] Furthermore, they assert that the loss alleged by Andretti is NMHC's alleged failure to pay Andretti under the Racing Services Agreement, a loss they contend was not caused by Chouest in any way.[66]

In the alternative, NOLA Motor and Chouest aver that Andretti should be required to supplement its allegations with more specific facts as required by Federal Rule of Civil Procedure 9(b).[67] They assert that Andretti has only stated that Chouest misrepresented his promise to guarantee the Racing Services Agreement, but Andretti has not pled the time, place, the specific content of each alleged misrepresentation, and the person to whom the misrepresentations were made.[68] They further aver that Andretti must also plead "malice, intent, knowledge, and other conditions of the person's mind" who made each misrepresentation.[69]

### B.     Andretti's Arguments in Opposition

#### 1.     Breach of Contract

In opposition, Andretti argues that the contract provisions do not bar its argument that Chouest and NOLA Motor acted as a single business entity and/or alter-ego.[70] Andretti argues that

---

[64]  Rec. Doc. 23-1 at p. 23.

[65]  *Id.*

[66]  *Id.*

[67]  *Id.* at p. 24.

[68]  *Id.*

[69]  *Id.*

[70]  Rec. Doc. 30 at pp. 6–7.

the Racing Agreement provides that NMHC is not "an affiliate of NOLA Motor Club, LLC or any entity associated with the NOLA Motorsport Park."[71] However, Andretti contends that it is not claiming that Defendants acted as "affiliates," but rather that they acted as one.[72] Furthermore, Andretti asserts that the integration clause does not preclude it from introducing evidence of fraud and that many of the misrepresentations by Chouest occurred after the parties entered into the Racing Services Agreement.[73] Andretti also contends that it never agreed that it would be paid only if the Event was profitable, and the Racing Services Agreement itself provided for payment in full, regardless of the success of the event.[74]

Next, Andretti asserts that the failure to allege a legal relationship between NOLA Motor, Chouest, and NMHC is not a bar to its claim because courts have held that no legal relationship is necessary to extend the alter-ego theory or single business enterprise doctrine to individuals.[75] In addition, Andretti contends that the allegations are sufficient to support the application of these doctrines.[76] Andretti asserts that the factors to be considered in determining the existence of an alter ego and whether two entities are a "single business enterprise" are similar and they include: "common ownership, directors and officers, employees, and offices; unified control; inadequate capitalization; noncompliance with corporate formalities, centralized accounting; unclear allocation of profits and losses between corporations; one corporation paying the salaries, expenses or losses

---

[71] *Id.*

[72] *Id.*

[73] *Id.* at p. 7.

[74] *Id.*

[75] *Id.* at p. 8.

[76] *Id.* at p. 9.

of another corporation; and undocumented transfers of funds between entities," with no one factor being dispositive.[77]

Andretti asserts that it has made the following allegations in support of the application of the single business enterprise and alter-ego doctrines: (1) NHMC and its offices and members were controlled by NOLA Motor and Chouest; (2) during negotiations leading up to the execution of the agreement and in subsequent dealings, NOLA Motor and Chouest controlled all of the named entities and handled and/or controlled the dealings with Andretti; (3) NOLA Motor and Chouest formed and undercapitalized NMHC with the intention of sheltering themselves from liability; (4) the negotiations regarding the Event involved Chouest, his companies, and his agents, including Michael Sherman ("Sherman"), who acted as Chouest's representative and later served as a member of NMHC; (5) Sherman and Kristen Engeron, President of NOLA Motorsports Park, were described by Chouest to Andretti as "equity partners" in the Event; (6) NOLA Motor and Chouest allocated $3.4 million of the money provided by the State of Louisiana for capital improvements to NOLA Motorsports Park that was in excess of the amounts disclosed to Andretti; (7) Chouest was personally involved in negotiating the terms of the Racing Services Agreement; (8) Chouest verbally represented to Andretti that he personally stood behind the event and would insure that its obligations were fully funded in the first year; (9) prior to the execution of the Agreement, Chouest represented on multiple occasions that payment for Andretti's services would be guaranteed through the State of Louisiana's appropriation and through Chouest's own private investment; and (10) the funds received from the State of Louisiana were instead set aside by Chouest to pay vendors who

---

[77] *Id.* (citing *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010)).

performed capital improvements on the track in order to prevent the vendors from placing a lien on the track.[78]

Furthermore, Andretti asserts that almost every officer of NMHC was a member of NOLA Motor or acting as an agent of NOLA Motor and/or Chouest, NMHC had the same corporate office as Chouest-related entities, and NMHC shared an accountant with Chouest-related entities.[79] Andretti asserts that discovery will bear out that Chouest put personal funds into NMHC and/or NOLA Motor to offset Event expenses and that money flowed between the Chouest-related entities with poor financial discipline such that funds eventually landed into Chouest's personal accounts.[80]

Finally, Andretti contends that NMHC was undercapitalized and that the Racing Services Agreement was specifically premised on the promise that NMHC would receive an additional $4.5 million from the State, and that these funds would be used to pay Andretti rather than for the benefit of NOLA Motor.[81]

### 2.    LUTPA

Andretti asserts that although LUTPA does not provide an alternative remedy for simple breaches of contract, its LUTPA claim against NOLA Motor and Chouest "is not *simply* an alternative to its breach of contract claim."[82] Andretti contends that NOLA Motor and Chouest were not signatories to the Racing Services Agreement and the allegations are not limited to the

---

[78] *Id.* at p. 10.

[79] *Id.* at p. 11.

[80] *Id.*

[81] *Id.*

[82] Rec. Doc. 30 at p. 13 (citing *Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp, Inc.*, 292 F.3d 471 (5th Cir. 2002)).

contractual provisions of the Agreement.[83] Nor is this "simply a case of Defendant Laney Chouest failing to keep his promise to provide a guarantee of payments to [Andretti]."[84]

First, Andretti contends that Chouest and NOLA Motor engaged in deceptive, unethical, oppressive and unscrupulous conduct sufficient to plead a claim under LUTPA. Andretti avers that, prior to the execution of the Racing Services Agreement, Chouest represented that Andretti would be compensated in full from the $4.5 million appropriated to NMHC by the State of Louisiana and from Chouest's personal investment.[85] It contends that, after execution of the Agreement, Andretti learned that NMHC did not have the funds to pay Andretti under the Agreement and Chouest had no intention of personally covering the amounts owed to it as he had previously represented.[86] In addition, Andretti avers that Chouest used the state funds to benefit his race track rather than pay Andretti.[87] Andretti also contends that the assertion that the State of Louisiana required that funds be distributed only to a non-profit corporation was inaccurate.[88]

Second, Andretti challenges NOLA Motor and Chouest's assertion that in order to state a claim under LUTPA, Chouest's motive must have been "harm to competition."[89] Andretti contends that the cases cited by NOLA Motor and Chouest are all distinguishable and, with the exception of one case, all predate the Louisiana Supreme Court's decision in *Chemarie Services, Inc. v. Shell*

---

[83] *Id.*

[84] *Id.* (internal quotations omitted).

[85] *Id.* at p. 14.

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

*Deepwater Production*, which Andretti claims explicitly recognized standing under LUTPA for all persons, not just business competitors.[90]

Third, citing *J.M. Smith Corporation v. Ciolino Pharmacy Wholesale Distributors, LLC*,[91] a case from another section of the Eastern District of Louisiana, Andretti denies that a "special relationship" is required under LUTPA.[92] Andretti asserts that the Louisiana Supreme Court in *Cheramie Services, Inc.* promulgated a two-prong test that did not require a special relationship.[93] Andretti claims that the test requires that: "1) the person must suffer an ascertainable loss; and 2) the loss must result from another's use of unfair methods of competition and unfair or deceptive acts or practices."[94] Andretti asserts that even if a special relationship is required, such a relationship exists in this case because Andretti "was at the mercy of Chouest, who, because he controlled [NMHC] was able to meddle and unduly interfere with [Andretti's] rendering of services, and who deceptively guaranteed he would personally fund the race to ensure [Andretti] would be paid."[95]

Finally, Andretti contends that a challenge to its entitlement to treble damages is premature because a determination of whether Defendants have continued to engage in unfair trade practices since the date Andretti filed its complaint will be further developed during discovery and therefore is not an appropriate issue for a 12(b)(6) motion.[96]

---

[90] *Id.* (citing *Cheramie Servs., Inc. v. Shell Deepwater Prod.,* 09-1633, p. 6 (La. 4/23/10); 35 So.3d 1053, 1057).

[91] Nos. 10-1483; 10-786, 2012 WL 5493853 (E.D. La. Nov. 13, 2012) (Zainey, J.).

[92] Rec. Doc. 30 at p. 17.

[93] *Id.* at p. 16.

[94] *Id.* at p. 17.

[95] *Id.*

[96] *Id.* at. pp. 17–18.

### 3.     Unjust Enrichment

Andretti asserts that its unjust enrichment claim is properly pled in the alternative under Federal Rule of Civil Procedure 8, as the Court may find that no privity of contract exists between Andretti, NOLA Motor, and Chouest under the Racing Services Agreement, "or because the contract may be declared void due to fraud or error in the inducement."[97]

### 4.     Fraud

In opposition to the motion to dismiss the fraud claim, Andretti asserts that it has pled both duty and proximate cause.[98] Andretti contends that a duty was created at the time Chouest represented that payments due to Andretti under the Agreement would be met by allocation of funds by the State and that "he, personally, would ensure the Event's viability such that these funds from the State grant were not otherwise spent to the detriment of [Andretti]."[99] Andretti claims that despite Chouest's representations, "Chouest at all times intended to use this funding to protect himself and his investment in [NOLA Motor]."[100] Andretti contends that it was induced to enter into the Racing Services Agreement directly by all of the defendants' misrepresentations.[101] Furthermore, Andretti asserts that its loss was directly caused by Chouest's misallocation of funds for his benefit and to Andretti's detriment and his failure to abide by his representation that he would personally ensure the viability of the first year of the race.[102]

---

[97] *Id.* at p. 21.

[98] *Id.* at p. 22.

[99] *Id.*

[100] *Id.*

[101] *Id.* at pp. 22–23.

[102] *Id.*

In addition, Andretti asserts that it has sufficiently alleged the time, place, and identity of the speakers of the alleged misrepresentations.[103] Andretti contends that, in its complaint, it identified the timing of the misrepresentation as "days prior to July 6, 2014," and identified the people who made the representations as Michael Sherman, Laney Chouest, and Kristin Engeron.[104] Andretti further contends that these representations were also made after the Racing Services Agreement was executed.[105]

## C.    *NOLA Motor and Chouest's Arguments in Further Support of Their Motion*

In their reply, NOLA Motor and Chouest assert that Andretti "seriously misconstrues" the Racing Services Agreement in its argument that NMHC was undercapitalized.[106] NOLA Motor and Chouest contend that although Andretti represented in its opposition that the Agreement specified that the $4.5 million from the State would be used to pay Andretti, there was no such requirement in the Agreement.[107] Furthermore, NOLA Motor and Chouest assert that the "overwhelming weight of the case law recognizes that for alter ego/[single business enterprise] claims, the individual defendant must have some legal relationship with the company for which the plaintiff is seeking to hold him liable . . . ."[108]

NOLA Motor and Chouest also assert that none of the paragraphs cited by Andretti in support of their fraud claim state who the misrepresentations were made to, which is a clear

---

[103]  *Id.* at p. 24.

[104]  *Id.*

[105]  *Id.*

[106]  Rec. Doc. 35 at p. 2.

[107]  *Id.* at pp. 2–3.

[108]  *Id.* at p. 7.

requirement for pleading fraud.[109] Finally, NOLA Motor and Chouest contend that the "vast weight

of the case law calls for dismissing the unjust enrichment claim because there are other claims

available to Andretti . . . ."[110]

**IV. Law and Analysis**

**A.     *Legal Standard on a Motion to Dismiss***

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed "for

failure to state a claim upon which relief can be granted."[111] A motion to dismiss for failure to state

a claim is "viewed with disfavor and is rarely granted."[112] "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is

plausible on its face.'"[113] "Factual allegations must be enough to raise a right to relief above the

speculative level."[114] A claim is facially plausible when the plaintiff has pleaded facts that allow the

court to "draw a reasonable inference that the defendant is liable for the misconduct alleged."[115]

On a motion to dismiss, asserted claims are liberally construed in favor of the claimant, and

all facts pleaded are taken as true.[116] However, although required to accept all "well-pleaded facts"

---

[109]  *Id.* at p. 2.

[110]  *Id.* at p. 7 (citing *J.P. Mack Indus., LLC v. Mosaic Fertilizer*, LLC, 970 F. Supp. 2d 516, 521 n.2 (E.D. La
2013) (Feldman, J.).

[111]  Fed. R. Civ. P. 12(b)(6).

[112]  *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).

[113]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008)).

[114]  *Twombly*, 550 U.S. at 556.

[115]  *Id.* at 570.

[116]  *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *see
also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

as true, a court is not required to accept legal conclusions as true.[117] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."[118] Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice.[119] The complaint need not contain detailed factual allegations, but it must offer more than mere labels, legal conclusions, or formulaic recitations of the elements of a cause of action.[120] That is, the complaint must offer more than an "unadorned, the defendant-unlawfully-harmed-me accusation."[121] From the face of the complaint, there must be enough factual matter to raise a reasonable expectation that discovery will reveal evidence as to each element of the asserted claims.[122] If factual allegations are insufficient to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an "insuperable" bar to relief, the claim must be dismissed.[123]

It is well-established that, in deciding whether to grant a motion to dismiss pursuant to Rule 12(b)(6), a district court may not "go outside the complaint."[124] There is one recognized exception to that rule: a district court may consider documents attached to the motion to dismiss if they are

---

[117] *Iqbal*, 556 U.S. at 677–78.

[118] *Id.* at 679.

[119] *Id.* at 678.

[120] *Id.*

[121] *Id.*

[122] *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009).

[123] *Moore v. Metro. Human Serv. Dep't*, No. 09-6470, 2010 WL 1462224, at * 2 (E.D. La. Apr. 8, 2010) (Vance, C.J.) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)); *Carbe v. Lappin*, 492 F.3d 325, 328 n. 9 (5th Cir. 2007).

[124] *Rodriguez v. Rutter*, 310 F. App'x. 623, 626 (5th Cir. 2009); *Carter v. Target Corp.*, 541 F. App'x. 413, 416–17 (5th Cir. 2013).

referred to in the complaint and are central to the claim.[125]  "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated."[126] If, however, a district court considers other information outside the complaint, it must treat the motion to dismiss as a motion for summary judgment.[127]

### B.      Applying Louisiana Law

When a federal court interprets a state law, it must do so according to the principles of interpretation followed by that state's highest court.[128] In Louisiana, "courts must begin every legal analysis by examining primary sources of law: the State's Constitution, codes, and statutes."[129] These authoritative or primary sources of law are to be "contrasted with persuasive or secondary sources of law, such as [Louisiana and other civil law] jurisprudence, doctrine, conventional usages, and equity, that may guide the court in reaching a decision in the absence of legislation and custom."[130] To make a so-called "*Erie* guess" on an issue of Louisiana law, the Court must "employ the appropriate Louisiana methodology" to decide the issue the way that it believes the Supreme Court of Louisiana would decide it.[131] Although federal courts should not disregard the decisions

---

[125] *Id.; see also In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

[126] *Carter*, 541 F. App'x at 416.

[127] Fed. R. Civ. P. 12(d); *Rodriguez*, 310 F. App'x at 626.

[128] *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010); *Gen. Elec. Capital Corp. v. Se. Health Care, Inc.*, 950 F.2d 944, 950 (5th Cir. 1991).

[129] *Shaw Constructors v. ICF Kaiser Eng'rs, Inc*., 395 F.3d 533, 547 (5th Cir. 2004).

[130] *Id.* (quoting La. Civ. Code. art. 1 rev. cmt. b).

[131] *Id.* (citation omitted).

of Louisiana's intermediate courts unless they are "convinced that the Louisiana Supreme Court would decide otherwise," they are not strictly bound by them.[132]

## C.   *Breach of Contract Claim*

NOLA Motor and Chouest argue that Andretti's breach of contract claim should be dismissed on four grounds: (1) the single business enterprise doctrine may not be applied to impose liability on an individual; (2) there was no legal relationship between NOLA Motor, Chouest, and NMHC and therefore there can be no single business enterprise; (3) the Racing Services Agreement precludes Andretti's claims; (4) Andretti has not pled sufficient facts to support an application of either a single business enterprise or an alter ego theory; and (5) there was no legal relationship between NOLA Motor, Chouest, and NMHC and therefore the defendants cannot be liable under the alter ego doctrine.[133] The Court will address each of these arguments in turn.

### 1.   Whether the Single Business Enterprise Doctrine May Be Applied to Impose Liability on an Individual

In *Brown v. ANA Insurance Group*, the Louisiana Supreme Court explained that the single business enterprise doctrine is "a theory for imposing liability where two or more business entities act as one. Generally under the doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose."[134] NOLA Motor and Chouest contend that the single business enterprise doctrine applies only to corporations and therefore it may not be applied to Chouest individually.[135]

---

[132] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007).

[133] Rec. Doc. 23-1 at pp. 9–10.

[134] 2007-2116 (La. 10/14/08); 994 So. 2d 1265, 1266 n.2 (citing *Green v. Champion Ins. Co.*, 577 So. 2d 249 (La. App. 1 Cir. 1991)).

[135] Rec. Doc. 23-1 at p. 9.

In support, they quote the Louisiana Fourth Circuit Court of Appeal in *Lee v. Clinical Research Center of Florida, L.C.*, explaining that "[w]hen a group of corporations integrate their resources to achieve a common business purpose and do not operate as separate entities, each affiliated corporation may be held liable for debts incurred in pursuit of the general business purpose."[136] Andretti does not respond to  NOLA Motor and Chouest's argument that the single business enterprise cannot be applied to an individual.

The Louisiana Supreme Court has explained the single business enterprise is "a theory for imposing liability where two or more business entities act as one."[137] Accordingly, as Chouest is an individual, not a business entity, the Court finds that the single business enterprise doctrine may not be applied to Chouest in order to hold him liable for the breach of contract.

### 2.    Whether There Can Be a Single Business Enterprise When There was No Legal Relationship Between NOLA Motor, Chouest, and NMHC

NOLA Motor and Chouest also assert that they cannot be liable for NMHC's debts under the single business enterprise doctrine because in order for corporations to constitute a single business enterprise there must be a legal relationship between the two corporations, and no such relationship exists in this case.[138] In opposition, Andretti contends that a claim premised on the single business enterprise doctrine can survive absent any legal relationship.[139]

---

[136]  2004-0428 (La. App. 4 Cir. 11/17/04); 889 So. 2d 317, 323.

[137]  *Brown v. ANA Ins. Grp.*, 2007-2116 (La. 10/14/08); 994 So. 2d 1265, 1266 n.2 (citing *Green v. Champion Ins. Co.*, 577 So. 2d 249 (La. App. 1 Cir. 1991)).

[138]  Rec. Doc. 23-1 at p. 9.

[139]  Rec. Doc. 30 at p. 9.

In support of their argument, NOLA Motor and Chouest cite *Lee v. Clinical Research Center of Florida, L.C.*,[140] a Louisiana Fourth Circuit Court of Appeal case.[141] NOLA Motor and Chouest do not explain how this case supports their assertion, stating, in a parenthetical, only that the "single business enterprise theory would pierce corporate veil to impose corporate liability on parent corporation."[142] In *Lee*, the court observed that the single business enterprise has been recognized "as a vehicle for holding a group of affiliated entities responsible for the obligations of one of the entities."[143] Although the court used the term "affiliated," it did not further define or explain that term. The court evaluated the connections between the several corporations alleged to constitute a single business enterprise using the eighteen factors identified by the Louisiana First Circuit Court of Appeal in *Green v. Champion Ins. Co.*[144] as relevant to a determination of whether corporations constitute a single business enterprise.[145] The court in *Lee* found that although some of the factors established in the *Green* case may have been present, including shared offices and the corporations having a non-controlling member in common, "based on the totality of the evidence in the record, there clearly were not enough factors present to create a genuine issue of material fact as to whether the defendant entities constituted a single business enterprise."[146]

---

[140]  2004-0428 (La. App. 4 Cir. 11/17/04); 889 So. 2d 317.

[141]  Rec. Doc. 23-1 at p. 9.

[142]  *Id.*

[143]  889 So. 2d at 323.

[144]  577 So.2d 249 (La. App. 1 Cir. 3/5/91).

[145]  *Lee*, 889 So. 2d at 322–27.

[146]  *Id.* at 328.

In opposition, Andretti cites a Louisiana First Circuit Court of Appeal case, *Grayson v. R.B. Ammon and Associates, Inc.*,[147] asserting that, in *Grayson*, the court found that, "[i]f one corporation is wholly under the control of another, the fact that it is a separate entity does not relieve the latter from liability. In such an instance, the former corporation is merely an alter ego or business conduit of the latter."[148] In *Grayson*, Richard Ammon ("Ammon") incorporated R.B. Ammon & Associates, Inc. in order to supply temporary clerical and labor employees.[149] Because the workers' compensation coverage for the labor employees affected the overall workers' compensation rates, Ammon decided to separate its clerical and labor business and encouraged his nephew, Chevis Comeaux ("Comeaux"), to form a new corporation to provide temporary labor employees.[150] Comeaux formed CBC Temporary Staffing Services, Inc. ("CBC") and was the sole stockholder.[151] The court found that there was sufficient evidence to support the jury's factual determination that the two corporations constituted a single business enterprise.[152] The court noted that the evidence demonstrated that Ammon handled all the day-to-day operations for CBC, the two corporations operated under the same trade name, they shared the same office and computer system, all of the daily operations were handled by R.B. Ammon employees, and R.B. Ammon billed CBC's clients without CBC directly reimbursing R.B. Ammon for any of these services.[153]

---

[147] 1999-2597 (La. App. 1 Cir. 11/3/00); 778 So. 2d 1.

[148] Rec. Doc. 30 at p. 8.

[149] 778 So.2d at 21.

[150] *Id.*

[151] *Id.*

[152] *Id.* at 22.

[153] *Id.*

Andretti also cites a case from another section of the Eastern District of Louisiana, *Bona Fide Demolition and Recovery, LLC v. Crosby Construction Company of Louisiana, Inc.*[154] Andretti asserts that in *Bona Fide Demolition and Recovery, LLC*, the court noted that courts have "even extended the [single business enterprise] theory to unaffiliated corporations that lack common ownership . . . ."[155] In *Bona Fide Demolition and Recovery, LLC*, the court found that although no common ownership existed and there was no business relationship between the corporations, considering the *Green* factors, the corporations constituted a single business enterprise.[156] The court noted that the two corporations used the same office space and shared the same resources, the president of one of the corporations controlled the financial operations of both corporations, the finances of the two corporations were intermingled, and one of the corporations did not observe many corporate formalities that might indicate its separateness.[157]

Although, in *Lee*, the Louisiana Fourth Circuit Court of Appeal found that the single business enterprise applies to "affiliated entities," other courts have recognized that the doctrine can apply to unaffiliated corporations.[158] Furthermore, the cases cited by Andretti demonstrate that no formal legal relationship, such as that of a parent corporation and its subsidiary, is required in order for a single business enterprise to exist. Accordingly, NOLA Motor and Chouest's motion to dismiss Andretti's breach of contract claim is denied on the grounds that a legal relationship is required between NOLA Motor and NMHC in order for them to constitute a single business enterprise.

---

[154] 690 F. Supp. 2d 435 (E.D. La. 2010) (Vance, C.J.).

[155] Rec. Doc. 30 at pp. 8–9 (citing *Bona Fide Demolition and Recovery, LLC*, 690 F. Supp. 2d at 445).

[156] *Bona Fide Demolition and Recovery, LLC*, 690 F. Supp. 2d at 446.

[157] *Id.* at 446–47.

[158] *Bona Fide Demolition and Recovery, LLC*, 690 F. Supp. 2d at 445 (quoting *Grayson*, 778 So.2d at 14).

### 3.     Whether the Racing Services Agreement Precludes Andretti's Breach of Contract Claim

NOLA Motor and Chouest also assert that Andretti's breach of contract claim must be dismissed because the Racing Services Agreement precludes the claim.[159] In support, NOLA Motor and Chouest point to contractual provisions of the Racing Services Agreement.[160] A district court may consider documents attached to a motion to dismiss if they are referred to in the complaint and are central to the claim.[161] As the Racing Services Agreement was attached to NOLA Motor and Chouest's motion to dismiss and was referenced in Andretti's complaint, the Court may consider it in evaluating NOLA Motor and Chouest's motion to dismiss.

In the Racing Services Agreement, the parties agreed that "NMHC is an independent non-profit corporation" and that "NMHC is not an affiliate of [NOLA Motor] or any entity associated with the Nola Motorsports Park."[162] The Agreement defined "affiliate(s)" as "(1) all business units and divisions of a party or its parent entities, and (2) any entity controlled by, controlling, or under common control with such party."[163] The Agreement provided that "[t]he board members, officers, and agents of NMHC may, from time to time, serve in another capacity for [NOLA Motor] but such service shall not create an affiliate relationship between NMHC and [NOLA Motor] or Nola Motorsports Park."[164] In opposition, Andretti asserts that the Agreement does not preclude its breach of contract claim against NOLA Motor and Chouest because "[Andretti] is not claiming that [NOLA

---

[159]  Rec. Doc. 23-1 at p. 6.

[160]  Rec. Doc. 23-2.

[161]   *Id.; see also In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

[162]  Rec. Doc. 23-2 at p. 2.

[163]  *Id.* at p. 1.

[164]  *Id.* at p. 2.

Motor] and Chouest acted as 'affiliates.' [Andretti] claims that they acted as a single business entity and/or alter-ego. In other words, they were not just associated or affiliated, they acted as one."[165]

A contract has the effect of law for the parties and the words of a contract must be given their generally prevailing meaning.[166] "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[167] Where a contract is unambiguous, the interpretation of the contract becomes a matter of law.[168]

Andretti asserts that agreeing that NMHC and NOLA Motor are not affiliates is not the same as agreeing that they are not a single business enterprise. However, by signing the Racing Services Agreement, which provided that NMHC is not an affiliate of NOLA Motor, Andretti was agreeing that NMHC was not controlled by NOLA Motor because "affiliate" was defined, in part, as "any entity controlled by . . . such party." Accordingly, the Racing Services Agreement precludes Andretti from arguing, as Andretti does in its complaint, that NMHC and NOLA Motor constituted a single business enterprise because "NMHC and its officers and members, were controlled by Defendants, [NOLA Motor] and Chouest."[169]

The Agreement also states that the fact that board members, officers, and agents of NMHC may serve in another capacity for NOLA Motor will not create an affiliate relationship between

---

[165]  Rec. Doc. 30 at pp. 6–7.

[166]  La. Civ. Code arts. 1983, 2047.

[167]  La. Civ. Code art. 2046.

[168]  *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483, 486 (5th Cir.1983).

[169]  Rec. Doc. 1 at p. 3.

NMHC and NOLA Motor.[170] Therefore, Andretti may not rely upon the commonality of directors, officers, or employees as the basis for arguing that NMHC was controlled by NOLA Motor either.

There are several factors that may be considered in a determination of whether a single business enterprise exists and no one factor is dispositive.[171] Therefore the Racing Services Agreement's provision that NMHC is not an affiliate of NOLA Motor, as has been defined by the parties as "all business units and divisions of a party or its parent entities" and "any entity controlled by, controlling, or under common control with such party," does not necessarily preclude a finding that the two constituted a single business enterprise. Accordingly, the Court will turn to NOLA Motor and Chouest's argument that Andretti has failed to plead sufficient facts to support an application of the single business enterprise doctrine.

### 4. Whether Andretti Has Pled Sufficient Facts to Support an Application of the Single Business Enterprise Doctrine

The single business enterprise doctrine was first applied in Louisiana in *Green v. Champion Insurance Co.*[172] In *Green*, the court identified eighteen factors to be used to determine whether a group of entities constitute a "single business enterprise," noting that no one factor is dispositive of the issue.[173] These factors are:

> 1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control; 2. common directors or officers; 3. unified administrative control of corporations whose business functions are similar or supplementary; 4. directors and officers of one corporation act independently in the interest of that corporation; 5. corporation financing another corporation; 6. inadequate capitalization ("thin incorporation"); 7. corporation causing the

---

[170] Rec. Doc. 23-2 at p. 2.

[171] *Green v. Champion Ins. Co.*, 577 So. 2d 249 (La. App. 1 Cir. 1991).

[172] 577 So. 2d 249 (La. App. 1 Cir. 1991).

[173] *Id.* at 257.

incorporation of another affiliated corporation; 8. corporation paying the salaries and other expenses or losses of another corporation; 9. receiving no business other than that given to it by its affiliated corporations; 10. corporation using the property of another corporation as its own; 11. noncompliance with corporate formalities; 12. common employees; 13. services rendered by the employees of one corporation on behalf of another corporation; 14. common offices; 15. centralized accounting; 16. undocumented transfers of funds between corporations; 17. unclear allocation of profits and losses between corporations; and 18. excessive fragmentation of a single enterprise into separate corporations.[174]

Andretti treats the single business enterprise and alter ego doctrines as one. Citing the Fifth Circuit in *Jackson v. Tanfoglio Giuseppe, S.R.L.*,[175] Andretti asserts that the factors to be considered in determining the existence of an alter ego and whether there is a single business enterprise are similar.[176] Andretti asserts that the factors "include, but are not limited to[:] common ownership, directors and officers, employees, and offices; unified control; inadequate capitalization; non-compliance with corporate formalities; centralized accounting; unclear allocation of profits and losses between corporations; one corporation paying the salaries, expenses, or losses of another corporation; and undocumented transfers of funds between entities" but that "[n]o one factor is dispositive."[177] Andretti contends that its allegations are sufficient to support the application of the single business enterprise and alter-ego doctrines.[178] Although Andretti identifies several allegations in its complaint in support of its application of these doctrines, Andretti has failed to identify, in either its opposition to the motion to dismiss or at oral argument, how its allegations support the factors it asserts are to be considered in determining the existence of a single business enterprise.

---

[174] *Id.* at 257–58.

[175] 615 F.3d 579, 587 (5th Cir. 2010).

[176] Rec. Doc. 30 at p. 9.

[177] *Id.* (quoting *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010)).

[178] Rec. Doc. 30 at p. 9.

Andretti first points to several allegations it made in its complaint that appear to fall within the category of "common ownership, directors and officers, employees, and offices."[179] Andretti contends that "almost every officer of NMHC was, in fact, a member of [NOLA Motor] or acting as an agent of [NOLA Motor] and/or Chouest in their dealings, NMHC had the same corporate office as the other Chouest related entities, including [NOLA Motor], and that NMHC shared an accountant with [NOLA Motor] and the Chouest related entities."[180] Andretti specifically alleges that Chouest appointed three of the officers of NMHC, the President of NOLA Motor, Kristen Engeron, a lobbyist for Chouest, Michael Sherman, and a real estate listing agent for NOLA Motor, Delisha Boyd.[181] Andretti also alleges that Michael Sherman acted as Chouest's representative during the negotiations and later served as a member of NMHC and that both Sherman and Engeron "were described by Chouest to [Andretti] as 'equity partners' in the Event."[182] Andretti further asserts that "[d]iscovery will also reveal that any distinction between Michael Sherman and Kristen Engeron's roles as directors of NMHC and their roles as employees of [NOLA Motor] and/or Chouest is a legal fiction."[183]

Next, Andretti appears to assert that there was "unified control" of NMHC by NOLA Motor and Chouest.[184] Andretti alleged in its complaint that "NMHC and its officers and members, were

---

[179] *Id.* at p. 10.

[180] Rec. Doc. 30 at p. 11 (citing Rec. Doc. 1 at pp. 10–11).

[181] Rec. Doc. 1 at p. 10.

[182] *Id.* at pp. 4–5.

[183] Rec. Doc. 30 at p. 11.

[184] *Id.*

controlled by Defendants, [NOLA Motor] and Chouest."[185] Andretti also alleges that NOLA Motor and Chouest "controlled all of the named entities and handled and/or controlled the dealings with [Andretti]" during the negotiations for Racing Services Agreement and in subsequent dealings.[186] On a motion to dismiss, the Court is required to take all well-pleaded facts as true, but "mere conclusory statements" are not sufficient.[187] Andretti has not provided any factual support for its conclusion that NMHC and its members were "controlled" by either NOLA Motor or Chouest. Nor has Andretti provided factual support for its assertion that the "distinction between Michael Sherman and Kristen Engeron's roles as directors of NMHC and their roles as employees of [NOLA Motor] and/or Chouest is a legal fiction."[188] Furthermore, as discussed above, Andretti agreed in the Racing Services Agreement that NMHC was not controlled by NOLA Motor. Therefore, the Court finds that Andretti has failed to plead sufficient facts to demonstrate that there was "unified control."

Andretti also alleges that "NMHC was undercapitalized, inadequately capitalized, and thinly incorporated such that it was insufficiently funded, and had insufficient capital to support its operations."[189] In its opposition, Andretti contests NOLA Motor and Chouest's claim that the Agreement set forth NMHC's capitalization requirement at $1 million.[190] It appears that Andretti's argument as to undercapitalization is based upon its assertion that "the Racing Services Agreement was specifically premised on the agreement that NMHC would receive an addition [sic] $4.5 million

---

[185]  Rec. Doc. 1 at p. 3.

[186]  *Id.*

[187]  *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).

[188]  Rec. Doc. 30 at p. 11.

[189]  Rec. Doc. 1. at p. 12.

[190]  Rec. Doc. 30 at p. 11.

dollars from the State, and that these funds would be used to pay [Andretti] and not for the benefit of [NOLA Motor]."[191] At oral argument, however, Andretti acknowledged that the contract was silent as to how the $4.5 million was to be spent. Accordingly, the Court finds that Andretti has failed to plead sufficient facts to demonstrate that NMHC was undercapitalized.

Andretti also asserts that "discovery will bear out that Chouest put personal funds into NMHC and/or [NOLA Motor] to offset Event expenses, and that money flowed between the Chouest-related entities with poor financial discipline such that the funds eventually landed in the accounts of most importance to Chouest personally, and his Motorsports Park – into which Chouest has sunk a king's ransom."[192] However, Andretti does not make any factual allegations in its complaint to support this assertion. If such factual allegations existed, perhaps they could support the factor that "one corporation [was] paying the salaries, expenses, or losses of another corporation." Although Andretti asserts that it can obtain this information in discovery, Andretti does not provide any further explanation regarding how it believes that discovery will bear this out. Furthermore, Andretti's assertion that Chouest put his own personal funds into NMHC cannot support a finding of single business enterprise between NMHC and NOLA Motor. Therefore, the Court finds that Andretti has failed to plead sufficient facts to show that there was an unclear allocation of profits and losses between NMHC, NOLA Motor, and Chouest.

Andretti also alleges that Chouest was actively involved in negotiating the terms of the Racing Services Agreement and that he verbally represented to Andretti that he personally stood

---

[191] *Id.*

[192] *Id.*

behind the event and would insure that its obligations were fully funded in the first year.[193] Furthermore, Andretti alleges that Chouest represented that payment for Andretti's services would be guaranteed through the State of Louisiana's appropriation and Chouest's own private investment, but that the funds received from the State were instead set aside by Chouest to pay vendors who performed capital improvements to the track.[194] Andretti does not explain how these allegations support any of the factors or how these allegations support a finding that NOLA Motor and NMHC together constitute a single business enterprise.

Considering Andretti's allegations and the factors to be considered in determining the existence of a single business enterprise, the Court finds that the only factor that Andretti has sufficiently pled is that NMHC and NOLA Motor had in common certain directors, officers, employees, and offices. The significance of this factor, however, is undermined by the fact that NMHC is a non-profit corporation staffed on a volunteer basis.[195] NOLA Motor and Chouest assert, and Andretti does not contest, that NMHC performed its work with "100% volunteerism."[196] Therefore, this is not a case where one corporation was paying the salaries of another corporation's employees. Nor can this factor be used to support any inference of control of NMHC by NOLA Motor, pursuant to the provisions of the Racing Services Agreement.

In *Lee v. Clinical Research Center of Florida, L.C.*,[197] a case from the Louisiana Fourth Circuit Court of Appeal, the plaintiff filed suit against several entities for breach of an employment

---

[193] Rec. Doc. 1 at p. 7.

[194] *Id.* at p. 8.

[195] Rec. Doc. 23-2 at p. 1.

[196] Rec. Doc. 23-1 at p. 13.

[197] 2004-0428 (La. App. 4 Cir. 11/17/04); 889 So. 2d 317.

34

contract, alleging that the entities were operating as a single business enterprise.[198] On the motion for summary judgment, in evaluating the relationship between the companies CRC Florida and Florida Medical Management, the court found that Florida Medical Management's acquisition of a non-controlling interest in the company and documented, interest-accruing loans to CRC Florida were not sufficient to establish that CRC Florida and Florida Medical Management were operating as a single business enterprise.[199] The court also looked to the relationship between the companies CRC Mississippi and CRC Florida, which shared a member with a non-controlling interest in both companies.[200] The court found that the evidence showed that CRC Mississippi had maintained its own bank accounts, paid its own expenses and taxes, and that there was no evidence other than the common member of any of the other factors identified in *Green* as relevant to a single business enterprise analysis. As in *Lee*, here, the only factor Andretti has sufficiently pled in support of its assertion that NOLA Motor and NMHC constituted a single business enterprise is common directors, officers, employees, and office.

Andretti urges the Court to deny the motion to dismiss, arguing that in considering the factual allegations, the Court must "draw on [its] judicial experience and common sense, to analyze whether those facts, which need not be detailed and specific, allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged [under the single business enterprise/alter ego doctrine]."[201] Andretti contends that in *Diamond Services Corporation v.*

---

[198]  *Id.* at 322.

[199]  *Id.* at 327.

[200]  *Id.* at 326.

[201]  Rec. Doc. 30 at p. 9 (quoting *Diamond Servs. Corp. v. Oceanografia, S.A. DE C.V.*, No. 10-cv-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011)).

*Oceanografia, S.A. DE C.V.*, an unpublished case from the Western District of Louisiana, the magistrate judge denied the motion to dismiss a claim based upon the application of the single business enterprise doctrine.[202] Andretti avers that the court reasoned that if specific details regarding accounting, allocation and corporate governance issues were required to be specifically pled at the motion to dismiss stage, essentially no case of this type could ever survive a motion to dismiss, because the necessary facts would be in the sole possession of the defendant.[203] In that case, however, the court had found that the plaintiff had sufficiently pled several of the factors recognized by the Fifth Circuit in *Jackson v. Tanfoglio Giuseppe, S.R.L.*[204] as factors to be considered in determining whether a single business enterprise existed, including the existence of common ownership, directors, and officers, unified control, and that one of the companies had paid some debts and expenses owed by the other.[205] Here, the Court finds that Andretti has only sufficiently pled, at most, one of these factors.

Accordingly, the Court finds that Andretti has failed to sufficiently plead that NOLA Motor and NMHC constitute a single business enterprise. Next, the Court will address whether Andretti has stated claims for breach of contract against NOLA Motor and Chouest pursuant to the alter ego doctrine.

---

[202] *Id.*

[203] *Diamond Servs. Corp.*, 2011 WL 938785 at *6.

[204] 615 F.3d 579 (5th Cir. 2010).

[205] *Diamond Servs. Corp.*, 2011 WL 938785 at *5.

**5.** **Whether the Alter Ego Doctrine May Be Applied to Impose Liability When There is No Legal Relationship Between NOLA Motor, Chouest, and NMHC**

NOLA Motor and Chouest contend that they cannot be held liable for breach of contract under the alter ego doctrine because in order for the doctrine to apply, Andretti must allege a legal relationship between NMHC, NOLA Motor, and Chouest and no such relationship exists.[206] NOLA Motor and Chouest assert that they are not shareholders, members, directors, or officers of NMHC.[207] In opposition, Andretti asserts that no legal relationship is necessary to apply the alter ego doctrine.[208]

In *Riggins v. Dixie Shoring Company, Inc.*, the Louisiana Fourth Circuit Court of Appeal found that the purpose behind the "piercing the corporate veil" and "alter ego" doctrines is to "protect a creditor in his dealings with a shareholder who fails to distinguish, in transactions, between the corporation and his identity as a shareholder."[209] In *Riggins*, the plaintiffs originally filed suit against Dixie Shoring Company, Inc. ("Dixie"), with which they had contracted to have their house leveled.[210] During the litigation, however, Dixie filed bankruptcy pleadings and the plaintiffs subsequently amended their petition to include as defendants O.P. Bajoie, a major shareholder in Dixie, along with his son, Reginald Bajoie, an employee and officer at the company.[211] The Fourth Circuit Court of Appeal held that the alter ego doctrine was applicable only

---

[206] Rec. Doc. 23-1 at p. 9.

[207] *Id.*

[208] Rec. Doc. 30 at p. 8.

[209] 577 So. 2d 1060, 1065 (La. App. 4 Cir. 1991), *rev'd on other grounds*, 590 So. 2d 1164.

[210] *Id.* at 1061.

[211] *Id.*

against shareholders of a corporation, and therefore found that Reginald Bajoie, who was an employee and officer of the company, but not a shareholder, could not be held liable under the alter ego doctrine.[212] The court found that the trial court had not erred, however, in piercing the corporate veil and finding O.P. Bajoie, Dixie's major shareholder, individually liable to the plaintiffs.[213] The case was appealed to the Louisiana Supreme Court.

The Louisiana Supreme Court noted that the Fourth Circuit Court of Appeal had "exonerated" Reginald Bajoie, but the court analyzed only the Fourth Circuit Court of Appeal's affirmation of the district court ruling that O.P. Bajoie could be held individually liable to the plaintiffs under the alter ego doctrine.[214] The Louisiana Supreme Court noted that under Louisiana law, "[t]he general rule [is] that corporations are distinct legal entities, separate from the individuals who comprise them."[215] However, where a corporation is simply the "alter ego" of the shareholder, the Louisiana Supreme Court stated, the corporate veil may be pierced.[216] The court noted that the alter ego doctrine "usually involved situations where fraud or deceit has been practiced by the shareholder acting through the corporation;" however, "[a]nother basis for piercing the corporate veil is when the shareholders disregard the requisite corporate formalities to the extent that the corporation ceases to be distinguishable from its shareholders."[217] The court stated that "[b]ecause of the beneficial role of the corporate concept, the limited liability attendant to corporate ownership

---

[212] *Id.* at 1065.

[213] *Id.*

[214] *Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164, 1166 (La. 1991).

[215] *Id.* at 1167.

[216] *Id.* at 1168.

[217] *Id.*

should be disregarded only in exceptional circumstances."[218] The Louisiana Supreme Court identified several factors that courts may consider when determining whether to apply the alter ego doctrine: "1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings."[219] The Louisiana Supreme Court reversed the Fourth Circuit Court of Appeal, holding that O.P. Bajoie could not be individually liable under the alter ego doctrine.[220] The court reasoned that there was no evidence that O.P. Bajoie had used the corporate form to perpetrate fraud, and that although some corporate formalities were not strictly followed, the Bajoies had followed most of the essential corporate formalities for the twenty-three years of the corporation's existence.[221]

In opposition, Andretti cites *Middleton v. Parish of Jefferson*, a Louisiana Fifth Circuit Court of Appeal case.[222] At issue in *Middleton* was "whether a corporate official can avoid an exception of res judicata by bringing, in his individual capacity, a suit already litigated on behalf of the corporation."[223] The court found that "[a]lthough it is alleged that Mr. Middleton is not a shareholder of [the corporation], shareholder status is not the only element used in determining if veil piercing

---

[218] *Id.*

[219] *Id.*

[220] *Id.* at 1172.

[221] *Id.* at 1169.

[222] 97-324 (La. App. 5 Cir. 1/14/98); 707 So. 2d 454.

[223] *Id.* at 455.

is appropriate."[224] The court held that veil piercing "must be used in this instance not to impose personal liability on Mr. Middleton but to prevent his use of subversive tactics to take an unjust advantage of a legal distinction. Allowing a corporate official to bring suit in his individual capacity, solely for the purpose of avoiding an exception to res judicata, would be an unjust result."[225] As NOLA Motor and Chouest, correctly assert, however,[226] Middleton was the president of the corporation and therefore a legal relationship existed in that case.[227] The court in *Middleton* referenced the Fourth Circuit Court of Appeal decision in *Riggins*, but noted that in *Withers v. Timber Products, Inc.*, another case cited by Andretti, the Louisiana Third Circuit Court of Appeal also pierced the corporate veil to hold liable a person who was not formally a shareholder in the pierced corporation.[228]

In *Withers*, the trial court had held that defendant John Makar ("Makar") was acting as the alter ego of defendant Timber Products, Inc.[229] On appeal, the Third Circuit Court of Appeal noted that Makar was the sole stockholder and officer at the time of Timber Products, Inc.'s incorporation, but that Makar had testified that he had "swapped" one hundred percent of the stock of Timber Products, Inc. to a judgment-proof individual in exchange for property.[230] Therefore, at the time the plaintiff sought to pierce the corporate veil, Makar was no longer a stockholder of Timber Products,

---

[224] *Id.* at 456.

[225] *Id.* at 457.

[226] Rec. Doc. 35 at p. 6.

[227] *Middleton*, 707 So. 2d at 455.

[228] *Id.* (citing *Withers v. Timber Prods., Inc.*, 574 So. 2d 1291 (La. App. 3 Cir. 2/6/91)).

[229] *Withers*, 574 So. 2d at 1293.

[230] *Id.* at 1295.

Inc. The Third Circuit Court of Appeal noted that the trial judge had found that the alleged transfer of stock was "nothing more than a sham transfer in an attempt by Makar to avoid exposure for worker's compensation liability" and held that the trial judge had not clearly erred in finding Timber Products, Inc. to be the alter ego of Makar.[231]

The Louisiana Supreme Court has noted that "[p]iercing the corporate veil is largely a jurisprudential doctrine."[232] In *Ogea v. Merritt*, the Louisiana Supreme Court noted that

> Louisiana courts have allowed a piercing of the corporate veil under two exceptional circumstances, namely, *where the corporation is an alter ego of the shareholders* and the shareholders have used the corporation to defraud a third party (the "alter ego" doctrine) and where the shareholders have failed to conduct a business on a "corporate footing" to such an extent that the *corporation ceases to be distinguishable from its shareholders*.[233]

None of the cases cited by Andretti support its contention that the alter ego doctrine may be applied to an individual or entity who, as the facts here present, has never been a shareholder or officer of the company whose veil the plaintiff seeks to pierce. The Court will not extend the alter ego doctrine beyond its application in Louisiana courts. Accordingly, in light of the decisions of the Louisiana Supreme Court and the Louisiana Circuit Courts of Appeal, the Court finds that the alter ego doctrine may not be applied to NOLA Motor and Chouest, who are not alleged to have been officers, directors, or shareholders of NMHC, in order to pierce the corporate veil in this case.

Having found that Andretti has failed to state claims for breach of contract against Chouest and NOLA Motor pursuant to either the alter ego or the single business enterprise doctrines, the Court grants NOLA Motor and Chouest's motion to dismiss Andretti's breach of contract claims.

---

[231] *Id.* at 1295–96.

[232] *Ogea v. Merritt*, 2013-1085 (La. 12/10/13); 130 So. 3d 888, 895.

[233] *Id.* at 895 n.4 (emphasis added) (quoting *Charming Charlie, Inc. v. Perkins Rowe Assocs.*, 2011-2254 (La. App. 1 Cir. 7/10/12); 97 So. 3d 595, 598).

**D.**     *LUTPA Claim*

NOLA Motor and Chouest assert that Andretti's claim under LUTPA should be dismissed because: (1) Andretti does not allege, as it must under LUTPA, that NOLA Motor and Chouest took the alleged wrongful actions with the specific purpose of harming competition; (2) Andretti has not alleged the special relationship required for a claim under LUTPA; and (3) Andretti's claim is simply for breach of contract and LUTPA does not provide a substitute for a breach of contract claim.[234] The Court will address each of these arguments in turn.

LUTPA, Louisiana Revised Statute § 51:1401, declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." LUTPA affords a cause of action to any natural or juridical person "who suffers any ascertainable loss of money or moveable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by [Louisiana Revised Statute] 51:1405."[235] The Louisiana Supreme Court has stated that the goals of LUTPA include "halting unfair business practices and sanctioning the businesses which commit them, preserving and promoting effective and fair competition, and curbing business practices that lead to a monopoly and unfair restraint of trade within a certain industry."[236] What constitutes an unfair trade practice is to be determined by the courts on a case-by-case basis.[237] Under LUTPA, a business action is deemed "unfair" when it offends established public policy and when it is "immoral,

---

[234] Rec. Doc. 23-1 at p. 15.

[235] *Cheramie Serv., Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633, p. 6 (La. 4/23/10); 35 So. 3d 1053 (quoting La. Rev. Stat. 51:1409).

[236] *Quality Envtl. Processes, Inc. v. I.P. Petrol. Co., Inc.*, 2013-1582 (La. 5/7/14); 144 So. 3d 1011, 1025.

[237] *Cheramie Serv., Inc.,* 2009-1633 at p. 10.

unethical, oppressive, unscrupulous, or substantially injurious to consumers."[238] A business action is "deceptive" when it amounts to fraud, deceit, or misrepresentation.[239] Ultimately, however, "the range of prohibited practices under LUTPA is extremely narrow."[240]

### 1. Whether the LUTPA Claim Must Be Dismissed Because Andretti Has Not Pled that Defendants' Actions Were Committed for the Purpose of Harming Competition

NOLA Motor and Chouest contend that an intention to harm competition is "an essential element to a claim under [LUTPA]."[241] They assert that Andretti's LUTPA claim should be dismissed because "Andretti has not pled, and could not plead, that the alleged promise by Mr. Chouest to guarantee the payments to Andretti was done for the purpose of harming competition" and that such a pleading would not make sense in this context.[242] In opposition, Andretti contends that none of the cases cited by NOLA Motor and Chouest are analogous to Andretti's claim and that all except one predate the Louisiana Supreme Court's decision in *Cheramie*, where the court recognized standing under LUTPA for all persons, not solely business competitors.[243]

The Fifth Circuit has observed that "[t]he real thrust of the LUTPA, modeled after the Federal Trade Commission Act, 15 U.S.C. § 45, is to deter injury to competition."[244] In support of its motion to dismiss, NOLA Motor and Chouest cite *Nursing Enterprises, Inc. v. Marr*, a case from

---

[238] *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1332 (5th Cir. 1994).

[239] *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 553 (5th Cir. 2015).

[240] *Quality Envtl. Processes, Inc.*, 144 So. 3d at 1025.

[241] Rec. Doc. 23-1 at p. 18.

[242] *Id.* at pp. 18–19.

[243] Rec. Doc. 30 at p. 14 (citing *Cheramie Serv., Inc.*, 2009-1633 at p. 6).

[244] *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1331 (5th Cir. 1994).

the Louisiana Second Circuit Court of Appeal.[245] In *Marr*, defendant Susan Marr was alleged to have acquired trade secrets while working for her employer and then starting a new company in direct competition with her former employer.[246] A jury found that she had committed an unfair trade practice and rendered judgment in favor of the plaintiff.[247] The Louisiana Second Circuit Court of Appeal reversed, holding that the plaintiff had not shown that Susan Marr was attempting to intentionally harm her former employer in any way and that "[a] defendant's motivation is a critical factor; the actions must have been taken with the specific purpose of harming the competition."[248]

However, NOLA Motor and Chouest have not pointed to any factually analogous cases where courts have dismissed LUTPA claims for failure to allege that the acts were committed with the purpose of causing harm to competition. The cases cited by NOLA Motor and Chouest involve a claim that former employees misappropriated trade secrets and engaged in unfair competition,[249] a claim that a nursing home failed to treat a resident with dignity and respect,[250] and a claim that a hospital attempted to stifle competition by preventing a competing hospital from entering the full-service hospital market.[251] In those cases, the courts found intent to harm the competition to be a

---

[245] No. 30, 776 (La. App. 2 Cir. 8/19/98); 719 So. 2d 524.

[246] *Id.* at 527–28.

[247] *Id.* at 530.

[248] *Id.* at 528, 530.

[249] *See Nursing Enters., Inc.*, 719 So. 2d at 528–29; *SDT Indus., Inc. v. Leeper*, 34-655, p. 1 (La. App. 2 Cir. 6/22/01); 793 So. 2d 327.

[250] *Schenck v. Living Centers-East, Inc.*, 917 F. Supp. 432, 435 (E.D. La. Feb. 21, 1996) (Berrigan, J.).

[251] *Monroe Surgical Hosp., LLC v. St. Francis Med. Ctr., Inc.*, 49,600, p. 2 (La. App. 2 Cir. 8/21/14); 147 So. 3d 1234.

critical factor. However, in the more factually analogous cases, discussed *infra*, courts have not discussed a "critical factor" or "essential element" of intent to harm competition.[252]

Furthermore, in *Industrias Magromer Cueros y Pieles S.A. v. Louisiana Bayou Furs Inc.*,[253] the Fifth Circuit analyzed the defendants' argument that a jury's finding of liability under LUTPA was inconsistent with the jury's finding that the defendants did not act "with the intention to obtain an unjust advantage over [the plaintiff]."[254] The Fifth Circuit agreed with the district court that "LUTPA does not require a misrepresentation or unethical conduct to be engaged in with the intent to obtain an unjust advantage or to cause a loss or inconvenience."[255] Rather, the Fifth Circuit asserted that the statute "merely requires a showing of 'some element of fraud, misrepresentation, deception or other unethical conduct on [a] defendant's part.'"[256] The court held that "[b]ecause LUTPA does not require an intent to obtain an advantage or to cause a loss, there is no inconsistency in the jury verdict."[257]

The Fifth Circuit in *Louisiana Bayou Furs* did not find that there was any essential element of an intent to harm competition, and in fact, rejected an argument that LUTPA required an intent to obtain an unjust advantage or cause a loss or inconvenience to the other party. The LUTPA statute provides only that "[u]nfair methods of competition and unfair or deceptive acts or practices in the

---

[252] *Admins. of the Tulane Educ. Fund v. Biomeasure, Inc.*, No. 08-5096, 2011 WL 3268108 (E.D. La. 2011) (Vance, C.J.); *Shaw Indus., Inc. v. Brett*, 884 F. Supp. 1054 (M.D. La. 1994); *Belle Pass Terminal, Inc. v. Jolin, Inc.*, 618 So. 2d 1076 (La. App. 1 Cir. 1993); *NOLA Fine Art, Inc. v. Ducks Unlimited, Inc.*, 88 F. Supp. 3d 602 (E.D. La 2015) (Vance, C.J.)).

[253] 293 F.3d 912 (5th Cir. 2002).

[254] *Id.* at 921.

[255] *Id.* at 921–22.

[256] *Id.* at 922.

[257] *Id.*

45

conduct of any trade or commerce are hereby declared unlawful."[258] The statute does not provide

that in order for there to be a violation under LUTPA there must be an intent to harm competition.

Accordingly, the Court denies the motion to dismiss Andretti's LUTPA claim on the grounds that

Andretti has not pled a specific intent to harm competition.

> ### 2.    Whether the LUTPA Claim Must Be Dismissed Because There Was No Special Relationship Between NOLA Motor, Chouest, and Andretti

NOLA Motor and Chouest contend that "a 'special relationship,' akin to a fiduciary

relationship, is important in finding a violation of [LUTPA]."[259] In opposition, Andretti asserts that

after the Louisiana Supreme Court's decision in *Cheramie*, granting a right of action under LUTPA

to all persons, natural or juridical, a special relationship between the parties is not required.[260]

Andretti contends that, even if a special relationship is required, one existed in this case because

"[Andretti] was at the mercy of Chouest, who, because he controlled the Host Committee was able

to meddle and unduly interfere with [Andretti's] rendering of services, and who deceptively

guaranteed he would personally fund the race to ensure [Andretti] would be paid."[261]

In its opposition to the motion to dismiss, Andretti cites to a case from another section of the

Eastern District of Louisiana, *J.M. Smith Corporation v. Ciolino Pharmacy Wholesale Distributors,*

*LLC*.[262] In *J.M. Smith Corporation*, Smith, a pharmaceutical wholesaler, brought suit regarding

---

[258] La. Rev. Stat. 51:1405.

[259] Rec. Doc. 23-1 at p. 19 (citing *Clark v. Am.'s Favorite Chicken Co.*, 916 F. Supp. 586, 593 (E.D. La. Feb. 8, 1996); *Shaw Indus., Inc. v. Brett*, 884 F. Supp. 1054, 1058 (M.D. La. Nov. 3, 1994)).

[260] Rec. Doc. 30 (citing *Cheramie Serv., Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633 (La. 4/23/10); 35 So. 3d 1053).

[261] Rec. Doc. 30 at p. 17.

[262] Nos. 10-1483; 10-786, 2012 WL 5493853 (E.D. La. Nov. 13, 2012) (Zainey, J.).

unpaid balances it alleged it was owed.[263] Defendant Ciolino Entities filed a counterclaim, alleging

breach of contract and a violation of LUTPA.[264] On a motion for summary judgment on the LUTPA

counterclaim, Smith argued, *inter alia*, that it was entitled to summary judgment because the Ciolino

Entities could not establish a special relationship between the Ciolino Entities and Smith.[265] In

opposition, the Ciolino Entities disputed the contention that a special relationship or fiduciary duty

must be proven to maintain a claim under LUTPA.[266] The court held that the line of cases that

established the need to prove a special relationship or fiduciary duty involved competitors, not

consumers and, were therefore inapplicable because the Ciolino Entities were better described as

consumers rather than business competitors.[267] The instant case, however, cannot be described as

a consumer case.

      In *NOLA Fine Art, Inc. v. Ducks Unlimited, Inc.*,[268] another case from another section of the

Eastern District of Louisiana, the court stated that "'only egregious actions involving elements of

fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA'

and this 'egregiousness' often involves 'the breach of a special relationship of trust.'"[269]

      The Court is not persuaded that Andretti's LUTPA claim must be dismissed because there

was no special relationship between the parties. In *Cheramie*, the Louisiana Supreme Court held that

---

[263] *Id.* at *1.

[264] *Id.*

[265] *Id.* at *4.

[266] *Id.*

[267] *Id.*

[268] 88 F. Supp. 3d 602 (E.D. La. 2015) (Vance, C.J.).

[269] *Id.* at *8 (internal citation omitted).

"LUTPA grants a right of action to any person, natural or juridical, who suffers an ascertainable loss as a result of another person's use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[270] Although the Court does not find that Andretti has demonstrated that such a relationship existed through its assertion that it was "at the mercy of Chouest," the Court is not convinced that a LUTPA violation cannot occur without the presence of a special relationship. The LUTPA statute does not state that a special relationship is required between the parties in order for there to be a LUTPA violation. Furthermore, the Louisiana Supreme Court in *Cheramie* held that *any person* who suffers an ascertainable loss as a result of another's unfair method of competition and unfair or deceptive act or practice has standing under LUTPA. Therefore, the Court declines to dismiss Andretti's LUTPA claim on the grounds that Andretti has not pled a special relationship between the parties.

### 3.    Whether Andretti's Allegations Rise to the Level of a LUTPA Violation

NOLA Motor and Chouest also contend that Andretti's LUTPA claim should be dismissed because LUTPA does not provide a substitute for a breach of contract claim.[271] In support, they cite *Administrators of the Tulane Educational Fund v. Biomeasure, Inc.*, a case from another section of the Eastern District of Louisiana.[272] In *Biomeasure, Inc.*, the plaintiffs brought suit alleging that the defendants had deprived them of their rights pursuant to multiple agreements regarding the invention of a drug.[273] Plaintiffs then brought a claim pursuant to LUTPA alleging that the defendants had "knowingly and willfully led Plaintiffs to believe that the dispute had been settled" and that the

---

[270]   09-1633 (La. 4/23/10); 35 So.3d 1053, 1057.

[271]   Rec. Doc. 23-1 at p. 16.

[272]   No. 08-5096, 2011 WL 3268108 (E.D. La. 2011) (Vance, C.J.).

[273]   *Id.* at *1.

parties had memorialized their agreement to settle the case, but then later failed to execute the agreement.[274] The plaintiffs alleged that the defendants' failure to execute the settlement agreement rendered their conduct surrounding the agreement an unfair method of competition and unfair and deceptive act and practice.[275] The court found that there were no allegations of fraud or misrepresentation in the complaint and the plaintiffs therefore relied solely upon the ultimate failure to execute the settlement agreement as support for their claim under LUTPA.[276] The court held that the defendants' decision not to execute the final settlement agreement, even following extensive negotiations, could not be distinguished from a simple breach of contract.[277] Quoting the Fifth Circuit in *Turner v. Purina Mills, Inc.*,[278] the court stated that "[t]here is a great deal of daylight between a breach of contract claim and the egregious behavior [LUTPA] proscribes."[279] Although both cases involve an alleged failure to do something that one promised, here there are allegations of fraud and misrepresentation, unlike in *Biomeasure, Inc.*

NOLA Motor and Chouest also cite *Shaw Industries, Inc. v. Brett*, a case from the Middle District of Louisiana.[280] In *Brett*, plaintiff Nass obtained the brokerage services of the defendants to locate a potential joint venture partner.[281] According to the contract, if the defendants located a

---

[274]  *Id.* at *5, 7.

[275]  *Id.* at *7.

[276]  *Id.*

[277]  *Id.*

[278]  989 F.2d 1419 (5th Cir. 1993).

[279]  *Id.* at 1422.

[280]  884 F. Supp. 1054 (M.D. La. 1994)

[281]  *Id.* at 1055.

partner, they would be compensated pursuant to terms mutually agreed upon in the future.[282] When the defendants located a potential partner, the defendants proposed that the terms of their compensation be a lump sum amount and an indefinite participation in the profits.[283] The new partner rejected the proposal and stated that it would not form a joint venture if the defendants insisted on being included in the joint venture as partners.[284] The defendants subsequently stated that they would accept a lump sum payment as their entire brokerage commission.[285] In reliance upon the defendants' concession, the new partner signed a letter of intent to form the joint venture with plaintiff Nass.[286] Later, defendant Brett contacted the plaintiffs and requested an interest in the profits, despite his earlier statement that he would accept the lump sum alone as payment.[287] Brett admitted that he had entered into a secret agreement with plaintiff Nass to allow him to share in the profits and that he had misrepresented this fact.[288] The plaintiffs brought suit under LUTPA, arguing that the defendants had "acted in bad faith and/or in a manner intended to deceive and coerce plaintiffs into paying exorbitant brokerage fees."[289]

The court found that the plaintiffs were not members of the class of plaintiffs sought to be protected by LUTPA and that the "suit is more analogous to a breach of contract dispute than one

---

[282] *Id.*

[283] *Id.*

[284] *Id.*

[285] *Id.*

[286] *Id.*

[287] *Id.*

[288] *Id.*

[289] *Id.* at 1057.

involving unfair or deceptive acts."[290] *Brett* is more factually analogous to the instant case than *Biomeasure, Inc.* because in *Brett*, there was evidence of deception where one of the defendants admitted to having misrepresented his previous agreement. However, this case was pre-*Cheramie*, before which courts had limited standing under LUTPA to consumers and business competitors. In *Brett*, the court held that the case was more analogous to a breach of contract, but relied not only upon the conduct at issue but also on the nature of the relationship between the parties and the fact that they were not in competition with the defendants.[291]

NOLA Motor and Chouest also cite *Belle Pass Terminal, Inc. v. Jolin, Inc.*,[292] a Louisiana First Circuit Court of Appeal case, in support of their argument that the allegations at issue in this case do not rise to a LUTPA violation. In that case, the action arose out of a sale and mortgage of property as well as transfer of leases.[293] The defendants filed a counterclaim pursuant to LUTPA.[294] The conduct alleged to form the basis of the LUTPA claim was that the plaintiffs had "misrepresented their true intent by seeking the inclusion of language in the documents that would give them the right to go onto the leased property to operate their business;" misrepresented that they had, in fact, purchased the leased property in question; tried to influence a cancellation of the lease; and failed to disclose that they had agreed to abide by the terms of the lease.[295] The court held that there was no allegation of any conduct that offends established public policy or conduct that would

---

[290] *Id.* at 1058.

[291] *Id.*

[292] 618 So. 2d 1076 (La. App. 1 Cir. 1993).

[293] *Id.* at 1077–78.

[294] *Id.* at 1078–79.

[295] *Id.*

be unethical, oppressive, or substantially injurious as applied to a consumer or business competitor.[296] Furthermore, the court stated that none of the allegations implied that there was an imbalance in negotiating power.[297] Here, Andretti alleges that NMHC was formed by Chouest "solely to capitalize on the race and to accept the state grant for his benefit, while avoiding any financial liability for the Racing Event and sheltering other Chouest-related entities and Chouest, individually, from financial liability therefor"[298] and that Chouest "falsely assured [Andretti] its fees would be fully paid" when he never intended to pay Andretti.[299] These allegations contain conduct that could be characterized as unethical.

The Court observes that this case is factually analogous to a case from another section of the Eastern District of Louisiana, *NOLA Fine Art, Inc. v. Ducks Unlimited, Inc.*[300] In that case, the parties entered into an agreement intending to raise money for the restoration of Cat Island, a small island located off the coast of Southeast Louisiana.[301] Plaintiff NOLA Fine Art, Inc. agreed to paint, sell, and ship a "Cat Island Poster" and donate 20% of the proceeds to the restoration project.[302] Defendant Ducks Unlimited, Inc. permitted NOLA Fine Art, Inc. to use the Ducks Unlimited logo on select editions of the Cat Island Poster in exchange for a 20% licensing fee.[303] According to the plaintiffs, Ducks Unlimited's State Chairman also agreed to donate a portion of the licensing

---

[296] *Id.* at 1081.

[297] *Id.*

[298] Rec. Doc. 1 at p. 16.

[299] *Id.* at p. 12.

[300] No. 13-4904, 2015 WL 631244 (E.D. La. Feb. 12, 2015) (Vance, C.J.).

[301] *Id.* at *1.

[302] *Id.*

[303] *Id.*

revenues to the Cat Island project and send "email blasts" advertising the prints to its members.[304] However, the parties did not execute a written contract to this effect.[305] In a later meeting, the Ducks Unlimited Chairman indicated that the licensing fees would instead go to general coastal restoration rather than the Cat Island restoration project in particular and Ducks Unlimited would not send any national emails advertising the Cat Island poster.[306] Plaintiff sued Ducks Unlimited for breach of contract, detrimental reliance, unfair trade practices, and fraud under Louisiana law.[307] The court held that "absent contemporaneous intent not to perform, Ducks Unlimited's failure to fulfill the alleged promises is 'merely a breach of contract which must be enforced by an action on the contract.'"[308]

This case is at the motion to dismiss stage, where the Court must take all well-pleaded facts as true. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[309] Andretti alleges in its complaint that there was contemporaneous intent not to pay Andretti.[310] Andretti alleges that although Chouest asserted that Andretti would be fully paid from Chouest's investments, Chouest "actually intended to only fully pay those contractors who made improvements to his race track or who had ongoing relationships with Chouest or who had the

---

[304] *Id.*

[305] *Id.*

[306] *Id.*

[307] *Id.* at *2.

[308] *Id.* at *10 (quoting *Hanover Modular Homes of N. La., Inc. v. Scottish Inns of Am.*, 443 F. Supp. 888, 892 (W.D. La. 1978)).

[309] Fed. R. Civ. P. 9(b).

[310] *See* Rec. Doc. 1 at p. 12.

ability to place a lien on NOLA Motorsports Park."[311]

In opposition to the motion to dismiss its LUTPA claim, Andretti cites *Creative Choice Home, Inc. v. Historic Restoration, Inc.*, a case from another section of the Eastern District of Louisiana.[312] In that case, the plaintiff alleged that defendant Historic Restoration, Inc. ("HRI") had improperly submitted a substantially revised proposal in a bid to obtain a contract as developer of a housing development, despite an order by the housing authority prohibiting the revision of any proposals.[313] The court found that "[g]iven the broad interpretation by Louisiana courts of LUTPA, this allegation is sufficient to withstand HRI's motion to dismiss under Rule 12(b)(6)."[314] *Creative Choice Home, Inc.* is not factually analogous to this case; however, it supports Andretti's assertion that violations of LUTPA are to be determined on a case by case basis.

Andretti also cites the Fifth Circuit's decision in *Tubos de Acero de Mexico, S.A. v. American International Investment Corp, Inc.*[315] In that case, Tubos de Acero de Mexico, S.A. ("TAMSA") and American International Investment Corp. ("American") had entered into a lease agreement regarding ultrasonic testing pipe inspection equipment.[316] The lease terms stated that the lease was contingent upon TAMSA buying new or used equipment from American, American renovating any inspection equipment needed by TAMSA while the equipment was being leased, and the condition

---

[311] *Id.*

[312] No. CIV. A. 99-1569, 1999 WL 1009810 (E.D. La. Nov. 5, 1999).

[313] *Id.* at *1–2.

[314] *Id.* at *2.

[315] 292 F.3d 471 (5th Cir. 2002).

[316] *Id.* at 474.

that all spare parts must be purchased from American.[317] American provided evidence on the motion for summary judgment that at the time TAMSA entered into the lease agreement, TAMSA knew that it was no longer going to purchase the equipment from American and that eventually TAMSA purchased equipment from another company, not American.[318] In addition, American provided evidence that TAMSA undertook renovation of its existing equipment through contractors other than American and that TAMSA "manufactured and/or purchased from parties other than American spare or replacement parts."[319] The Fifth Circuit held that "considering the deceptive and unethical undertones of TAMSA's alleged behavior during the 1997 lease period," the LUTPA counterclaim was not properly characterized as a mere breach of contract claim and the court affirmed the district court's denial of summary judgment.[320]

The Court finds that the instant case is analogous to *Tubos de Acero de Mexico, S.A.* in that the instant case also cannot be properly characterized as a mere breach of contract claim. In this case, Andretti alleges that "Chouest falsely assured [Andretti] its fees would be fully paid through the State appropriations or through his personal investment, when he actually intended to only fully pay those contractors who made improvements to his race track or who had ongoing relationships with Chouest or who had the ability to place a lien on NOLA Motorsports Park. Chouest provided false assurances to [Andretti] throughout its performance until they were ultimately informed they would not be paid."[321] Andretti contends that Chouest and NOLA Motor were not signatories to the

---

[317] *Id.* at 476.

[318] *Id.*

[319] *Id.*

[320] *Id.* at 482.

[321] Rec. Doc. 1 at p. 12.

Racing Services Agreement and the allegations forming the basis of the LUTPA claim are not limited to the contractual provisions of the Agreement.[322] Andretti asserts that Chouest personally led Andretti to believe that it would be fully compensated from either the $4.5 million appropriated to NMHC and from Chouest's personal investment.[323] According to Andretti, Andretti relied upon those representations in executing the Racing Services Agreement and it only learned afterwards that NMHC did not have the funds to pay Andretti and that Chouest had no intention of personally covering the amounts owed to Andretti.[324] Additionally, Andretti alleges that NMHC was formed by Chouest "solely to capitalize on the race and to accept the state grant for his benefit, while avoiding any financial liability for the Racing Event and sheltering other Chouest-related entities and Chouest, individually, from financial liability therefor."[325]

This case is also factually analogous to *Industrias Magromer Cueros y Pieles S.A. v. Louisiana Bayou Furs, Inc.*, a Fifth Circuit case in which the court found that there was sufficient evidence of a LUTPA violation to withstand a motion for judgment as a matter of law.[326] In *Louisiana Bayou Furs*, the plaintiff and defendant Bayou Furs had entered into a contract for the sale of unprocessed nutria skins.[327] The plaintiff alleged that during the negotiations, it expressed concerns about entering into an agreement with Bayous Furs, which was a newly formed

---

[322] Rec. Doc. 30 at p. 13.

[323] *Id.* at p. 14.

[324] *Id.*

[325] Rec. Doc. 1 at p. 16.

[326] 293 F.3d 912, 922 (5th Cir. 2002).

[327] *Id.* at 915.

56

company.[328] Defendant Berry represented that there was no need for concern because another company, Louisiana Land & Exploration Company, "stood behind Bayou Furs's agreement."[329] At trial, the jury found that both defendants had violated LUTPA and that the plaintiff had detrimentally relied upon the representations made by the defendants.[330] On appeal, the Fifth Circuit addressed Bayou Furs's argument that there is insufficient evidence to support a finding that Bayou Furs and Berry engaged in the type of "egregious" conduct that forms the basis of a LUTPA violation.[331] The Fifth Circuit upheld the district court's denial of Bayou's motion for judgment as a matter of law, holding that "[t]he jury could have found that [defendant] Berry's representations, on behalf of [defendant] Bayou Furs, that the contract was backed by [another company], and the refusal of Bayou Furs to perform under the contract due to changed market conditions, [was] unethical."[332]

LUTPA provides a cause of action to "[a]ny person who suffers an ascertainable loss of money or movable property . . . as the result of the use or employment by another person of an unfair or deceptive method, act or practice . . . ."[333] Andretti alleges that Chouest represented that it would be paid all the sums it was owed under the Agreement from the state funds and from Chouest's personal investment and that Chouest formed NMHC to avoid financial liability for the Event.[334] Taking all well-pleaded facts as true, as the Court must on a motion to dismiss, the Court finds that

---

[328] *Id.* at 916.

[329] *Id.*

[330] *Id.* at 917.

[331] *Id.* at 921.

[332] *Id.*

[333] La. Rev. Stat. § 51:1409.

[334] Rec. Doc. 1 at p. 16.

Andretti has stated sufficient facts to state a claim under LUTPA against Chouest. Therefore, the Court denies the motion to dismiss Andretti's LUTPA claim against Chouest. However, Andretti has not alleged any facts regarding a LUTPA violation committed by NOLA Motor. All of the LUTPA allegations concern Chouest's representations that Andretti would be fully compensated from Chouest's personal investments. Accordingly, the Court finds that Andretti has failed to state a LUTPA claim against NOLA Motor and therefore grants the motion to dismiss Andretti's LUTPA claim against NOLA Motor.

### E.      *Treble Damages Claim under LUTPA*

NOLA Motor and Chouest also move to dismiss Andretti's claim for treble damages under LUTPA.[335] In opposition, Andretti asserts that a challenge to Andretti's entitlement to treble damages is premature.[336] According to Andretti, on July 1, 2015, which it asserts was the same day that Andretti filed its complaint,[337] Andretti provided notice to the Louisiana Attorney General of its LUTPA claim against Defendants.[338] Andretti asserts that "[w]hether the Chouest Defendants have continued to engage in unfair trade practices since that date, which [Andretti] believes is the case . . . will be further developed during discovery and is not appropriate for a 12(b)(6) motion."[339]

Under LUTPA, "[i]f the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times

---

[335]  Rec. Doc. 23-1 at p. 19.

[336]  Rec. Doc. 30 at p. 17.

[337]  In fact, Andretti filed its complaint on June 16, 2015. Rec. Doc. 1.

[338]  *Id.*

[339]  *Id.*

the actual damages sustained."[340] Although Andretti asserts that it provided notice of its LUTPA

claim to the attorney general, Andretti does not allege anywhere in its complaint or in any amended

complaint that the attorney general has put the defendants on notice of a LUTPA violation, as

required by the statute in order to be entitled to treble damages. Accordingly, the Court finds that

Andretti has failed to state a claim for treble damages. Therefore, the Court grants the motion to

dismiss the claim for treble damages under LUTPA.

## F.   *Unjust Enrichment Claim*

Andretti alleges that NMHC, NOLA Motor and Chouest were enriched through Andretti's

provision of services under the Racing Services Agreement and that the track itself benefitted from

the "advertisement, global recognition and awareness" that resulted from the Andretti's "successful

management of the Race."[341] NOLA Motor and Chouest move to dismiss Andretti's claim for unjust

enrichment on the grounds that: (1) Andretti has other claims available, and therefore may not assert

an unjust enrichment claim and (2) Andretti cannot allege the essential element of the claim that

NOLA Motor or Chouest were "enriched without cause."[342] In opposition, Andretti asserts that the

unjust enrichment claim is properly pled in the alternative under Federal Rule of Civil Procedure

8 "as this Court may find that no privity of contract exists between [Andretti], [NOLA Motor], and

Chouest under the Racing Services Agreement at issue or because the contract may be declared void

due to fraud or error in the inducement."[343] Andretti does not address NOLA Motor and Chouest's

argument that it cannot show that NOLA Motor or Chouest were enriched without cause.

---

[340] La. Rev. Stat. § 51:1409(A).

[341] Rec. Doc. 1 at p. 16.

[342] Rec. Doc. 23-1 at p. 21.

[343] Rec. Doc. 30 at p. 21.

Louisiana Civil Code Article 2298 provides that

A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

The requisite elements of a claim for unjust enrichment are: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) an absence of justification or cause for the enrichment and impoverishment; and (5) no other remedy at law.[344]

The existence of another remedy at law will preclude an unjust enrichment claim. In *Walters v. MedSouth Record Management, LLC*, the Louisiana Supreme Court held that a plaintiff was precluded from seeking to recover under unjust enrichment because in his original petition he alleged that he had suffered harm as a "direct result of the negligent and tortious conduct" of the defendant.[345] The court found that it was of no consequence that the plaintiff's tort claims had prescribed and held that "[b]ecause the law provided plaintiff with another remedy," the plaintiff had failed to state a cause of action for unjust enrichment.[346]

NOLA Motor and Chouest argue that because Andretti has a breach of contract claim against NMHC, Andretti has another remedy and therefore may not assert an unjust enrichment claim.[347] In support, NOLA Motor and Chouest cite a Louisiana Fourth Circuit Court of Appeal case, *II Fire Records, L.L.C v. Clouden*.[348] In that case, the plaintiff, II Fire, entered into an exclusive contract

---

[344] *Baker v. Maclay Props. Co.*, 94-1529, p. 18 (La. 1/17/95); 648 So.2d 888.

[345] 2010-0352, p. 2 (La. 6/4/10); 38 So. 3d 241.

[346] *Id.*

[347] Rec. Doc. 23-1 at pp. 20–21.

[348] 2006-0763 (La. App. 4 Cir 1/31/07); 951 So. 2d 1272.

60

with the defendant, Clouden, who subsequently signed another contract with Forefront and Inner City, in violation of his contract with II Fire.[349] The trial court found that II Fire was entitled to recover from Forefront and Inner City on the basis of unjust enrichment.[350] On appeal, the defendants argued that the trial court had erred in allowing the unjust enrichment claim and the Fourth Circuit Court of Appeal agreed.[351] The court held that the fifth requirement for proving unjust enrichment, whether there was no other remedy at law available to plaintiff, had not been met.[352] The court held that "II Fire's remedy was against Mr. Clouden. It is clear that Mr. Clouden was the party who was contractually obligated to II Fire. Had he complied with the II Fire Contract, Forefront and Inner City would not even be involved in the lawsuit."[353]

In support of Andretti's unjust enrichment claim, Andretti alleges that it has not been paid in full for its services under the Racing Service Agreement and that NOLA Motor and Chouest were unjustly enriched through Andretti's provision of services under the Agreement.[354] Andretti has brought a breach of contract claim against all Defendants. As discussed *supra*, Andretti has failed to state a claim for breach of contract against NOLA Motor and Chouest. However, Andretti has also alleged a breach of contract claim against NMHC.[355] Therefore, this case is analogous to *II Fire Records, L.L.C.* Andretti may recover what it is allegedly owed under the Racing Services

---

[349] *Id.* at p. 1.

[350] *Id.* at p. 13.

[351] *Id.* at pp. 13, 15.

[352] *Id.* at p. 15.

[353] *Id.*

[354] Rec. Doc. 1 at pp. 16–17.

[355] *Id.* at pp. 13–15.

Agreement through its breach of contract claim against NMHC. Like in *II Fire*, here, if Andretti's allegations are true, had NMHC complied with the Racing Services Agreement, NOLA Motor and Chouest would not be involved in this lawsuit.

NOLA Motor and Chouest also cite a case from another section of the Eastern District of Louisiana, *Threadgill v. Orleans Parish School Board*.[356] In *Threadgill*, defendants Orleans Parish School Board ("OPSB") and Mitchell Crusto ("Crusto") entered into a contract in which Crusto was to provide damage assessments for hail damage.[357] Crusto subsequently entered into a contract with the plaintiffs under which the plaintiffs were to prepare estimates for damage to and repair of OPSB properties in exchange for the right to be assigned some work by Crusto in the future.[358] OPSB later learned that it would have to comply with Louisiana's public bid law in awarding the majority of the repair work.[359] Crusto subsequently terminated its contracts with the plaintiffs who demanded return of the damage and repair estimates they had performed, but Crusto refused.[360] The plaintiffs sued both Crusto and OPSB, asserting claims under federal copyright law, LUTPA, and state tort and contract law.[361] The plaintiffs and Crusto entered into an arbitration and the Court entered a judgment confirming the arbitration award.[362] After the stay that had been put in place during the pendency of the arbitration was lifted, the plaintiffs filed an amended complaint in which they

---

[356] No. 02-1122, 2013 WL 5560906 (E.D. La. Oct. 7, 2013) (Vance, J.).

[357] *Id.* at *1.

[358] *Id.*

[359] *Id.*

[360] *Id.*

[361] *Id.* at *2.

[362] *Id.*

asserted a claim of unjust enrichment against OPSB.[363] The court granted OPSB's motion for summary judgment on the unjust enrichment claim, holding that "[t]he inquiry is whether the plaintiff had another potential remedy available; against whom that remedy existed is immaterial."[364] The court found that the plaintiffs' remedy was against Crusto and that OPSB was never obligated to the plaintiffs in any way.[365]

In this case, Andretti argues that NOLA Motor and Chouest are liable to Andretti for payment and lost profits under the single business enterprise and alter ego doctrines.[366] As in *Threadgill*, however, here, Andretti asserts a claim for breach of contract against NMHC and therefore has another remedy at law.

In opposition, Andretti cites several cases from the Eastern District of Louisiana and the Middle District of Louisiana in which the courts held that an unjust enrichment claim could be pled alongside other claims because Federal Rule of Civil Procedure 8 allows for alternative pleading.[367] However, in *Ferrara Fire Apparatus, Inc. v. JLG Industries, Inc.*, the Fifth Circuit held that the availability of a claim for breach of contract precludes a claim of unjust enrichment.[368] The court found that "because [the plaintiff] could have brought a claim for breach of contract for any damages it incurred during the time the contract was still in effect, [the plaintiff] [could not] maintain a cause

---

[363]  *Id.* at *2–3.

[364]  *Id.* at *6.

[365]  *Id.* at *7.

[366]  Rec. Doc. 1 at p. 15.

[367]  Rec. Doc. 30 at pp. 21–22 (citing *Prop. One, Inc. v. USAgencies, L.L.C.*, 830 F. Supp. 2d 170 (M.D. La. 2011); *McCullum v. McAlister's Corp. of Miss.*, No. 08-5050, 2010 WL 1489907 (E.D. La. Apr. 13, 2010) (Lemmon, J.); *ORX Res., Inc. v. Autra*, No. 09-4451, 2009 WL 3447256 (E.D. La. Oct. 20, 2009) (Africk, J.); *Mayer v. Lamarque Ford, Inc.*, No. 00-1325, 2001 WL 175232 (E.D. La. Feb. 16, 2001) (Clement, J.)).

[368]  581 F. App'x 440, 444 (5th Cir. 2014).

of action for unjust enrichment during that time."[369] The Fifth Circuit found that "[t]he important question is whether another remedy is available, not whether the party seeking a remedy will be successful."[370] Furthermore, as discussed above, the Louisiana Supreme Court and Louisiana Circuit Courts of Appeal have held that the existence of another remedy at law will preclude an unjust enrichment claim, even if the other claim is prescribed.

In this case, Andretti has pleaded a breach of contract claim against NMHC. Although Andretti asserts that it pleads unjust enrichment in the alternative in the event that the "contract may be declared void due to fraud or error in the inducement,"[371] and in cases in which the contract is an absolute nullity a plaintiff may have a remedy in unjust enrichment,[372] there has been no assertion made by any party that the contract is a nullity. Since Andretti has pled a breach of contract claim against NMHC, it has another remedy at law and as such is precluded from seeking recovery against NOLA Motor and Chouest on a claim of unjust enrichment.

Andretti also alleges, however, that NOLA Motor and Chouest allocated approximately $3.4 million of state funds to Chouest and NOLA Motor's NOLA Motorsports Park "measurably in excess of the amounts disclosed to [Andretti]" and that this use of funds "deprived NMHC of needed capital to fulfill its financial obligations to various vendors and contractors . . . including [Andretti]."[373] Accordingly, it appears possible that Andretti may be able to state a claim for unjust enrichment on these grounds. The Court is unable to determine from the pleadings, however,

---

[369] *Id.*

[370] *Id.* at 443–444.

[371] Rec. Doc. 30 at p. 21.

[372] *See Baker v. Maclay Props.*, 94-1529 (La. 1/17/95); 648 So. 2d 888.

[373] Rec. Doc. 1 at p. 6.

whether there exists "an absence of justification or cause for the enrichment and impoverishment."

Accordingly, the Court finds that Andretti has failed to state a claim for unjust enrichment. The

Court grants NOLA Motor And Chouest's motion for a more definite statement pursuant to Federal

Rule of Civil Procedure 12(e) and orders Andretti to amend its complaint to address the last two

elements of an unjust enrichment claim, whether there was an absence of justification or cause for

the enrichment and impoverishment and whether there is no other remedy at law, by December 18,

2015.

## G.    *Fraud Claim*

NOLA Motor and Chouest also move to dismiss Andretti's fraud claim on the grounds that

Andretti does not plead the two essential elements of duty and proximate cause.[374] In the alternative,

they seek a more definite statement of Andretti's fraud claim.[375] In opposition, Andretti asserts that

"a duty was created at the time Chouest represented . . . that the payments due under the Racing

Services Agreement would be met by allocation of funds by the State of Louisiana and that he,

personally, would ensure the Event's viability . . . ."[376] Andretti also contends that its loss was

"directly caused by Chouest's misallocation of funding for his benefit and to [Andretti's]

detriment."[377]

"The elements of a Louisiana delictual fraud or intentional misrepresentation cause of action

are: (a) misrepresentation of a material fact, (b) made with the intent to deceive, and (c) causing

---

[374] Rec. Doc. 23-1 at p. 22.

[375] *Id.* at p. 24.

[376] Rec. Doc. 30 at p. 22.

[377] *Id.*

65

justifiable reliance with resultant injury."[378] In Louisiana "[a]lthough a party may keep absolute

silence and violate no rule of law or equity, . . . if he volunteers to speak and to convey information

which may influence the conduct of the other party, he is bound to [disclose] the whole truth."[379]

### 1.     Duty

Citing *Becnel v. Grodner*,[380] a Louisiana Fourth Circuit Court of Appeal case, NOLA Motor

and Chouest first contend that Andretti must allege that the defendants had a duty to accurately

disclose the information which Andretti alleges was misrepresented.[381] NOLA Motor and Chouest

contend that "Andretti pleads no duty that Mr. Chouest had to guarantee the Racing Services

Agreement."[382] At issue in *Becnel*, however, was a failure to disclose, not an affirmative

misrepresentation, which is alleged in this case.[383] The court in *Becnel* stated that "[u]nder Louisiana

law, to state a cause of action in fraud from silence or suppression of the truth, there must be a duty

to speak or disclose information."[384] Finding that the defendants did not owe a duty of any kind to

disclose the information, the court upheld the trial court's dismissal of the claim.[385]

However, as noted above, if an individual "volunteers to speak and to convey information

---

[378]  *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 627 (5th Cir. 1999).

[379]  *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412 (5th Cir. 2008) (quoting *Am. Guar. Co. v. Sunset Realty & Planting Co., Inc.*, 23 So. 2d 409, 455–56 (La. 1944)).

[380]  2007-1041 (La. App. 4 Cir. 4/2/08); 982 So. 2d 891, 894–95.

[381]  Rec. Doc. 23-1 at pp. 22–23.

[382]  *Id.* at p. 23.

[383]  982 So. 2d at 894–95.

[384]  *Id.* at 894.

[385]  *Id.* at 895–896.

which may influence the conduct of the other party, he is bound to [disclose] the whole truth."[386]

Accordingly, the duty to disclose the truth arises when an individual volunteers to speak and convey information which may influence another party's conduct. In this case, Andretti alleges that Chouest verbally represented to Andretti that he "personally stood behind the Event and would insure that its obligations were fully funded for the first year of the Event."[387] Andretti alleges that "[i]n reasonable reliance on the misrepresentations and/or omissions by NMHC, Chouest, and [NOLA Motor] [(who Andretti claims together constitute a single business enterprise)], [Andretti] entered into the Racing Services Agreement and, as a result, suffered harm."[388] In order to state a claim for fraud, Andretti must show that, in making these statements, NOLA Motor and Chouest "(a) [made a] misrepresentation of a material fact, (b) made [the representation] with the intent to deceive, and (c) caus[ed] justifiable reliance with resultant injury."[389] Contrary to NOLA Motor and Chouest's assertion, Andretti need not show that NOLA Motor and Chouest had an independent duty outside of their representations to guarantee the Racing Services Agreement in order to state a claim for fraud. Therefore, the Court finds that a duty to "[disclose] the whole truth"[390] arose at the time that any statements were allegedly made.

### 2.   Proximate Cause

In order to state a claim for fraud, a plaintiff must show that the alleged misrepresentation

---

[386] *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412 (5th Cir. 2008) (quoting *Am. Guar. Co. v. Sunset Realty & Planting Co., Inc.*, 23 So. 2d 409, 455–56 (La. 1944)).

[387] Rec. Doc. 1 at p. 7.

[388] *Id.* at p. 18.

[389] *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 627 (5th Cir. 1999).

[390] *Kadlec Med. Ctr.*, 527 F.3d at 419 (quoting *Am. Guar. Co.*, 23 So. 2d at 455–56).

"caus[ed] justifiable reliance with resultant injury."[391] NOLA Motor and Chouest contend that Andretti's alleged loss was proximately caused by NMHC's alleged failure to pay Andretti under the Racing Services Agreement, and was not caused by Chouest in any way.[392] Andretti asserts, on the other hand, that it was induced to enter the Racing Services Agreement directly by Defendants' misrepresentations and its loss was "directly caused by Chouest's misallocation of funding for his benefit and to [Andretti's] detriment, and his failure to abide by his representation that he, personally, would ensure the viability of the first year of the race."[393]

In support of their motion to dismiss the fraud claim, NOLA Motor and Chouest again cite *Becnel v. Grodner*.[394] In *Becnel*, an attorney who represented a plaintiff that entered into a settlement sued his co-counsel and the opposing counsel after the settlement, claiming that he was not informed of the settlement and therefore did not receive his share of the attorney's fees.[395] The attorney, Daniel Becnel, claimed that opposing counsel had committed fraud when they refused to disclose to him the amount of the settlement and instead advised him to contact his co-counsel for that information.[396] The court dismissed the fraud claim, holding that the opposing counsel had no duty to disclose the settlement amount.[397] The court noted that even if opposing counsel had owed the attorney a duty, opposing counsel's refusal to disclose the settlement amount was not the legal cause

---

[391] *Guidry*, 188 F.3d at 627.

[392] Rec. Doc. 23-1 at p. 23.

[393] Rec. Doc. 30 at p. 22.

[394] *Id.*

[395] *Becnel v. Grodner*, 2007-1041, pp. 1–2 (La. App. 4 Cir. 4/2/08); 982 So. 2d 891.

[396] *Id.*

[397] *Id.* at p. 4.

of the attorney's injuries, but rather the injuries were instead caused by his co-counsel's alleged breach of their fee-sharing agreement.[398]

The Court finds this case inapposite. In *Becnel*, the alleged fraud occurred after the breach of the fee-sharing agreement. Here, Andretti alleges that the fraud committed by Defendants occurred prior to the parties entering into the Racing Services Agreement and that Andretti relied upon Chouest's representations that he would ensure that there were adequate funds available to pay Andretti when it entered into the Agreement with NMHC.[399] Andretti alleges that it was harmed as a result of Chouest's alleged fraudulent statements that he would pay Andretti from his own private investment and from his subsequent failure to pay.[400] Accordingly, the Court finds that Andretti has sufficiently pled that Defendants' alleged misrepresentations were the proximate cause of Andretti's alleged injuries.

### 3.    Motion for More Definite Statement

In the alternative to their motion to dismiss, NOLA Motor and Chouest assert that Andretti should be required to supplement its allegations because it has failed to plead the specifics of the misrepresentation alleged.[401] In opposition, Andretti contends that it has adequately alleged the time, place, and identity of the speakers.[402]

Pursuant to Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent,

---

[398]  *Id.* at p. 5.

[399]  Rec. Doc. 1 at pp. 7–8.

[400]  Rec. Doc. 30 at p. 22.

[401]  Rec. Doc. 23-1 at p. 24.

[402]  Rec. Doc. 30 at p. 23.

knowledge, and other conditions of a person's mind may be alleged generally." "What constitutes 'particularity' will necessarily differ with the facts of each case . . . ."[403] The Fifth Circuit has held, however, that "[a]t a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."[404] In cases involving an omission of facts, Rule 9(b) "typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading."[405] In addition, "[a]lthough scienter may be 'averred generally,' . . . [t]o plead scienter adequately, a plaintiff must set forth specific facts that support an inference of fraud."[406]

In Andretti's complaint, Andretti asserts that Chouest, NOLA Motor, and NMHC made false and misleading statements to Andretti, including:

> a. [i]ntentionally misrepresenting to [Andretti] that NMHC was adequately capitalized such that [Andretti] would receive full payment regardless of the event's profitability; b. [i]ntentionally misrepresenting that Chouest himself stood behind the venture and intended to invest his own money, if necessary, to ensure the venture would not fail financially and remain viable for the future for NMHC to fulfill the terms of the Racing Services Agreement and that [Andretti] would be fully compensated under the Racing Services Agreement; and c. [f]ailing to inform [Andretti] that [NOLA Motor] would operate as an instrumentality of Chouest and [NOLA Motor] for the benefit of Chouest and [NOLA Motor] and the detriment of [Andretti].[407]

NOLA Motor and Chouest contend that Andretti is required to plead the time, place, and specific

---

[403] *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992).

[404] *Tel-Phonic Servs., Inc. v. TBS Int'l*, 975 F.2d 1134, 1139 (5th Cir. 1992) (internal quotations and citation omitted).

[405] *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004) (internal quotations and citation omitted).

[406] *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 106, 1068 (5th Cir. 1994).

[407] *Id.*

content of the alleged misrepresentation each time it took place, it must identify the person(s) to whom the misrepresentation was made, and plead "[m]alice, intent, knowledge and other conditions of [the] person's mind" who made the misrepresentation.[408] In opposition, Andretti cites to several paragraphs of its complaint and contends that it has identified the timing of the misrepresentations as the "days prior to July 6, 2014," and identified the people who made the misrepresentations as Michael Sherman, Laney Chouest, and Kristen Engeron.[409]

Andretti appears to assert that it has stated the time the misrepresentations took place because it stated in one paragraph that representations were made "[i]n the days prior to July 6, 2014." However, Andretti asserted that those dates were when Andretti was advised that NMHC was being formed to execute the Agreement, not the dates that anyone represented that Chouest would personally ensure the Event's viability or that Andretti would be paid from the state funds. The paragraphs pertaining to allegations that Andretti was informed that it would be paid by funds from the State or by Chouest's personal investment do not contain any dates.[410] Andretti does not specifically allege when or where these representations were made, or specifically to whom the representations were made.

In its opposition, Andretti also cites to paragraph 23 of its complaint in which it alleges that "[i]n the days prior to July 6, 2014," Andretti representatives were advised by Michael Sherman, Laney Chouest and Kristen Engeron that NMHC was being formed specifically to execute the Agreement with Andretti because the State of Louisiana required that NOLA Motorsports Park and

---

[408]  Rec. Doc. 23-1 at p. 24.

[409]  Rec. Doc. 30 at p. 24.

[410]  Rec. Doc. 1 at pp. 7–10.

Chouest form a non-profit to accept the NGO grant money.[411] Andretti contends in its opposition to the motion to dismiss that this representation was inaccurate.[412] However, in Andretti's complaint, Andretti does not allege that this statement was false, Andretti does not allege the conditions of the speaker's mind at the time the representation was made, nor is the alleged statement included in Andretti's list of Chouest, NOLA Motor, and NMHC's "false and misleading statements" in the complaint.[413] Lastly, Andretti does not allege the place of the alleged fraudulent statement. Therefore, it is unclear to the Court whether Andretti asserts that this statement also constitutes a fraudulent misrepresentation.

Accordingly, the Court finds that Andretti has failed to plead its fraud claims with the particularity required by Federal Rule of Civil Procedure 9(b). Therefore, the Court grants NOLA Motor and Chouest's motion for a more definite statement pursuant to Federal Rules of Civil Procedure 9(b) and 12(e) and it hereby orders Andretti to amend its complaint consistent with this Order by December 18, 2015.

## IV. Conclusion

For the foregoing reasons, the Court concludes that Andretti has failed to state a claim against NOLA Motor and Chouest for breach of contract. The Court finds that Andretti has stated a claim against Chouest under LUTPA but has failed to state a claim against NOLA Motor under LUTPA. Furthermore, the Court finds that Andretti has failed to state a claim for treble damages under LUTPA. Finally, the Court finds that Andretti has failed to state its fraud and unjust enrichment claims against NOLA Motor and Chouest with sufficient particularity. Accordingly;

---

[411] *Id.* at p. 7.

[412] Rec. Doc. 30 at p. 14.

[413] Rec. Doc. 1 at pp. 17–18.

**IT IS HEREBY ORDERED** that NOLA Motor and Chouest's "Rule 12(b)(6) Motion to Dismiss, and Alternative 12(e) Motion for More Definite Statement"[414] is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that the motion is **GRANTED** to the extent that it moves for dismissal of: (1) Andretti's claims against NOLA Motor and Chouest for breach of contract; (2) Andretti's claims against NOLA Motor and Chouest for treble damages under LUTPA; and (3) Andretti's claim against NOLA Motor under LUTPA.

**IT IS FURTHER ORDERED** that the motion is **GRANTED** to the extent that it moves for a more definite statement regarding Andretti's fraud and unjust enrichment claims against NOLA Motor and Chouest. Andretti is ordered to amend its complaint by December 18, 2015.

**IT IS FURTHER ORDERED** that the motion is **DENIED** to the extent that it moves to dismiss: (1) Andretti's LUTPA claim against Chouest; (2) Andretti's fraud claims against NOLA Motor and Chouest; and (3) Andretti's unjust enrichment claims against NOLA Motor and Chouest.

**NEW ORLEANS, LOUISIANA,** this 24th day of November, 2015.

_____
**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[414] Rec. Doc. 23.