## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**NUSSLI US, LLC**                                    **CIVIL ACTION**

**VERSUS**                                           **NO. 15-2167**
                                                     **c/w NO. 15-2372**

**NOLA MOTORSPORTS HOST COMMITTEE,**                 **SECTION "G"(3)**
**INC., et al.**

### ORDER

In this litigation, Plaintiff NUSSLI (US), LLC ("NUSSLI") alleges that it is owed money under a contract it entered into with NOLA Motorsports Host Committee, Inc. ("NMHC"), NOLA Motor Club, LLC ("NOLA Motor"), and Motor Realty, L.L.C. ("Motor Realty").[1] NUSSLI also alleges that Defendants NOLA Motor, Motor Realty, Laney C Racing, L.L.C. ("Laney C Racing"), Laney C, L.L.C. ("Laney C"), and Laney Chouest ("Chouest") are liable to it under Louisiana's single business enterprise, alter ego, unjust enrichment, conversion, and fraud doctrines.[2] Pending before the Court is NOLA Motor, Motor Realty, Laney C. Racing, Laney C, and Chouest's (collectively "Chouest Defendants") "Rule 12(b)(6) Motion to Dismiss, and Alternative Rule 12(e) Motion for More Definite Statement."[3] Having considered the motion, the memoranda in support, the memorandum in opposition, the record, and the applicable law, the Court will grant the motion to dismiss.

### I. Background

#### A.    *Factual Background*

In its first amended complaint, NUSSLI alleges that it entered into a Lease Agreement on

---

[1] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 1.

[2] *Id.* at pp. 1–2.

[3] Rec. Doc. 65.

or about November 4, 2014 with NMHC, NOLA Motor, and Motor Realty (collectively "Lessee Parties").[4] NUSSLI alleges that, pursuant to the Lease Agreement, the Lessee Parties agreed to lease grandstands from NUSSLI and NUSSLI agreed to supply, install, and thereafter remove the grandstands that were to be used in connection with the 2015 Indy Grand Prix of Louisiana (the "Event").[5] NUSSLI alleges that the Lessee Parties initially agreed to pay NUSSLI $871,763.97, but later requested that NUSSLI make additions and deductions to its services, bringing the total contract price for 2015 to $652,008.54.[6] NUSSLI also alleges that, pursuant to the Lease Agreement, the Lessee Parties also agreed to pay NUSSLI $884,840.43 for an Event to take place in 2016 and $898,113.04 for an Event to take place in 2017.[7] NUSSLI alleges that, to date, it has only received $293,404.04 for the 2015 Event, which, it asserts, is less than the $374,000 in funds that were designated by the State of Louisiana for the "Grandstand Build."[8]

NUSSLI further alleges that the Chouest Defendants committed fraud by misrepresenting to Andretti Sports Marketing Louisiana, LLC ("Andretti") and, by extension, NUSSLI, that the State of Louisiana's $4.5 million appropriation, along with Laney Chouest's investment, would cover expenses incurred by the Indy Grand Prix of Louisiana, including NUSSLI's fees.[9]

---

[4] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 24.

[5] *Id.*

[6] *Id.* at p. 25.

[7] *Id.*

[8] *Id.*

[9] *Id.* at p. 26.

**B.     Procedural Background**

NUSSLI filed a complaint on June 29, 2015.[10] On December 22, 2015, the Chouest Defendants filed the instant motion.[11] On January 8, 2016, NUSSLI filed an amended complaint, alleging claims of breach of contract, unfair and deceptive trade practices pursuant to the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), Louisiana Revised Statute § 51:1401 *et seq.*, fraud, conversion, unjust enrichment, failure to pay an open account, and claims pursuant to the Louisiana Private Works Act ("PWA"), Louisiana Revised Statute § 9:4801 *et seq.*[12] On January 12, 2016, NUSSLI filed its opposition.[13] With leave of Court, the Chouest Defendants filed a reply on February 1, 2016.[14] On January 27, 2016, this case was consolidated with *Andretti Sports Marketing Louisiana v. NOLA Motorsports Host Committee* for discovery purposes only.[15]

On February 2, 2016, NUSSLI filed a motion for leave to file a second amended complaint.[16] On February 23, 2016, the Chouest Defendants and NUSSLI filed a joint stipulation asserting that NUSSLI's second amended complaint only adds one defendant, Andretti Sports Marketing Louisiana, LLC, and the addition does not affect NUSSLI's allegations or claims against the Chouest Defendants for the purposes of their motion to dismiss.[17] Furthermore, the Chouest

---

[10] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 1.

[11] Rec. Doc. 65.

[12] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47.

[13] Rec. Doc. 68.

[14] Rec. Doc. 71.

[15] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 57.

[16] Rec. Doc. 74.

[17] Rec. Doc. 78 at p. 3.

Defendants and NUSSLI stipulate that the pending motion to dismiss is not mooted or otherwise affected by NUSSLI's second amended complaint so that "claims against Movants which the Court may dismiss from the original Complaint and First Amended Complaint, if any, based on the Motion to Dismiss should also be dismissed from the Second Amended Complaint."[18]

## II. Parties' Arguments

### A.    The Chouest Defendants' Arguments in Support of Dismissal

The Chouest Defendants move to dismiss all of NUSSLI's claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6), and, in the alternative, seeks a more definite statement pursuant to Federal Rule of Civil Procedure 12(e).[19]

### 1.      Breach of Contract

First, the Chouest Defendants assert that NUSSLI has no contract with any of the Chouest Defendants and therefore, the breach of contract claims should be dismissed.[20] Second, the Chouest Defendants contend that the single business enterprise theory may not be used to impose liability upon the Chouest Defendants for any breach of contract.[21] Citing Louisiana First Circuit Court of Appeal case *Lee v. Clinical Research Center of Florida, L.C.*, the Chouest Defendants assert that the single business enterprise doctrine applies only to corporations and therefore, the doctrine may not be used to impose liability on Chouest as an individual.[22]

Third, the Chouest Defendants contend that NUSSLI has not pled sufficient facts to support

---

[18] *Id.*

[19] Rec. Doc. 65-1 at p. 1.

[20] *Id.* at p. 5.

[21] *Id.*

[22] *Id.* at pp. 5–6 (citing No. 2004-CA-0428 (La. App. 4 Cir. 11/17/04); 889 So. 2d 317, 323).

an application of the alter ego doctrine.[23] The Chouest Defendants assert that: (1) Andretti has pled only one of the five factors identified by the Louisiana Supreme Court to determine whether to apply the alter ego doctrine;[24] (2) NUSSLI fails to allege that Chouest had any duty to capitalize NMHC at all as he was not a shareholder, member, director or officer of NMHC; and (3) this Court has already held that the alter ego doctrine may not be applied to an individual or entity who has never been a shareholder or officer of the company whose veil it seeks to pierce.[25]

Fourth, the Chouest Defendants contend that NUSSLI has failed to plead sufficient facts supporting a claim of single business enterprise, pleading "precious few" of the 18 factors identified by the Louisiana First Circuit Court of Appeal in *Green v. Champion Insurance Co.*[26]

### 2.     LUTPA

The Chouest Defendants also contend that NUSSLI's LUTPA claims should be dismissed because NUSSLI fails to allege any action that the Chouest Defendants took directly against NUSSLI.[27] They further assert that the claims against the corporate defendants should be dismissed because all of the allegations relate to Chouest personally.[28] They contend that in order to state a LUTPA claim, NUSSLI "must show the alleged conduct 'offends established public policy and is

---

[23] *Id.*

[24] *Id.* at pp. 6–7 (citing *Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164, 1168 (La. 1992)). The Chouest Defendants assert that these factors are : "(1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings." *Id.*

[25] *Id.*

[26] *Id.* at p. 8 (citing 577 So. 2d 249, 257–58 (La. 1991)).

[27] *Id.* at p. 12.

[28] *Id.*

immoral, unethical, oppressive, unscrupulous or substantially injurious.'"[29] According to the Chouest Defendants, NUSSLI's allegation that Chouest promised to guarantee payments to Andretti under its Racing Services Agreement with NMHC and subsequent failure to pay is not egregious conduct because Andretti could have simply chosen not to sign the Racing Services Agreement.[30] Furthermore, the Chouest Defendants contend that such conduct cannot constitute an egregious act specifically against NUSSLI.[31] In addition, the Chouest Defendants assert that this Court in *Andretti Sports Marketing Louisiana v. NOLA Motorsports Host Committee* dismissed the LUTPA claim against NOLA Motor and, for the same reasons, here should dismiss the LUTPA claims against the other corporate movants.[32]

### 3. Treble Damages Under LUTPA

The Chouest Defendants also move to dismiss the claim for treble damages under LUTPA on the grounds that pursuant to Louisiana Revised Statute § 51:1409(A), treble damages are only permitted "[i]f the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the Attorney General."[33] According to the Chouest Defendants, NUSSLI does not and cannot allege that the Louisiana Attorney General provided such notice to any of the defendants or that they continued to use the alleged deceptive method, act, or practice after receiving

---

[29] *Id.* at p. 13 (citing *Cheramie Servs., Inc. v. Shell Deepwater Prod.*, 2009-C-1633 (La. 4/23/10); 35 So. 3d 1053, 1059).

[30] *Id.*

[31] *Id.* (citing *Nursing Enters., Inc. v. Marr*, 30776-CA (La. App. 2 Cir. 1998); 719 So. 2d 524, 528).

[32] *Id.* at p. 14.

[33] *Id.* (citing *Conry v. Ocwen Fin. Corp.*, No. 11-0647, 2012 WL 5384681, at *2 (E.D. La. Nov. 1, 2012) (Brown, J.)).

that notice.[34]

### 4.    Unjust Enrichment

The Chouest Defendants move to dismiss NUSSLI's unjust enrichment claims on the grounds that: (1) NUSSLI has another remedy at law and is therefore precluded from asserting an unjust enrichment claim; and (2) the alleged enrichment resulted from a juridical act.[35] The Chouest Defendants assert that Louisiana Civil Code article 2298 provides:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results form a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.[36]

The Chouest Defendants assert that the Court in *Andretti Sports Marketing Louisiana v. NOLA Motorsports Host Committee* held that the existence of another remedy at law precludes an unjust enrichment claim, even if the remedy is against another party.[37] They contend that although the Court permitted Andretti to amend its complaint based upon its allegation that NOLA Motor and Chouest misspent state funds intended for Andretti, NUSSLI can make no such claim because NUSSLI's Lease Agreement did not provide for any minimum funding from the state.[38] The Chouest Defendants assert that NUSSLI has a remedy for breach of contract against NMHC and therefore the unjust enrichment claims should be dismissed.[39] Citing another section of the Eastern

---

[34] *Id.*

[35] *Id.* at pp. 14–15.

[36] *Id.* at p. 15.

[37] *Id.* (citing Rec. Doc. 40 at pp. 60, 62–64).

[38] *Id.* at p. 15 n.8.

[39] *Id.* at p. 16.

District of Louisiana in *Target Construction, Inc. v. Baker Pile Driving & Site Work, LLC*, the Chouest Defendants assert that even if NMHC has insufficient funds to pay NUSSLI, the unjust enrichment claims should be dismissed because it is the existence of an alternative claim, rather than its success, that determines whether a claim for unjust enrichment is available.[40]

The Chouest Defendants also assert that the unjust enrichment claims should be dismissed because NUSSLI cannot allege that the Chouest Defendants were enriched without cause, as required by Article 2298.[41] They contend that the alleged enrichment came "in the form of some rent paid by [NMHC] pursuant to the rental agreement between those parties; alleged promotion of the facility resulting from the Event itself, which was put on pursuant to those agreements; modifications made to the track pursuant to a contract between [NMHC] and the State; or from use of the grandstands pursuant to [NUSSLI's] Lease."[42] The Chouest Defendants assert that this enrichment "result[ed] from a valid juridical act," and therefore the unjust enrichment claims must be dismissed.[43]

### 5.    Fraud

The Chouest Defendants also move to dismiss NUSSLI's fraud claims on the grounds that NUSSLI does not allege the essential elements of duty and proximate cause and because NUSSLI does not allege that any false statement was made to it.[44] The Chouest Defendants contend that under Louisiana law, the elements of a fraud claim are: "(i) a misrepresentation of a material fact, (ii) made

---

[40] *Id.* (citing No. 12-1820, 2012 WL 5878855, at *5 (E.D. La. Nov. 20, 2012) (Fallon, J.)).

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.* at pp. 16–17.

with the intent to deceive, and (iii) causing justifiable reliance with resultant injury."[45] First, they assert that, like all tort-based claims, a plaintiff must allege that a duty existed on behalf of the defendant toward the plaintiff and that the defendant breached that duty.[46] They contend that Chouest had no duty toward NUSSLI to guarantee Andretti's contract, nor did NUSSLI plead any duty that Chouest had to guarantee the Grandstand Lease, or that Chouest even promised to do so.[47] Second, they assert that the element of proximate cause is also absent in this case.[48] The Chouest Defendants contend that NUSSLI's alleged loss was proximately caused by NMHC's failure to pay NUSSLI under the Lease, a loss that was not caused by Chouest in any way.[49] Finally, the Chouest Defendants assert that NUSSLI has not pled its fraud claims with the specificity required by Federal Rule of Civil Procedure 9(b).[50] They contend that NUSSLI must allege the identity of the person making a fraudulent statement, the time, place and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated.[51] According to the Chouest Defendants, NUSSLI cannot plead its fraud claims with those specific allegations because it had no interaction with any of the Chouest Defendants.[52]

---

[45] *Id.* at p. 17 (quoting *Cargill, Inc. v. Degesch Am., Inc.*, 875 F. Supp. 2d 667, 675 n.22 (E.D. La. 2012) (Vance, C.J.)).

[46] *Id.* (citing *Becnel v. Grodner*, 2007-CA-1041 (La. App. 4 Cir. 4/2/08); 982 So. 2d 891, 894).

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at p. 18.

[51] *Id.* at pp. 18–19  (citing *Dolphin Fleet Holdings, Inc. v. H.I.G. Capital, LLC*, 491 B.R. 747, 761 (W.D. La. Bankr. 2013)).

[52] *Id.* at p. 19.

### 6.      Open Account

The Chouest Defendants move to dismiss NUSSLI's claims pursuant to the Open Account Statute, Louisiana Revised Statute § 9:2781, on the grounds that NUSSLI had no contract or open account with any of the Chouest Defendants.[53]

### 7.      Conversion

The Chouest Defendants also move to dismiss NUSSLI's conversion claims against them on the grounds that NUSSLI has not pled any of the following: "1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel."[54] The Chouest Defendants assert that NUSSLI has not pled any wrongful exercise or assumption of authority over the grandstands by the Chouest Defendants, and the grandstands were given to NMHC pursuant to a Lease, therefore NMHC's possession of them was not wrongful.[55] Furthermore, the Chouest Defendants contend that NMHC did not remove the grandstands from one place to another, nor did they withhold possession from NUSSLI, or alter or destroy the grandstands in any way.[56] More importantly, according to the Chouest Defendants, NUSSLI has not pled that any of the Chouest Defendants possessed the grandstands at all because NMHC was conducting its Event pursuant to the Lease.[57]

---

[53] *Id.*

[54] *Id.* at p. 20 (citing *Jefferson v. Crowell*, 42,177-CA (La. App. 2 Cir. 5/9/07); 956 So. 2d 746, 749).

[55] *Id.*

[56] *Id.*

[57] *Id.*

8.        **Private Works Act**

The Chouest Defendants also move to dismiss NUSSLI's claims pursuant to the PWA on the grounds that NUSSLI is not a proper party plaintiff and has no right or cause of action pursuant to the PWA.[58] They assert that the PWA was created for construction projects to protect contractors and subcontractors and to give them rights against owners of projects, but the Event was not a construction project within the meaning of the PWA.[59] In addition, they contend that NMHC was not a contractor or a general contractor, nor was NUSSLI a contractor or subcontractor.[60] Furthermore, the Chouest Defendants assert that the grandstands are movable property that were not permanently incorporated into the immovable property.[61]

The Chouest Defendants assert that because the PWA is in derogation of common rights, it must be strictly construed.[62] They contend that this rule of strict construction specifically applies to interpretation of key terms such as "owner" and "contractor."[63] Furthermore, they assert that the PWA, like all statutes that create civil penalties or privileges, "shall not be extended by implication or by considerations of equity."[64]

The Chouest Defendants assert that the purpose of the PWA is to provide rights and remedies

---

[58] *Id.* at p. 21.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.* (citing *Shreveport Armature & Elec. Works, Inc. v. Harwell*, 172 So. 463, 467 (La. App. 2 Cir. 1937)).

[63] *Id.* (citing *Shreveport Armature & Elec. Works, Inc.*, 172 So. at 467–68)).

[64] *Id.* at p. 22 (citing *Fruge v. Muffoletto*, 137 So. 2d 336, 582–83 (La. 1962)).

11

for "improvements of immovables."[65] NMHC contends that pursuant to Louisiana Revised Statute § 9:4808(A), work is defined as "a single continuous project for the improvement, construction, erection, reconstruction, modification, repair, demolition or other physical change of an immovable or its component parts."[66]  NMHC contends that there is no "work" at issue in this case because the renting of the grandstands was not a continuous project for the improvement of the immovable or its component parts and was not even a part of any such project.[67] The Chouest Defendants aver that the rental of the grandstands was not a physical change to the immovable or its component parts.[68]

The Chouest Defendants also assert that NMHC is not a contractor and NUSSLI is not a subcontractor.[69] They contend that contractor is defined in § 4807(A) as "one who contracts with an owner to perform all or a part of a work" and § 4807(C) defines subcontractor as "one who, by contract made directly with a contractor, or by a contract that is one of a series of contracts emanating from a contractor, is bound to perform all or part of a work contracted for by the contractor."[70] NMHC asserts that it simply had a lease for the facility to use the racetrack, but NMHC was not performing any construction on the land and did not cause any physical change to the land.[71] The Chouest Defendants, citing a Louisiana Second Circuit Court of Appeal case, *Shreveport Armature & Electric Works, Inc.*, contend that "[a] lessor of land who contracts for work

---

[65] *Id.* (citing §§ 4801, 4802)).

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.* at p. 23.

[70] *Id.* at p. 22.

[71] *Id.* at p. 23.

will not be construed to be a contractor in order for a would-be claimant under the PWA to reach the landowner and to gain a privilege against the land itself."[72]

The Chouest Defendants assert that while the PWA addresses movables in a limited way, that provision is inapplicable to the temporary renting of grandstands for the race event.[73] They contend that § 4801(3) addresses "[s]ellers, for the price of movables sold to the owner that become component parts of the immovable, or are consumed at the site of the immovable, or are consumed in the machinery or equipment used at the site of the immovable."[74] The Chouest Defendants assert that NUSSLI was not a seller, only a renter of the grandstands, and the grandstands were not made to be a component part of the land or consumed.[75] They contend that Section 4801(4) applies to "[l]essors, for the rent of movables used at the site of the immovable and leased to the owner by written contract" but that this section anticipates movables such as equipment used during a construction project.[76] Additionally, the Chouest Defendants contend that for a lessor of movables to gain rights under the PWA, the lessor must either rent the movable to the owner under § 4801(4) or to a contractor or subcontractor under § 4801(A)(4); however, NUSSLI did not lease the grandstands to the landowner but rather to NMHC, who was not a contractor or subcontractor.[77]

The Chouest Defendants also assert that NUSSLI's claims under the PWA for movables fail because § 4802(G)(1) requires that for any right to arise under § 4801 or § 4802, the lessor of the

---

[72] *Id.* (citing 172 So. at 468–70)).

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.* at p. 24.

movables must deliver a specific notice to the owner and to the contractor not more than 10 days after the movables are first placed at the site of the immovable for use in a work.[78] The Chouest Defendants contend that lack of notice nullifies the claim by the equipment lessor.[79] They aver that NUSSLI provided no such notice within 10 days after the grandstands were first placed at the site and NUSSLI does not allege that it did.[80]

The Chouest Defendants also assert that even where there is "work," and where the project owner is a mere lessor of the immovable property and not the owner of the immovable property, a claimant under the PWA has rights only against whatever right the lessor has to the immovable.[81] Therefore, they contend, at most, the privilege would apply to NMHC's lease rights, not the land itself.[82]

**B.    *NUSSLI's Arguments in Opposition to Dismissal***

      **1.    Breach of Contract and Claim on an Open Account**

            *a.    Motor Realty and NOLA Motor*

First, NUSSLI contends that the Court need not reach the issue of whether the alter ego or single business enterprise doctrines can be applied to the Motor Realty and NOLA Motor because those defendants were parties to the Lease Agreement and are obligated to pay NUSSLI pursuant

---

[78] *Id.*

[79] *Id.* (citing *Hawk Field Servs., LLC v. Mid Am. Underground, LLC*, 47,078-CA (La. App. 2 Cir. 5/16/12); 94 So. 3d 136, 141).

[80] *Id.*

[81] *Id.*

[82] *Id.* (citing *Sinclair v. Justice*, 414 So. 2d 826, 828 (La. App. 4 Cir. 1982)).

to its terms.[83] According to NUSSLI, the Lease Agreement designates the Lessee Parties as "NOLA Motor Club, LLC, Motor Realty, LLC, Andretti Sports Marketing Louisiana, LLC and their directors, officers, employees, agents and representatives . . . ."[84] NUSSLI contends that the only reasonable construction of the terms of the Lease Agreement is that each of the Lessee Parties are liable for the obligations of the Lessee.[85] NUSSLI contends that, for the same reasons, it has adequately pled a claim for breach of an open account and is entitled to interest and attorneys' fees.[86]

### b.    Single Business Enterprise

Second, NUSSLI asserts that it has pled sufficient facts to impose liability on the Chouest Defendants under the single business enterprise doctrine.[87] NUSSLI asserts that in *Andretti Sports Marketing Louisiana v. NOLA Motorsports Host Committee*, the plaintiff, Andretti, had executed an agreement with NMHC in which the parties agreed that NMHC was not an affiliate of NOLA Motor or NOLA Motorsports Park.[88] According to NUSSLI, NUSSLI did not sign any such contract and therefore is not subject to that restriction in its argument that the single business enterprise doctrine applies.[89] Furthermore, NUSSLI asserts that the Court's decision in *Andretti* should not be viewed as controlling in this case as Louisiana courts have observed that although veil piercing may be appropriate for some purposes, it may not be appropriate for others, and such a determination is

---

[83] Rec. Doc. 68 at p. 6.

[84] *Id.* at pp. 6–7 (citing Rec. Doc. 47-2).

[85] *Id.* at p. 7.

[86] *Id.*

[87] *Id.*

[88] *Id.* at pp. 7–8.

[89] *Id.* at p. 8.

based upon the particular circumstances of the case.[90]

NUSSLI asserts that NMHC and the Chouest Defendants should be recognized as a single business enterprise under the eighteen-factor test articulated by the Louisiana First Circuit Court of Appeal in *Green v. Champion Insurance Co.*[91] NUSSLI contends that courts have held that no legal relationship is necessary to extend the alter ego or single business enterprise doctrines to individuals.[92] NUSSLI contends that the single business enterprise applies when "a corporation is so organized and controlled as to make it merely an instrumentality of another corporation."[93] According to NUSSLI, the *Green* factors are:

> (1) corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control; (2) common directors or officers; (3) unified administrative control of corporations whose business functions are similar or supplementary; (4) directors and officers of one corporation act independently in the interest of that corporation; (5) corporation financing another corporation; (6) inadequate capitalization ("thin incorporation"); (7) corporation causing the incorporation of another affiliated corporation; (8) corporation paying the salaries and other expenses or losses of another corporation; (9) receiving no business other than that given to it by its affiliated corporations; (10) corporation using the property of another corporation as its own; (11) noncompliance with corporate formalities; (12) common employees; (13) services rendered by the employees of one corporation on behalf of another corporation; (14) common offices; (15) centralized accounting; (16) undocumented transfers of funds between corporations; (17) unclear allocation of profits and losses between corporations; and (18) excessive fragmentation of a single enterprise into separate corporations.[94]

---

[90] *Id.* (citing *Glazer v. Comm'n on Ethics for Pub. Emps.*, 431 So. 2d 752, 758 (La. 1983)).

[91] *Id.* (citing 577 So. 2d 249, 257–58 (La. 1 Cir. 1991)).

[92] *Id.* at p. 16 (citing *Bona Fide Demolition and Recovery, LLC v. Crosby Constr. Co. of La.*, 690 F. Supp. 2d 435, 445 (E.D. La. 2010) (Vance, C.J.); *Grayson v. R.B. Ammon and Assocs., Inc.*, 99-2597 (La. App. 1 Cir. 11/3/00); 778 So. 2d 1, 14; *Middleton v. Par. of Jefferson ex. rel. De't of Inspection & Code Enf't*, 97-235 (La. App. 5 Cir 1/14/98); 707 So. 2d 454, 457; *Withers v. Timber Prods., Inc.*, 89-0840 (La. App. 3 Cir. 2/6/91); 575 So. 2d 1291).

[93] *Id.* at p. 8 (citing *Cargill, Inc. v. Clark*, No. 14-233-BAJ-SCR, 2015 WL 4715010 (M.D. La. Aug. 7, 2015)).

[94] *Id.* at pp. 8–9 (citing *Green*, 577 So. 2d at 257–58).

NUSSLI asserts that the doctrine applies with equal force to LLCs as to other corporate entities.[95] NUSSLI contends that in *Green*, the court affirmed the trial court's application of the single business enterprise doctrine, observing that the corporations in question were dominated by two individuals, that the directors did not act independently, that the companies had common employees, and that the entities operated out of a single location.[96] NUSSLI contends that, here, at least sixteen of the eighteen *Green* factors have been pled in this case.[97]

### c.      Alter Ego

Third, NUSSLI asserts that it has pled sufficient facts to support the imposition of liability upon the Chouest Defendants under an alter ego theory.[98] NUSSLI claims that this doctrine unquestionably applies to both affiliated corporations and individual members or shareholders of a business association.[99] NUSSLI asserts that whether a corporation has disregarded the corporate formalities in such a way that a corporate veil may be pierced is determined using a five-factor test: (1) commingling of personal and corporate funds; (2) the observance of statutory formalities in the incorporation and operation of the company; (3) undercapitalization; (4) whether a separate bank account has been established for the corporation and whether its financial records are separately maintained; and (5) whether regular meetings of the shareholders and directors have been held.[100]

NUSSLI also cites another test from a Louisiana First Circuit Court of Appeal case,

---

[95] *Id.* (citing *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 389 (5th Cir. 2000)).

[96] *Id.* at p. 9 (citing *Green*, 577 So. 2d at 258).

[97] *Id.* at p. 10.

[98] *Id.* at p. 17.

[99] *Id.*

[100] *Id.* (citing *Riggins v. Dixie Shoring Co., Inc.*, 590 So. 2d 1164 (La. 1991)).

*Kingsman Enterprises, Inc. v. Bakerfield Electric Co.*, which NUSSLI asserts is sometimes used alone and is sometimes used by courts in conjunction with the traditional five-factor test.[101] According to NUSSLI, under the *Kingsman* test, the corporate veil may be pierced if: (1) the corporation is an alter ego and has been used by the shareholder to carry out some sort of fraud; or (2) even in the absence of fraud, the shareholder has failed to conduct business on a "corporate footing" to such an extent that the corporation has become indistinguishable from the shareholder.[102]

NUSSLI contends that a finding that the alter ego doctrine applies in this case is supported by the five-factor test.[103] NUSSLI asserts that NMHC overtly used its funds to pay expenses attributable to Motor Realty and NOLA Motor, and NOLA Motor paid the salary of at least one of its employees, Kristen Engeron ("Engeron"), President of NOLA Motor, while her work was primarily devoted to her position as President of NMHC.[104] NUSSLI also contends that NMHC failed to follow statutory formalities for incorporation when it failed to provide the information mandated by Louisiana Revised Statute § 12:203(B)(12).[105] According to NUSSLI, the third factor, undercapitalization, is met because NMHC was "ultimately insolvent."[106] NUSSLI also asserts that NMHC utilized the same accounting personnel and NOLA Motor made payments to Andretti.[107] Finally, NUSSLI contends that as a company incorporated on a nonstock basis, NMHC would be

---

[101] *Id.* (citing 339 So. 2d 1280 (La. App. 1 Cir. 1976)).

[102] *Id.*

[103] *Id.* at p. 18.

[104] *Id.*

[105] *Id.* at p. 19.

[106] *Id.*

[107] *Id.*

required to hold regular member meetings.[108] However, NUSSLI asserts, because no member qualifications or voting terms were established, no proper member meetings could have been held.[109]

### 2.    Private Works Act

NUSSLI also contends that it has stated the requisite elements of a Private Works Act claim.[110] NUSSLI asserts that under the PWA, persons who perform work on an immovable, including lessors, for the rent of movables, are granted a claim against the owner and the contractor, as well as a privilege against the immovable.[111] NUSSLI asserts that "the owner of immovable property has personal liability under the PWA to those who perform work on the property, even as to those with whom the owner does not have a contractual relationship, unless the owner timely files a notice of contract and had the general contractor timely file a proper bond."[112] NUSSLI contends that, as a lessor seeking payment for the rent of a movable (the grandstands) placed on an immovable, the property "located at or near the NOLA Motorsports Park, corresponding to the municipal address of 11075 Nicolle Boulevard, Avondale, Louisiana," NUSSLI "falls squarely within the express terms of the PWA."[113]

NUSSLI asserts that the PWA is not limited to construction projects and is defined broadly as "a single continuous project for the improvement, construction, erection, reconstruction, modification, repair, demolition, or other physical change of an immovable or its component

---

[108] *Id.*

[109] *Id.*

[110] *Id.* at p. 20.

[111] *Id.* (citing La. R.S. § 9:4802(A)(4) and (B)).

[112] *Id.* (citing La. R.S. 9:4802, 4811).

[113] *Id.*;  *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 32.

parts."[114] NUSSLI contends that under the statute, the provision "or other physical change of an immovable or its component parts" encompasses a broad spectrum of activities and there can be little dispute that the various constructions and modifications required with respect to the NOLA Motorsports Park consisted of improvement, modifications, repairs, and other physical changes.[115] According to NUSSLI, the Cooperative Endeavor Agreement, entered into by NMHC and the State of Louisiana for the allocation of state funds, describes numerous physical changes to the land that would be required, including track improvements, safety upgrades, and the installation of grandstands.[116] Furthermore, NUSSLI asserts that any argument that the temporary nature of the grandstands removes them from the scope of the PWA is "completely belied" by the text of the PWA which specifically includes movables for rent, which are temporary by their very nature.[117]

In opposition to the Chouest Defendants' assertion that they cannot be held liable as owners or contractors because the property was purportedly leased from Motor Realty or NOLA Motor to NMHC, NUSSLI contends that this assertion rests upon a false factual predicate that only NMHC authorized the work to be performed.[118] NUSSLI asserts that the Lessee Parties included NMHC, Motor Realty, and NOLA Motor.[119] Furthermore, NUSSLI contends that the Chouest Defendants' citation of *Shreveport Armature & Electric Works, Inc. v. Harwell*, is inapposite.[120] NUSSLI asserts

---

[114] Rec. Doc. 68 at p. 21.

[115] *Id.* (citing *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372. Rec. Doc. 47 at p. 27).

[116] *Id.*

[117] *Id.*

[118] *Id.* at p. 22.

[119] *Id.*

[120] *Id.* (citing 172 So. 463, 467 (La. App. 2 Cir. 1937)).

that in *Fruge v. Muffoletto*, the Louisiana Supreme Court held that mere consent of an owner-lessor to a lessee to authorize work on the immovable could not serve as the basis for a claim against the owner-lessor or a PWA lien against the immovable.[121] NUSSLI asserts that *Fruge* has been distinguished in cases where the lessor and lessee are acting as part of a business enterprise with a contemplated benefit to the owner.[122] NUSSLI cites a Louisiana Fourth Circuit Court of Appeal case, *Roman v. Zuppardo*, where, NUSSLI asserts, an owner and lessee entered into a commercial lease with a provision whereby the lessee would undertake certain projects and the lessee would pay $300 less in rent per month.[123] NUSSLI asserts that the court in *Roman* concluded that the work was for the account of the owner-lessor and held that the lienholder claims fell within the scope of the PWA, allowing for a lien against the owner's property.[124]

NUSSLI also cites another Louisiana Fourth Circuit Court of Appeal case, *Lake Forest, Inc. v. Cirlot Co.*, in which NUSSLI contends the owner of an immovable entered into a lease agreement that granted the lessee the exclusive right to operate a sand pit for twenty months after which the lessee was to make certain modifications to the land.[125] NUSSLI asserts that because the sand pit was designed to improve the lessor's property and inured to its benefit, a subcontractor's liens and claims against the owner and the property were valid under the PWA.[126] NUSSLI asserts that this Court need not even reach the factual questions posed by these cases regarding the relationship between

---

[121] *Id.*

[122] *Id.*

[123] *Id.* at pp. 22–23 (citing 407 So. 2d 65, 68–69 (La. App. 4 Cir. 1981)).

[124] *Id.* at p. 23 (citing 407 So. 2d at 68–69).

[125] *Id.* (citing 466 So. 2d 61, 66 (La. Ct. App. 1985)).

[126] *Id.* (citing 466 So. 2d at 66).

the lessor and lessee, however, because both Motor Realty and NMHC were parties to the Lease Agreement.[127]

Assuming that the Court concludes that Motor Realty and the other Lessee Parties are not directly bound by the Lease Agreement, NUSSLI asserts that Motor Realty and its property are still subject to the claim and privilege of NUSSLI as a subcontractor.[128] NUSSLI contends that this case is distinguishable from *Fruge* because Motor Realty and NOLA Motor participated in the negotiations through their sole member, owner, and representative, Chouest, and they were named as a Lessee Party.[129] NUSSLI asserts that the other Lessee Parties also indicated financial responsibility for the costs of the project.[130] NUSSLI asserts that this case is similar to the situation in *Lake Forest* because physical changes to the NOLA Motorsports Park were intended to confer a benefit upon the owner and the relationship between NOLA Motor, Motor Realty, and NMHC was more akin to a joint venture than an ordinary lease of land.[131] NUSSLI also contends that the alleged contract entered into by NOLA Motor/Motor Realty by which they "leased" the property to NMHC was not executed until after NUSSLI's work had commenced.[132] In addition, NUSSLI asserts that the nature of the agreement between Motor Realty, the Chouest Defendants, and NMHC is a highly contested factual issue which is not susceptible to determination at this stage.[133]

---

[127] *Id.*

[128] *Id.* at p. 24.

[129] *Id.*

[130] *Id.*

[131] *Id.* at pp. 24–25.

[132] *Id.* at p. 25.

[133] *Id.*

NUSSLI also argues that the notice required pursuant to Louisiana Revised Statute § 9:4802(G)(1) was provided.[134] Pointing to its amended complaint, NUSSLI asserts that Defendants received notice before the scheduled date of delivery of the grandstands and during the erection of the grandstands.[135] NUSSLI asserts that Motor Realty was designated a Lessee Party pursuant to the Lease Agreement and it received the notice.[136] Furthermore, NUSSLI argues that in *Hawk Field Services, L.L.C. v. Mid America Underground, L.L.C.*, a Louisiana Second Circuit Court of Appeal case, the court held that the failure of delivery of the notice to the owner only defeats the *in rem* privilege and not the *in personam* claim.[137] NUSSLI asserts that it properly filed a statement of claim and lien within the time period required by the PWA and any alleged failure regarding the notice requirement under § 4802(G)(1) would be relevant only to the existence of the privilege, and not to the claim against the owner.[138]

### 3.    Fraud

NUSSLI opposes the motion to dismiss its fraud claims, stating that it has pled sufficient facts to support a claim of fraud against the Chouest Defendants.[139] NUSSLI contends that it has alleged that it relied, to its detriment, on: (1) intentional misrepresentations to Andretti, and by extension, NUSSLI, that NMHC was adequately capitalized such that NUSSLI would receive full payment regardless of the Event's profitability; (2) intentional misrepresentations that Chouest

---

[134] *Id.*

[135] *Id.* (citing Rec. Doc. 47 at p. 33).

[136] *Id.* at p. 26.

[137] *Id.* (citing No. 47,078-CA (La. App. 2 Cir. 45/16/12); 94 So. 3d 136, 141).

[138] *Id.*

[139] *Id.* at p. 27.

himself stood behind the venture and intended to invest his own money to ensure that the venture would not fail financially, and that it would remain viable for the future in order for NMHC to fulfill the terms of its contracts; and (3) a misrepresentation to Andretti, and by extension, NUSSLI, that NMHC was established merely to receive state funds, when the true intention was to operate NMHC as an instrumentality of Chouest, NOLA Motor, and other Chouest-related entities for their benefit.[140] NUSSLI contends that these misrepresentations were repeated to the Event's creditors by Andretti serving as the Chouest Defendants' agent.[141]

In opposition to the Chouest Defendants' argument that no duty existed on behalf of Chouest or the Chouest Defendants to guarantee the obligations under the contract, NUSSLI contends that this argument was rejected by the Court in *Andretti Sports Marketing Louisiana, LLC v. NOLA Motorsports Host Committee, Inc*.[142] Furthermore, NUSSLI asserts that although the Chouest Defendants argue that they had no duty to NUSSLI, the Chouest Defendants authorized Andretti to act as their agent with respect to the Lease Agreement with NUSSLI.[143] Therefore, NUSSLI contends, because Andretti acted as an agent of the Chouest Defendants, the Chouest Defendants are liable for the misrepresentations of fact that NUSSLI received through their agent.[144]

NUSSLI contends that it relied upon Chouest's representations that he would ensure there were adequate funds available to pay vendors when it entered into the Agreement with NMHC, as

---

[140] *Id.* at pp. 27–28.

[141] *Id.* at p. 28 (citing Rec. Doc. 47 at pp. 15, 19).

[142] *Id.* (citing *Andretti Sports Mktg. La., LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2167, Rec. Doc. 40 at pp. 66–67).

[143] *Id.* (citing Rec. Doc. 47 at p. 19).

[144] *Id.* (citing Rec. Doc. 47 at pp. 15, 19).

well as his representations that he would pay Andretti, and other vendors, from his own private investment.[145] Therefore, NUSSLI asserts it has sufficiently pled that the Defendants' misrepresentations were the proximate cause of its injuries.[146]

NUSSLI also asserts that it has pled its fraud claims with the particularity required by Federal Rule of Civil Procedure 9(b).[147] NUSSLI contends that Rule 9(b) does not require that a plaintiff plead that a misrepresentation occurred at specific time and courts have accepted a month period as an adequate time frame.[148] NUSSLI contends that the specific misrepresentations, as well as the particular facts regarding the time, place, and intent behind the misrepresentations, are clearly stated.[149]

### 4.    Unjust Enrichment

In opposition to the Chouest Defendants' motion to dismiss NUSSLI's unjust enrichment claims, NUSSLI contends that the Chouest Defendants were enriched through NUSSLI's renting and erecting the grandstands and provision of services under the Lease Agreement.[150] NUSSLI asserts that although it has also argued that each of the Lessee Parties are bound by the Lease Agreement, it is not precluded from raising an alternative argument of unjust enrichment in the event

---

[145] *Id.* at p. 29.

[146] *Id.*

[147] *Id.*

[148] *Id.* (citing *Juergens v. Urban Title Servs., Inc.*, 533 F. Supp. 2d 64, 77 (D.D.C. 2008)).

[149] *Id.* at p. 30.

[150] *Id.* at p. 31 (citing Rec. Doc. 47 at pp. 35–38).

this Court ultimately finds that no other remedy exists.[151]

In response to the Chouest Defendants' argument based upon the Court's ruling in *Andretti Sports Marketing Louisiana, LLC v. NOLA Motorsports Host Committee, Inc.* that NUSSLI cannot assert unjust enrichment in the alternative, NUSSLI asserts that the Court in *Andretti* stated that Andretti could have a claim based upon the Chouest Defendants' misallocation of funds.[152] NUSSLI asserts that the Cooperative Endeavor Agreement allocated $374,000 to the Grandstand Build and NUSSLI only received $293,404.04 because the Chouest Defendants wrongfully caused the remainder to be diverted for their own benefit.[153]

### 5.    LUTPA

NUSSLI asserts that the motion to dismiss improperly asks the Court to resolve factual issues in its favor at the pleading stage.[154] NUSSLI contends that although LUTPA does not provide an alternative remedy for simple breaches of contract, here, the Chouest Defendants engaged in unfair or deceptive conduct by making false and misleading statements to Andretti and sending Andretti to contract on their behalf based upon those misstatements.[155] Furthermore, NUSSLI asserts that the Chouest Defendants claim they are not bound by the terms of the Lease Agreement, and therefore their extracontractual course of conduct constitutes a LUTPA claim.[156] According to NUSSLI, it has

---

[151] *Id.* (citing *McCullum v. McAlister's Corp. of Miss.*, No. 08-5050, 2010 WL 1489907 (E.D. La. Apr. 13, 2010) (Lemmon, J.); *ORX Res., Inc. v. Autra*, No. 09-4451, 2009 WL 3447256 (E.D. La. Oct. 20, 2009) (Africk, J.)).

[152] *Id.* at p. 32.

[153] *Id.* (citing Rec. Doc. 47 at p. 25).

[154] *Id.* at p. 33.

[155] *Id.*

[156] *Id.* at p. 34.

alleged that the Chouest Defendants misrepresented the financial backing behind the Event, improperly distributed the $4.5 million appropriated under the Cooperative Endeavor Agreement, and failed to distribute the full amount that had been appropriated for the grandstand installation.[157] NUSSLI also claims that the orchestration of the Event as a "nonprofit" enterprise, in addition to the misrepresentations and allegations that Chouest used state funds to benefit his own race track, constitute an unfair trade practice.[158]

Finally, NUSSLI asserts that it has pled an adequate claim for treble damages under LUTPA because it alleged that the Chouest Defendants and NMHC were served with a "Notice of R.S. 51:1401 Complaint" on July 28, 2015.[159] NUSSLI contends that the Chouest Defendants are liable for treble damages to the extent that they have continued in the same course of conduct since their receipt of the notice.[160]

### 6.    Conversion

In opposition to the Chouest Defendants' motion to dismiss its conversion claims, NUSSLI incorporates by reference the arguments it made in its opposition to NMHC's motion to dismiss.[161] Citing a Louisiana Third Circuit Court of Appeals case, *Broussard, Bolton, Halcomb & Vizzier v. Williams*, NUSSLI asserted in that memorandum in opposition that the tort of conversion applies to the wrongful exercise of dominion over money.[162] In *Broussard*, NUSSLI contends that the court

---

[157] *Id.*

[158] *Id.*

[159] *Id.* at p. 35.

[160] *Id.*

[161] *Id.*

[162] Rec. Doc. 69 at p. 13 (citing 01-0219 (La. App. 3 Cir. 10/03/91); 796 So. 2d 791, 796).

found that the plaintiff had stated a claim for conversion where a lawyer withdrew funds from his trust account, despite the existence of an agreement that he would do so only upon the satisfaction of certain terms.[163]

In response to the argument that NUSSLI's claim for conversion is simply a reiteration of its breach of contract claim, NUSSLI asserts that NMHC consented under the Cooperative Endeavor Agreement to devote $374,000 to the Grandstand Build, but, in spite of that agreement, NMHC diverted those funds to other recipients.[164] NUSSLI asserts that, like the lawyer in *Broussard*, NMHC and the Chouest Defendants wrongfully exercised dominion over the funds contrary to the terms of the Cooperative Endeavor Agreement, and instead disbursed the funds for their own benefit.[165]

### 7.    Request for Leave to Amend its Complaint

Finally, NUSSLI asserts that should the Court grant the motion to dismiss regarding one or more of its claims, it requests that it be granted leave to amend its complaint in accordance with the Court's ruling.[166]

## C.    *Chouest Defendants' Arguments in Further Support of Dismissal*

### 1.    Breach of Contract and Claim on an Open Account

#### a.    *Motor Realty and NOLA Motor*

In reply, the Chouest Defendants contend that NUSSLI mischaracterizes the Lease

---

[163] *Id.*

[164] *Id.*

[165] *Id.* at p. 14.

[166] Rec. Doc. 68 at p. 35.

Agreement by claiming that Motor Realty, NOLA Motor, and NMHC are all parties to the Lease, when only NMHC is.[167] The Chouest Defendants aver that only NMHC is defined as the "Lessee" in the Lease Agreement and the term "Lessee Parties" has a different meaning.[168] The Chouest Defendants explain that the Lease Agreement states that it is made between NMHC and NUSSLI, that the term of the Lease commences on the date it is executed by "both parties," and the Lease Agreement only calls for the signatures of two parties.[169] The Chouest Defendants assert that pursuant to the Lease Agreement, only the Lessee (NMHC) is required to pay rent.[170] They contend that the Chouest Defendants are only mentioned in the indemnification section of the Lease, which states "[NUSSLI] shall indemnify, defend, and hold Lessee, NOLA Motor Club, LLC, Motor Realty, LLC, Andretti Sports Marketing Louisiana, LLC and their directors, officers, employees, agents and representatives (collectively, '*Lessee Parties*') harmless from and against any and all claims . . . imposed upon Lessee . . . ."[171]

### b.   *Single Business Enterprise*

The Chouest Defendants also assert that NUSSLI's claims for breach of contract may not be based upon an application of the single business enterprise.[172] They assert that NUSSLI has not responded to their argument that the single business enterprise doctrine may not be applied to

---

[167] Rec. Doc. 71.

[168] *Id.* at p. 2 (citing Rec. Doc. 40-2 at p. 1).

[169] *Id.*

[170] *Id.* (citing Rec. Doc. 40-2 at pp. 1–3).

[171] *Id.* at p. 3 (citing Rec. Doc. 40-2 at p. 5).

[172] *Id.* at p. 4.

impose liability on an individual and therefore the Court should dismiss the claim against Chouest.[173] The Chouest Defendants also argue that NUSSLI has not pled sufficient facts to support an application of the single business enterprise doctrine.[174] The Chouest Defendants also assert that it is significant that the allegations in NUSSLI's amended complaint are repetitive of those alleged by Andretti because NUSSLI itself has no knowledge of them.[175] They contend that NUSSLI never had any dealings with Chouest and did not receive any statements from him.[176]

### c.    *Alter Ego*

The Chouest Defendants also assert that NUSSLI's claims for breach of contract may not be based upon an application of the alter ego doctrine.[177] They contend that NUSSLI failed to respond to their argument that the Court, in *Andretti,* held that the alter ego doctrine may not be applied to impose liability on individuals or entities who have never been a shareholder or officer of the company whose veil it seeks to pierce.[178] The Chouest Defendants also contend that NUSSLI fails to adequately plead alter ego and relies upon the same inadequate arguments related to the single business enterprise claim.[179] Finally, they assert that although NUSSLI mentions a failure to provide separate bank accounts and bookkeeping records and failure to hold regular shareholder and

---

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Id.* at p. 9.

director meetings, NUSSLI does not cite to any such allegations in its amended complaint.[180]

### d.   Open Account Claim

For all of reasons discussed above, the Chouest Defendants contend that NUSSLI's open account claims should be dismissed as well.[181]

### 2.   LUTPA

In reply, the Chouest Defendants contend that the allegations do not satisfy the elements of a LUTPA claim against any movant.[182] They also state that, as the Court held in *Andretti Sports Marketing Louisiana, LLC v. NOLA Motorsports Host Committee, Inc.*, the allegations here do not state a LUTPA claim against NOLA Motor because all of the allegations concern Chouest personally.[183] The Chouest Defendants also assert that NUSSLI did not respond to its argument regarding the claim for treble damages and therefore the treble damages claim should be dismissed.[184]

### 3.   Unjust Enrichment

The Chouest Defendants assert that the claims for unjust enrichment should be dismissed because NUSSLI makes no argument in opposition to its assertion that NUSSLI has another remedy at law and NUSSLI does not allege that the Chouest Defendants were enriched without cause.[185]

---

[180] *Id.* at pp. 9–10.

[181] *Id.* at p. 12.

[182] *Id.* at p. 10.

[183] *Id.*

[184] *Id.*

[185] *Id.*

### 4.      Fraud

The Chouest Defendants further argue that there are no allegations of misrepresentations made to NUSSLI and Chouest had no duty to NUSSLI to guarantee the Lease.[186] Furthermore, the Chouest Defendants contend that NUSSLI never alleged that Chouest guaranteed all payments to all vendors, nor does NUSSLI plead any guarantee of the Lease Agreement by Chouest or any of the other Chouest Defendants.[187] The Chouest Defendants contend that there is no basis to extrapolate from NUSSLI's specific allegations to the much broader conclusion that there was a guarantee by Chouest to all vendors.[188]

Next, the Chouest Defendants contend that NUSSLI did not respond to their argument that NUSSLI failed to plead proximate cause.[189] Last, they assert that the allegations of specific misrepresentations were statements made to Andretti, not NUSSLI, and therefore, they cannot serve as a specific allegation of fraud against NUSSLI.[190]

### 5.      Conversion

The Chouest Defendants assert that NUSSLI, in its opposition to the Chouest Defendants' motion to dismiss, simply incorporates its argument from its opposition to NMHC's motion to dismiss.[191] The Chouest Defendants contend, however, that the argument refers only to NMHC's alleged misspending of state funds and those allegations do not support a claim against the Chouest

---

[186] *Id.* at p. 11.

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] *Id.* at pp. 11–12.

[191] *Id.*

Defendants.[192]

### 6.     Private Works Act

The Chouest Defendants assert that in opposing the motion to dismiss, NUSSLI only makes "broad, inaccurate statements regarding the [Private Works Act]."[193] They contend that in an attempt to characterize the rental of the grandstands as part of a "work" under the PWA, NUSSLI attempts to blend its Lease with the Cooperative Endeavor Agreement.[194] The Chouest Defendants assert that the Cooperative Endeavor Agreement is not a general contract for improvements on the immovable, but rather simply granted funds from the state to NMHC for certain purposes.[195] Furthermore, they argue that the Cooperative Endeavor Agreement is not a general contract for improvements on the immovable (the track) because the state did not own the track and the contract for the work would have been with whatever contractor constructed the modifications to the track facility.[196]

The Chouest Defendants also contend that although NUSSLI argues that *Shreveport Armature & Electric Works, Inc. v. Harwell* is inapplicable after the Louisiana Supreme Court in *Fruge v. Muffoletto*, the rule announced in *Shreveport Armature* was reiterated in a later decision, a Louisiana Fifth Circuit Court of Appeal case, *Control Masters, Inc. v. Molenaar*.[197] Therefore, they contend, that the law did not change after *Fruge* and furthermore, the facts in *Fruge* are not present here.

---

[192] *Id.*

[193] *Id.*

[194] *Id.* at p. 13.

[195] *Id.*

[196] *Id.*

[197] *Id.* at p. 14 (citing 540 So. 2d 1291, 1292 (La. App. 5 Cir. 1989).

The Chouest Defendants also assert that *Roman v. Zuppardo* and *Lake Forest, Inc. v. Cirlot Co.* are distinguishable because there is no allegation in this case that the owner and lessee of the immovable had an agreement requiring the lessee to make improvements upon the immovable.[198] As for NUSSLI's contention that some of the movants are parties to the Lease, the Chouest Defendants assert that this is clearly a mischaracterization by NUSSLI and even accepting their argument as true, NUSSLI ignores that only NOLA Motor and Motor Realty are listed as "Lessee Parties," but none of the other Chouest Defendants are.[199]

The Chouest Defendants also assert that NUSSLI's failure to provide written notice to the purported owner and contractor is fatal to the PWA claims.[200] They assert that § 4802(D)(1) requires a specific written notice with specific content, which NUSSLI does not allege that it provided.[201]

Finally, the Chouest Defendants contend that NUSSLI failed to respond to their argument that even where there is a "work" and where the project owner is a mere lessor of the immovable property, a claimant under the PWA only has rights against whatever right the lessor has to the immovable.[202] Therefore, they contend, the privilege would apply, at most, to NMHC's lease rights, not to the land itself.[203]

---

[198] *Id.*

[199] *Id.* at pp. 14–15.

[200] *Id.* at p. 15.

[201] *Id.*

[202] *Id.* at p. 16.

[203] *Id.* (citing *Sinclair v. Justice*, 414 So. 2d 826, 828 (La. App. 4 Cir. 1982)).

### III. Law and Analysis

***A.    Legal Standard on a Motion to Dismiss***

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed "for failure to state a claim upon which relief can be granted."[204] A motion to dismiss for failure to state a claim is "viewed with disfavor and is rarely granted."[205] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[206] "Factual allegations must be enough to raise a right to relief above the speculative level."[207] A claim is facially plausible when the plaintiff has pleaded facts that allow the court to "draw a reasonable inference that the defendant is liable for the misconduct alleged."[208]

On a motion to dismiss, asserted claims are liberally construed in favor of the claimant, and all facts pleaded are taken as true.[209] However, although required to accept all "well-pleaded facts" as true, a court is not required to accept legal conclusions as true.[210] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."[211] Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements"

---

[204] Fed. R. Civ. P. 12(b)(6).

[205] *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).

[206] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008)).

[207] *Twombly*, 550 U.S. at 556.

[208] *Id.* at 570.

[209] *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

[210] *Iqbal*, 556 U.S. at 677–78.

[211] *Id.* at 679.

will not suffice.[212]  The complaint need not contain detailed factual allegations, but it must offer more than mere labels, legal conclusions, or formulaic recitations of the elements of a cause of action.[213]  That is, the complaint must offer more than an "unadorned, the defendant-unlawfully-harmed-me accusation."[214] From the face of the complaint, there must be enough factual matter to raise a reasonable expectation that discovery will reveal evidence as to each element of the asserted claims.[215] If factual allegations are insufficient to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an "insuperable" bar to relief, the claim must be dismissed.[216]

It is well-established that, in deciding whether to grant a motion to dismiss pursuant to Rule 12(b)(6), a district court may not "go outside the complaint."[217] There is one recognized exception to that rule: a district court may consider documents attached to the motion to dismiss if they are referred to in the complaint and are central to the claim.[218]  "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated."[219] If, however, a district court considers other

---

[212] *Id.* at 678.

[213] *Id.*

[214] *Id.*

[215] *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009).

[216] *Moore v. Metro. Human Serv. Dep't*, No. 09-6470, 2010 WL 1462224, at * 2 (E.D. La. Apr. 8, 2010) (Vance, C.J.) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)); *Carbe v. Lappin*, 492 F.3d 325, 328 n.9 (5th Cir. 2007).

[217] *Rodriguez v. Rutter*, 310 F. App'x. 623, 626 (5th Cir. 2009); *Carter v. Target Corp.*, 541 F. App'x. 413, 416–17 (5th Cir. 2013).

[218] *Id.; see also In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

[219] *Carter*, 541 F. App'x at 416.

information outside the complaint, it must treat the motion to dismiss as a motion for summary judgment.[220]

## B.      *Applying Louisiana Law*

When a federal court interprets a state law, it must do so according to the principles of interpretation followed by that state's highest court.[221] In Louisiana, "courts must begin every legal analysis by examining primary sources of law: the State's Constitution, codes, and statutes."[222] These authoritative or primary sources of law are to be "contrasted with persuasive or secondary sources of law, such as [Louisiana and other civil law] jurisprudence, doctrine, conventional usages, and equity, that may guide the court in reaching a decision in the absence of legislation and custom."[223] To make a so-called "*Erie* guess" on an issue of Louisiana law, the Court must "employ the appropriate Louisiana methodology" to decide the issue the way that it believes the Supreme Court of Louisiana would decide it.[224] Although federal courts should not disregard the decisions of Louisiana's intermediate courts unless they are "convinced that the Louisiana Supreme Court would decide otherwise," they are not strictly bound by them.[225]

## C.      *Breach of Contract Claim*

The Chouest Defendants make several arguments in support of their motion to dismiss

---

[220] Fed. R. Civ. P. 12(d); *Rodriguez*, 310 F. App'x at 626.

[221] *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010); *Gen. Elec. Capital Corp. v. Se. Health Care, Inc.*, 950 F.2d 944, 950 (5th Cir. 1991).

[222] *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 547 (5th Cir. 2004).

[223] *Id.* (quoting La. Civ. Code. art. 1 rev. cmt. b).

[224] *Id.* (citation omitted).

[225] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007).

NUSSLI's breach of contract claims, including: (1) that there was no contract between NUSSLI and any movant; (2) that the single business enterprise may not be applied to impose liability on an individual and therefore the breach of contract claim against Chouest should be dismissed; and (3) NUSSLI has not pled sufficient facts to support the application of either the single business enterprise or alter ego doctrines.[226] In opposition, NUSSLI contends that NOLA Motor and Motor Realty were parties to the Lease Agreement and therefore are obligated to pay NUSSLI pursuant to its terms.[227] NUSSLI also asserts that it has pled sufficient facts to support the application of both the alter ego and single business enterprise doctrines.[228] The Court will address each of these arguments in turn.

### 1.    Whether a Contract Existed Between NUSSLI, NOLA Motor, and Motor Realty

NUSSLI asserts that NOLA Motor and Motor Realty are liable for breach of contract for failure to pay rent under the Lease Agreement because NOLA Motor and Motor Realty were designated as "Lessee Parties" in the Lease Agreement.[229] NUSSLI asserts that the only reasonable construction of the terms of the Lease Agreement is that each of the Lessee Parties are liable for the obligation to pay rent.[230] In reply, the Chouest Defendants assert that the term "Lessee Parties" was defined in the indemnification section of the Lease Agreement and the remainder of the contract is clear that the agreement is between only NUSSLI and NMHC.[231]

---

[226] Rec. Doc. 65-1 at pp. 5–12.

[227] Rec. Doc. 68 at p. 6.

[228] *Id.* at pp. 7–16.

[229] *Id.* at p. 6.

[230] *Id.* at p. 7.

[231] Rec. Doc. 71.

In the Lease Agreement, which was attached to the first amended complaint, the first line states, "THIS LEASE AGREEMENT ("*Agreement*") is made by and between NOLA Motorsports Host Committee, Inc., a Louisiana non-profit company, ("*Lessee*"), and NUSSLI (US), LLC, an Indiana limited liability company (*NUS*)."[232] Under Section (5), "RENT," the Agreement states that "Lessee will pay NUS rent as set forth on Schedule A (the '*Rent*')."[233] The Agreement repeatedly uses the phrases "both parties" and "neither party," indicating that there are only two parties to the Agreement.[234] Furthermore, the Agreement was only signed by two parties, Andretti Sports Marketing Management, who is designated on the signature line as "LESSEE," and NUSSLI.[235] The only section in which any of the Chouest Defendants are mentioned is in the section regarding indemnification, stating:

> NUS shall indemnify, defend, and hold Lessee, NOLA Motor Club, LLC, Motor Realty, LLC, Andretti Sports Marketing Louisiana, LLC and their directors, officers, employees, agents, and representatives (collectively, '*Lessee Parties*') harmless from and against any and all claims . . . imposed upon Lessee . . . in connection with, or arising out of the negligent acts or omissions of NUS and its managers, officers, employees, agents and representatives . . . .[236]

The term "Lessee Parties" does not appear anywhere else in the Agreement aside from this section.

NUSSLI asserts that the distinction between the terms "Lessee" and "Lessee Parties" is, at best, an ambiguous factual issue not capable of determination on a motion to dismiss.[237] However,

---

[232] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47-2 at p. 1.

[233] *Id.* at p. 3.

[234] *Id.* at pp. 7–8.

[235] *Id.* at p. 9.

[236] *Id.*

[237] Rec. Doc. 68 at p. 7.

"[w]here a contract is unambiguous, the interpretation of the contract becomes a matter of law."[238] "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[239] This Lease Agreement is unambiguous. There is no indication, anywhere in the agreement, that NOLA Motor or Motor Realty were undertaking any obligation to pay rent or were otherwise parties to the Lease Agreement. The only place that they are mentioned, and the only place the term "Lessee Parties" is used, is in the indemnification section. NUSSLI does not explain how the contractual indemnification provision, pursuant to which NUSSLI agreed to indemnify NMHC, as well as NOLA Motor, Motor Realty, a company which NUSSLI alleges owns the property where the grandstands were to be installed, and Andretti, a company which NUSSLI alleges managed the Event, gives rise to a contractual obligation to pay rent. Therefore, the Court concludes, as a matter of law, that NOLA Motor and Motor Realty were not parties to this contract such that they can be held liable for a failure to pay rent.

## 2.    Whether the Alter Ego Doctrine May Be Applied to Impose Liability on the Chouest Defendants

NUSSLI also alleges that it has pled sufficient facts to impose liability on the Chouest Defendants for the obligations of NMHC through the application of the alter ego doctrine.[240] This Court, in *Andretti Sports Marketing Louisiana, LLC v. NOLA Motorsports Host Committee, Inc.*, concluded that the alter ego doctrine may not be applied to individuals or entities who have never

---

[238] *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483, 486 (5th Cir.1983).

[239] La. Civ. Code art. 2046.

[240] Rec. Doc. 68 at p. 17.

been a shareholder or officer of a company.[241] The Court cited the Louisiana Supreme Court in *Ogea v. Merritt*, where that court stated:

> Louisiana courts have allowed a piercing of the corporate veil under two exceptional circumstances, namely, *where the corporation is an alter ego of the shareholders* and the shareholders have used the corporation to defraud a third party (the "alter ego" doctrine) and where the shareholders have failed to conduct a business on a "corporate footing" to such an extent that the *corporation ceases to be distinguishable from its shareholders*.[242]

NUSSLI cites two cases in support of its assertion that no legal relationship is necessary to apply the alter ego doctrine, Louisiana Fifth Circuit Court of Appeal case *Middleton v. Parish of Jefferson*, and Louisiana Third Circuit Court of Appeal case *Withers v. Timbers Products*.[243] At issue in *Middleton* was "whether a corporate official can avoid an exception of res judicata by bringing, in his individual capacity, a suit already litigated on behalf of the corporation."[244] The court determined that "[a]lthough it is alleged that Mr. Middleton is not a shareholder of [the corporation], shareholder status is not the only element used in determining if veil piercing is appropriate."[245] The court held that veil piercing "must be used in this instance not to impose personal liability on Mr. Middleton but to prevent his use of subversive tactics to take an unjust advantage of a legal distinction. Allowing a corporate official to bring suit in his individual capacity, solely for the

---

[241] *Andretti Sports Mktg. La., LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2167, Rec. Doc. 40 at p. 41.

[242] *Id.* (quoting *Ogea v. Merritt*, 2013-1085 (La. 12/10/13); 130 So. 3d 888, 895 n.4) (emphasis added)).

[243] Rec. Doc. 65-1 at pp. 39–40 (citing *Middleton v. Par. of Jefferson ex. rel. De't of Inspection & Code Enf't*, 97-235 (La. App. 5 Cir 1/14/98); 707 So. 2d 454, 457; *Withers v. Timber Prods., Inc.*, 89-0840 (La. App. 3 Cir. 2/6/91); 575 So. 2d 1291).

[244] 707 So. 2d at 455.

[245] *Id.* at 456.

purpose of avoiding an exception to res judicata, would be an unjust result."[246] However, Middleton was the president of the corporation and therefore a legal relationship existed in that case.[247] Here, NUSSLI does not allege that any of the Chouest Defendants were officers, directors, members, or shareholders of NMHC.

In *Withers*, the trial court held that defendant John Makar ("Makar") was acting as the alter ego of defendant Timber Products, Inc.[248] On appeal, the Third Circuit Court of Appeal noted that Makar was the sole stockholder and officer at the time of Timber Products, Inc.'s incorporation, but that Makar had testified that he had "swapped" one hundred percent of the stock of Timber Products, Inc. to a judgment-proof individual in exchange for property.[249] Therefore, at the time the plaintiff sought to pierce the corporate veil, Makar was no longer a stockholder of Timber Products, Inc. The Third Circuit Court of Appeal noted that the trial judge had determined that the alleged transfer of stock was "nothing more than a sham transfer in an attempt by Makar to avoid exposure for worker's compensation liability" and held that the trial judge had not clearly erred in concluding that Timber Products, Inc. was the alter ego of Makar.[250]

Neither of the cases cited by NUSSLI support its contention that the alter ego doctrine may be applied to an individual or entity who, as the facts here present, has never been a shareholder, member, or officer of the company whose veil the plaintiff seeks to pierce. NUSSLI does not now allege that any of the Chouest Defendants were officers, directors, members, or shareholders of

---

[246] *Id.* at 457.

[247] *Id.* at 455.

[248] 574 So. 2d at 1293.

[249] *Id.* at 1295.

[250] *Id.* at 1295–96.

NMHC. Therefore, the Court concludes that NUSSLI has failed to plead sufficient facts to demonstrate that the alter ego doctrine may be applied to the Chouest Defendants.

### 3. Whether the Single Business Enterprise May Be Applied to Impose Liability on the Chouest Defendants

#### a. Whether the Single Business Enterprise Doctrine May Be Applied to Impose Liability on an Individual

In *Brown v. ANA Insurance Group*, the Louisiana Supreme Court explained that the single business enterprise doctrine is "a theory for imposing liability where two or more business entities act as one. Generally under the doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose."[251] The Chouest Defendants assert that the single business enterprise doctrine applies only to corporations and therefore it may not be used to impose liability upon Chouest.[252] In support, they quote the Louisiana Fourth Circuit Court of Appeal in *Lee v. Clinical Research Center of Florida, L.C.*, explaining that "[w]hen a group of corporations integrate their resources to achieve a common business purpose and do not operate as separate entities, each affiliated corporation may be held liable for debts . . . ."[253] NUSSLI does not respond to the Chouest Defendants' argument that the single business enterprise cannot be applied to an individual.

The Louisiana Supreme Court has explained the single business enterprise is "a theory for imposing liability where two or more business entities act as one."[254] Accordingly, as Chouest is an

---

[251] 2007-2116 (La. 10/14/08); 994 So. 2d 1265, 1266 n.2 (citing *Green v. Champion Ins. Co.*, 577 So. 2d 249 (La. App. 1 Cir. 1991)).

[252] Rec. Doc. 65-1 at p. 5.

[253] 2004-0428 (La. App. 4 Cir. 11/17/04); 889 So. 2d 317, 323.

[254] *Brown v. ANA Ins. Grp.*, 2007-2116 (La. 10/14/08); 994 So. 2d 1265, 1266 n.2 (citing *Green v. Champion Ins. Co.*, 577 So. 2d 249 (La. App. 1 Cir. 1991)).

individual, not a business entity, the Court concludes that the single business enterprise doctrine may not be applied to Chouest in order to hold him liable for the alleged breach of contract.

>    **b.      Whether NUSSLI Has Pled Sufficient Facts to Support an Application of the Single Business Enterprise Doctrine**

The single business enterprise doctrine was first applied in Louisiana in *Green v. Champion Insurance Co.*[255] In *Green*, the court identified eighteen factors to be used to determine whether a group of entities constitute a "single business enterprise," noting that no one factor is dispositive of the issue.[256] These factors are:

> 1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control; 2. common directors or officers; 3. unified administrative control of corporations whose business functions are similar or supplementary; 4. directors and officers of one corporation act independently in the interest of that corporation; 5. corporation financing another corporation; 6. inadequate capitalization ("thin incorporation"); 7. corporation causing the incorporation of another affiliated corporation; 8. corporation paying the salaries and other expenses or losses of another corporation; 9. receiving no business other than that given to it by its affiliated corporations; 10. corporation using the property of another corporation as its own; 11. noncompliance with corporate formalities; 12. common employees; 13. services rendered by the employees of one corporation on behalf of another corporation; 14. common offices; 15. centralized accounting; 16. undocumented transfers of funds between corporations; 17. unclear allocation of profits and losses between corporations; and 18. excessive fragmentation of a single enterprise into separate corporations.[257]

NUSSLI contends that it has pled at least sixteen of these eighteen factors.[258] The Court will address each of these factors in turn.

As an initial matter, the Court notes that, in its opposition to the motion to dismiss, NUSSLI

---

[255] 577 So. 2d 249 (La. App. 1 Cir. 1991).

[256] *Id.* at 257.

[257] *Id.* at 257–58.

[258] Rec. Doc. 68 at p. 10.

asserts, without citing to its first amended complaint, that NOLA Motor, Motor Realty, Laney C. Racing, Laney C, LLC, are all "dominated by Laney Chouest" and that NMHC and the Chouest Defendants "have been subject to singular control since the formation of [NMHC]."[259] After this paragraph, NUSSLI makes no further argument that Laney C. Racing or Laney C are part of a single business enterprise with NMHC or any other company, and NUSSLI makes only sparse assertions regarding Motor Realty. Therefore, the Court will focus first upon the relationship between NOLA Motor and NMHC and then, if necessary, will address whether NUSSLI has pled sufficient facts to include the other Chouest Defendants within any single business enterprise.

### (i)   Identity or Substantial Identity of Ownership, That Is, Ownership of Sufficient Stock to Give Actual Working Control

NUSSLI contends that this factor is met because although NMHC has not disclosed its members, it is clear that Chouest directed the activities of NMHC from its inception through Kristen Engeron, President of NOLA Motor, who also served as President of NMHC.[260] NUSSLI cites to its complaint wherein it provides links to news articles discussing Chouest's involvement in the Event, and audio interviews where Chouest and Engeron discuss the Event.[261] Finally, NUSSLI asserts that Chouest's control is further evidenced by NMHC's authorization of payment to its creditors in a way that benefitted Chouest by removing encumbrances on the immovable property of Chouest's wholly-owned Motor Realty.[262] In response, the Chouest Defendants contend that

---

[259] *Id.*

[260] *Id.*

[261] *Id.* (citing Rec. Doc. 47 at p. 23).

[262] *Id.*

NUSSLI fails to allege that Chouest or any other movant had any stock or ownership in NMHC.[263]

NUSSLI generally alleges that Chouest "controlled" NMHC through Engeron; however, this factor calls for the Court to look to the legal ownership of the company. NUSSLI asserts that NMHC failed to disclose the qualifications and voting terms of its membership in its Articles of Incorporation and has declined to state who the members of NMHC are.[264] However, NUSSLI does not allege that any of the Chouest Defendants were members of NMHC. Therefore, NUSSLI has not alleged sufficient facts to show that any of the Chouest Defendants had any legal ownership of NMHC.

Nor do NUSSLI's factual allegations support a conclusion that Chouest actually controlled NMHC. Allegations that Chouest was the "face of the Event"[265] do not support a conclusion that Chouest, acting on behalf of NOLA Motor, controlled NMHC in any way. Nor does an allegation that NMHC paid creditors in a way that benefitted Chouest support a conclusion that Chouest actively directed that NMHC pay the creditors in this way. In NUSSLI's first amended complaint, NUSSLI also alleges that Chouest's control of Engeron is evidenced by several emails between Engeron, Chouest, and Sherman.[266] NUSSLI alleges that, in September 2014, Engeron emailed Chouest stating that Chouest was "stressing [her] out throwing all this at [her] - wanting to restructure maintenance, sales and events, track improvements, Indy details . . . ."[267] NUSSLI also

---

[263] *Andretti Sports Mktg. La., LLC v. NOLA Motorsports Host Committee*, No. 15-2167, Rec. Doc. 71 at p. 5.

[264] Rec. Doc. 68 at p. 10.

[265] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 23.

[266] *Id.* at p. 13.

[267] *Id.*

alleges that in a March 2015 email exchange between Andretti and Engeron regarding merchandise, Engeron indicated that she planned to talk to Chouest.[268] Finally, NUSSLI alleges that Sherman indicated in an email to Andretti that he had to confirm with Engeron and Chouest regarding disclosing a list of hospitality and suite purchasers.[269] Although NUSSLI alleges that these emails show that Engeron was "being directed and authorized by Chouest at all relevant times,"[270] these emails merely demonstrate that Chouest was involved in the planning of the Event even after NMHC was formed. These allegations do not support a conclusion that NOLA Motor had actual control over NMHC. Therefore, NUSSLI has not pled sufficient facts to support a conclusion that NOLA Motor had actual working control of NMHC.

### (ii)       Common Directors or Officers

NUSSLI contends that this factor is met because Kristen Engeron acted as President of both NOLA Motor and NMHC, and Delisha Boyd is Treasurer and a member of the Board of Directors of NMHC and served as a real estate agent for Motor Realty.[271] Furthermore, NUSSLI asserts that Michael Sherman served as the Secretary and member of the Board of Directors of NMHC and represented Chouest as a lobbyist and advisor.[272]

NUSSLI has pled sufficient facts to show that NMHC and NOLA Motor had one officer in common, Kristen Engeron. NUSSLI's allegations that Delisha Boyd served as a real estate agent for

---

[268] *Id.*

[269] *Id.*

[270] *Id.*

[271] Rec. Doc. 68 at p. 11 (citing *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 12).

[272] *Id.* (citing Rec. Doc. 47 at p. 12).

47

Motor Realty, however, does not make her an employee of Motor Realty, nor is an allegation that Michael Sherman served as a lobbyist and advisor to Chouest sufficient to show that Michael Sherman was an employee of any of the other Chouest Defendants. Therefore, this factor weighs in favor of the existence of a single business enterprise.

### (iii)   Unified Administrative Control

NUSSLI contends that it has pled sufficient facts to show unified administrative control because both the Indy Race and prior events held at the NOLA Motorsports Park were overseen by Engeron, using location and equipment at 11075 Nicolle Boulevard in Avondale, Louisiana, the corporate address of NMHC, NOLA Motor, and Motor Realty.[273] NUSSLI has alleged that Engeron acted as the President of both NMHC and NOLA Motor.[274] However, this allegation has already been accounted for in the factor "common director or officers." In support of this factor, NUSSLI cites only to its first amended complaint in which it alleges that NMHC, NOLA Motor, Motor Realty, Laney C. Racing, Laney C, LLC all share a corporate address.[275] However, "common offices" is another *Green* factor. NUSSLI does not point to any specific allegations regarding unified administrative control that are not duplicative of other factors. Therefore, this factor does not support a conclusion that NMHC and the Chouest Defendants constitute a single business enterprise.

### (iv)   Independence of Directors and Officers

NUSSLI asserts that this factor supports a finding of a single business enterprise because the Board of Directors and officers of NMHC did not act independently in the interest of NMHC, but

---

[273] *Id.* at pp. 11–12 (citing Rec. Doc. 47 at p. 22).

[274] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 12.

[275] *Id.* at p. 22.

rather acted with the principal interest of limiting the losses and exposure of NOLA Motor and Chouest.[276] However, NUSSLI does not identify in its opposition specifically what actions taken by the Board of Directors or officers of NMHC would support such a conclusion. In *Green v. Champion Insurance Co.*, the court, in discussing this factor, determined that the directors in that case had not acted independently and in the primary interest of the particular entity, but rather that transactions were entered into solely for the benefit of another member in the group.[277] In its first amended complaint, NUSSLI alleges that NMHC paid vendors who could potentially place a lien on the track, rather than paying NUSSLI for its services.[278] These allegations could support a conclusion that NMHC was not acting entirely in its own interest, but do not rise to the level of the allegations in *Green*. Therefore, the Court concludes that this factor weakly weighs in favor of a conclusion that NOLA Motor and NMHC constitute a single business enterprise.

### (v) Corporation Financing Another Corporation

NUSSLI also contends that the fifth factor is met in this case because NOLA Motor provided financing for NMHC.[279] NUSSLI contends that NOLA Motor and its representatives received a commitment from the State of Louisiana for the funding of the Indy Race and then, after the funding was secured by NOLA Motor, it was redirected to NMHC.[280] Although NUSSLI alleges that Chouest and NOLA Motor lobbied for the involvement of and financial contribution from the State of Louisiana, they do not contest that it was the State of Louisiana, rather than Chouest or NOLA

---

[276] Rec. Doc. 68 at p. 12.

[277] 577 So. 2d at 258.

[278] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 20.

[279] Rec. Doc. 68 at p. 12.

[280] *Id.*

Motor, who financed NMHC through the grant of $4.5 million.[281] Therefore, this factor does not support a conclusion that NOLA Motor and NMHC constituted a single business enterprise.

### (vi)     Inadequate Capitalization

NUSSLI asserts that NMHC was inadequately capitalized because, pursuant to the Cooperative Endeavor Agreement between the State of Louisiana and NMHC, the projected expenses of the project were $7,285,599 and only $4.5 million was provided by grants from the State of Louisiana.[282] NUSSLI alleges that Chouest and the Chouest-related entities allocated approximately $3.4 million of this grant money for capital improvements to the NOLA Motorsports Park and thus deprived NMHC of needed capital to fulfill its financial obligations.[283] However, NUSSLI also alleges that the stated purpose of the grant was to "provide supplemental funding to the Contracting Party [NMHC] to host the inaugural Indy Grand Prix of Louisiana ('Event') which will support the expansion and promotion of tourism . . . ."[284] A review of the amended complaint also reveals that the parties anticipated raising additional money through the Event.[285] Therefore, NUSSLI's assertion that NMHC was undercapitalized is not supported by its allegation that the State of Louisiana grant would not cover all of the Event's expenses. Furthermore, NUSSLI's argument appears to rest upon its assertion that it was not paid because of misconduct by Chouest and the actions of other entities redirecting funds, not that an allegation that NMHC overall was inadequately capitalized. Therefore, the Court concludes that this factor does not support the

---

[281] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at pp. 8–9.

[282] Rec. Doc. 68 at p. 12.

[283] *Id.*

[284] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 14.

[285] *Id.*

application of the single business enterprise doctrine.

   **(vii) Corporation Causing the Incorporation of Another Affiliated Corporation**

  NUSSLI alleges that the incorporation of NMHC was directed and carried out by a representative of NOLA Motor, Kristen Engeron, who signed NMHC's Articles of Incorporation.[286] Therefore, the Court concludes that NUSSLI has sufficiently alleged that NOLA Motor caused the incorporation of NMHC.

   **(viii) Corporation Paying the Salaries and Expenses or Losses of Another Corporation**

  NUSSLI contends that Engeron performed the planning and development tasks relating to the Indy Race prior to the incorporation of NMHC, while being paid a salary by NOLA Motor.[287] NUSSLI also asserts that Frank Csaki, an accountant for NOLA Motor, "may very well have been asked to 'volunteer' for [NMHC] while being paid by [NOLA Motor]."[288] NMHC operated as a non-profit run by volunteers.[289] Therefore, the fact that Engeron maintained her position at NOLA Motor and continued to be paid by NOLA Motor does not support a conclusion that NOLA Motor and NMHC operated as a single business enterprise. However, NUSSLI also alleges that NOLA Motor paid some expenses of NMHC.[290] Therefore, this factor does weigh in favor of a conclusion that NOLA Motor and NMHC constitute a single business enterprise.

---

[286] Rec. Doc. 68 at p. 13 (citing Rec. Doc. 47 at p. 11).

[287] *Id.* (citing *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at pp. 12–13).

[288] *Id.*

[289] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at pp. 12–13.

[290] *Id.* at pp. 13, 17.

### (ix)   Corporation Receiving No Business Other Than That Given to It by Its Affiliated Corporations

NUSSLI alleges that NMHC received no other business other than the Event, which was provided to it by Chouest and the Chouest-related entities.[291] Therefore, the Court concludes that NUSSLI has pled sufficient facts to support this factor.

### (x)   Corporation Using the Property of Another Corporation As its Own

NUSSLI contends that this factor is met because: (1) NMHC used NOLA Motor's website, trademarks, copyrighted materials, and office space; (2) NOLA Motor paid some of NMHC's expenses; and (3) NOLA Motor continues to list Indy Race merchandise for sale on its website.[292] However, the only assertions that are supported by allegations in NUSSLI's first amended complaint are that NOLA Motor paid some of NMHC's expenses, which the Court addressed in a previous factor, "corporation paying the salaries and expenses or loss of another corporation,"and the common office space, which is will be addressed later as a separate factor. Because NUSSLI has not alleged in its first amended complaint  that NMHC used any other property of NOLA Motor, this factor does not weigh in favor of a conclusion that NOLA Motor and NMHC constitute a single business enterprise.

### (xi)   Noncompliance With Corporate Formalities

NUSSLI alleges that NMHC's Articles of Incorporation are deficient because they do not include a statement of the qualification of its members, the different classes of membership, if any, and the designations, voting powers, and other rights or privileges, restrictions or limitations,

---

[291] *Id.* at p. 11.

[292] Rec. Doc. 68 at p. 14.

granted to or imposed upon the members of each class pursuant to Louisiana Revised Statute § 12:203.[293] In response, the Chouest Defendants state that NUSSLI has alleged just one requirement that NMHC failed to meet out of the 12 listed.[294] Furthermore, the Chouest Defendants assert that NMHC did state the qualifications of its members and because there were no different classes of membership, the requirement that the Articles of Incorporation state the different classes does not apply.[295] It is well-established that, in deciding whether to grant a motion to dismiss pursuant to Rule 12(b)(6), a district court may not "go outside the complaint."[296] NUSSLI did not attach the NMHC's articles of incorporation to its first amended complaint, nor did the Chouest Defendants attach the articles of incorporation to their motion to dismiss. Therefore, as this is a motion to dismiss and asserted claims are liberally construed in favor of the claimant and all facts pleaded are taken as

---

[293] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 11.

[294] Rec. Doc. 71 at p. 8. Pursuant to Louisiana Revised Statute § 12:203, articles of incorporation shall set forth: (1) the name of the corporation; (2) in general terms, the purpose or purposes for which the corporation is to be formed, or that its purpose is to engage in any lawful activity for which corporations may be formed under this Chapter; (3) the duration of the corporation, if other than perpetual; (4) that it is a nonprofit corporation; (5) the location and address of its registered office, not a post office box only; (6) the full name and address of each registered agent, not a post office box only; (7) the full name and address of each incorporator; (8) the names, addresses, and terms of office of the initial directors, not a post office box only; (9) whether the corporation is to be organized on a stock basis or on a non-stock basis, or both; (10) if organized in whole or in part on a stock basis: (a) the aggregate number of shares which the corporation shall have authority to issue, (b) if the shares are to consist of one class only, the par value of each share, or a statement that the shares are without par value, (c) if the shares are to be divided into classes or series, the number of shares of each class or series, the par value of the shares of each class or series, or a statement that such shares are without par value; the designation of each class or series; and a statement of the preferences, limitations and relative rights of the shares of each class, and of the variations therein as between series; (11) if organized in whole or in part on a non-stock basis: (a) the qualifications of its members, (b) the different classes of membership, if any, (c) the designations, voting powers, and other rights or privileges, restrictions or limitations, granted to or imposed upon the members of each class; and (12) the taxpayer identification number of the corporation.

[295] *Id.* at pp. 5–6.

[296] *Rodriguez v. Rutter*, 310 F. App'x. 623, 626 (5th Cir. 2009); *Carter v. Target Corp.*, 541 F. App'x. 413, 416–17 (5th Cir. 2013).

true,[297] the Court takes as true that NMHC failed to meet this statutory requirement in filing its Articles of Incorporation. However, this is the only corporate formality to which NUSSLI alleges NMHC failed to adhere. Although NUSSLI asserts that it is unclear if membership certificates were ever issued and to whom, NUSSLI does not allege anything about membership certificates in its first amended complaint, nor does NUSSLI cite any authority for such a requirement. Therefore, the Court will consider only the allegation that NMHC failed to comply with the statutory requirement that a corporation state the qualification of its members, the different classes of membership, if any, and the voting powers and privileges granted to or imposed upon the members of each class. The Court concludes that, at best, this factor weighs weakly in favor of a  determination that NOLA Motor and NMHC constitute a single business enterprise.

### (xii)    Common Employees

NUSSLI asserts that NOLA Motor and NMHC employed both Engeron and Frank Csaki ("Csaki") and that NOLA Motor retained the services of two of NMHC's officers.[298] Engeron's position as President of both NOLA Motor and NMHC was addressed in a previous factor. Although NUSSLI asserts in its opposition to the motion to dismiss that Csaki was a common employee between NMHC and NOLA Motor, the only allegation in the first amended complaint concerning Csaki is that he was "beholden to and economically dependent upon Chouest and/or the Chouest-related entities."[299] There is no allegation in the first amended complaint that Csaki was an employee

---

[297] *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

[298] Rec. Doc. 68 at p. 15.

[299] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 22.

of either NMHC or any of the Chouest Defendants. The Court has already addressed the allegations regarding Sherman and Boyd in its discussion of the "common directors or officers" factor.

NUSSLI also alleges in its first amended complaint that Richard S. Vander Heide and Burt Benrud were employed and being paid by one or more of the Chouest companies while they "are/were members of [NMHC]."[300] NUSSLI does not make any argument regarding these individuals in its opposition to the motion to dismiss, nor does NUSSLI allege specifically that either of these individuals were employees of NOLA Motor. Therefore, the Court determines that this factor does not support a conclusion that NOLA Motor and NMHC constitute a single business enterprise.

### (xiii)   Services Rendered by the Employees of One Corporation on Behalf of Another Corporation

NUSSLI asserts that this factor is met because Engeron planned and developed the Indy Race for NMHC while employed by NOLA Motor, Sherman was retained as a lobbyist by the Chouest Defendants, and other employees of NOLA Motor "may have been asked to 'volunteer' for [NMHC] while being paid by [NOLA Motor]."[301] NUSSLI's allegations in its first amended complaint regarding Sherman, however, pertain to Sherman representing Chouest, the individual, as a lobbyist, not any of the corporate Chouest Defendants.[302] Furthermore, NUSSLI asserts only that there is a *possibility* that other employees were asked to volunteer to work for NMHC, not that any employee was actually asked to volunteer for NMHC. Therefore, this allegation is insufficient to demonstrate

---

[300] *Id.* at p. 12.

[301] Rec. Doc. 68 at p. 15.

[302] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 12.

that NOLA Motor's employees rendered any services on behalf of NMHC. Nor does Engeron's work for NMHC support this factor because Engeron was operating as President of NMHC. Therefore, the Court concludes that NUSSLI has not pled sufficient facts to support this factor.

### (xiv)   Common Offices

NUSSLI alleges that NOLA Motor, NMHC, Motor Realty, Laney C. Racing, Laney C, and Chouest all utilized common offices at 11075 Nicolle Boulevard in Avondale, Louisiana.[303] The Court determines that this factor does weigh in favor of a conclusion that NMHC and the Chouest Defendants constitute a single business enterprise.

### (xv)   Centralized Accounting

Although NUSSLI asserts in its opposition to the motion to dismiss that NOLA Motor, NMHC, and Chouest all used the same accounting personnel, no such allegation appears in NUSSLI's first amended complaint. Therefore, NUSSLI has failed to plead sufficient facts to support this factor.

### (xvi)   Undocumented Transfers of Funds Between Corporations

NUSSLI asserts that it is "not presently aware of what undocumented transfers of funds may have occurred between the Chouest Defendants and the Host Committee. However, discovery may disclose such transfers."[304] Therefore, NUSSLI has failed to plead sufficient facts to support this factor.

### (xvii)   Unclear Allocation of Profits and Losses Between Corporations

NUSSLI contends that this factor is met because NMHC was established as a nonprofit and,

---

[303] *Id.* at pp. 3–4, 22.

[304] Rec. Doc. 68 at p. 15.

because it was under the control of NOLA Motor's President, Engeron, the benefits of the Indy Race would flow to NOLA Motor.[305] NUSSLI also states that Chouest asserted that NOLA Motor would not make profits on race operations, but would receive commercial benefits from other activities related to Indy Car Racing.[306] NUSSLI assumes, without any explanation, that, because NMHC is a non-profit, any "benefits" will flow to NOLA Motor. However, without further factual allegations, NUSSLI's allegations cannot support a conclusion that there was an unclear allocation of profits and losses between the corporations.

### (xviii)   Excessive Fragmentation of a Single Enterprise

NUSSLI makes no argument that this factor is met in this case, stating only that this factor is neutral.[307] The Court agrees that this factor does not apply in this case.

### (xix)   Conclusion

The Court has found that NUSSLI has pled, at least in part, seven of the eighteen *Green* factors. These factors are: (1) common directors or officers; (2) the independence of the directors and officers; (3) a corporation causing the incorporation of another affiliated corporation; (4) corporation paying the salaries and other expenses or losses of another corporation; (5) corporation receiving no business other than that given to it by its affiliated corporation; (6) noncompliance with corporate formalities; and (7) common offices. The Louisiana First Circuit Court of Appeal in *Green* stated that "the legal fiction of a distinct corporate entity may be disregarded when a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another

---

[305] *Id.* at p. 16.

[306] *Id.*

[307] *Id.*

corporation. If one corporation is wholly under the control of another, the fact that it is a separate entity does not relieve the latter from liability."[308] In *Green*, the court also cited *Baker v. Raymond International, Inc.*, a Fifth Circuit case, for the proposition that none of the single business enterprise factors are dispositive.[309] In *Baker*, the Fifth Circuit emphasized that "[t]o justify the extraordinary step of holding the dominant party liable, the jury must find that this control 'amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.'"[310]

The factors that the Court has determined were sufficiently alleged are relatively weak and do not support an impression that NMHC was totally dominated by NOLA Motor. For example, in *Green v. Champion Insurance Co.*, the Louisiana First Circuit Court of Appeal held that the fourth factor regarding directors and officers of a corporation not acting independently had been met because transactions were entered into solely for the benefit of another member in the group.[311] The court stated that there were several instances in which one of the corporations entered into transactions without any economic justification.[312] Here, NUSSLI has alleged that NMHC chose to pay vendors who could put a lien on NOLA Motor's track, thereby benefitting NOLA Motor; however, NUSSLI has not alleged sufficient facts for the Court to conclude that NMHC's actions

---

[308] 577 So. 2d 249, 257 (La. 1 Cir. App. 1991).

[309] 577 So. 2d at 258.

[310] 656 F.2d 173, 181 (5th Cir. 1981).

[311] 577 So. 2d at 258.

[312] *Id.*

had no economic justification, or that its actions were solely for the benefit of NOLA Motor. In addition, in pleading the failure to follow corporate formalities, NUSSLI alleges only that NMHC failed to state one of twelve requirements in its Articles of Incorporation. NUSSLI does not allege any other failure to comply with corporate formalities.

Looking to the totality of the factors identified in *Green* and the allegations in NUSSLI's first amended complaint, the Court concludes that NUSSLI has not pled sufficient facts to show that NMHC was a "corporation [] so organized and controlled as to make it merely an instrumentality or adjunct" of NOLA Motor.[313] Therefore, NUSSLI has failed to sufficiently plead that NOLA Motor and NMHC constitute a single business enterprise. Nor does NUSSLI plead sufficient facts to support a conclusion that NMHC and any other Chouest Defendant together constitute a single business enterprise. As the Court has determined that NUSSLI has failed to plead sufficient facts to state a claim for breach of contract, or an application of the single business enterprise and alter ego doctrines, the Court grants the Chouest Defendants' motion to dismiss the breach of contract claims. **B.      Open Account**

The parties appear to agree that the Chouest Defendant's liability for the open account claims is tied to their liability for breach of contract.[314] Therefore, for the reasons discussed above, the Court grants the Chouest Defendants' motion to dismiss the open account claims as well.

**C.      Unjust Enrichment**

The Chouest Defendants also move to dismiss NUSSLI's unjust enrichment claims on the grounds that NUSSLI has another remedy at law and is therefore precluded from asserting an unjust

---

[313] *Id.* at 257.

[314] Rec. Doc. 65-1 at p. 19; Rec. Doc. 68 at p. 6.

enrichment claim, and on the grounds that any enrichment alleged by NUSSLI resulted from a juridical act.[315] In opposition, NUSSLI asserts that it has alleged that the Chouest Defendants wrongfully diverted funds earmarked for payment for NUSSLI's services to reduce other obligations for their own benefit, and that the Chouest Defendants were enriched through NUSSLI's renting and erecting the Grandstands.[316] NUSSLI contends that its unjust enrichment claim should be permitted as an alternative argument in the event that the Court ultimately accepts the Chouest Defendants' arguments that no other remedy exists.[317]

> Louisiana Civil Code Article 2298 provides that:
>
> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

The requisite elements of a claim for unjust enrichment are: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) an absence of justification or cause for the enrichment and impoverishment; and (5) no other remedy at law.[318]

The existence of another remedy at law will preclude an unjust enrichment claim. In *Walters v. MedSouth Record Management, LLC*, the Louisiana Supreme Court held that a plaintiff was precluded from seeking to recover under unjust enrichment because in his original petition he alleged that he had suffered harm as a "direct result of the negligent and tortious conduct" of the

---

[315] Rec. Doc. 65-1 at pp. 14–15.

[316] Rec. Doc. 68 at pp. 31–32.

[317] *Id.* at p. 31.

[318] *Baker v. Maclay Props. Co.*, 94-1529, p. 18 (La. 1/17/95); 648 So.2d 888.

defendant.[319] The court concluded that it was of no consequence that the plaintiff's tort claims had prescribed and held that "[b]ecause the law provided plaintiff with another remedy," the plaintiff had failed to state a cause of action for unjust enrichment.[320]

In essence, NUSSLI alleges that the Chouest Defendants benefitted from NUSSLI's provision of services pursuant to the Lease Agreement, and that state funds that should have been used to pay NUSSLI for its services pursuant to the Lease Agreement were diverted by the Chouest Defendants in order to reduce other obligations. In its Order on a motion to dismiss filed by NOLA Motor and Chouest in *Andretti*, the Court stated that it "appears possible that Andretti may be able to state a claim for unjust enrichment" on the grounds that NOLA Motor and Chouest allocated approximately $3.4 million of state funds to Chouest and NOLA Motor's NOLA Motorsports Park "measurably in excess of the amounts disclosed to [Andretti]"and that this use of funds "deprived NMHC of needed capital to fulfill its financial obligations to various vendors and contractors . . . including [Andretti]."[321] However, the Court stated that it was unable to determine from the pleadings whether there existed "an absence of justification or cause for the enrichment and impoverishment" and ordered Andretti to amend its complaint to address this prong, as well as whether there is no other remedy at law.[322] The parties in *Andretti* reached a settlement before the Court could address NOLA Motor and Chouest's second motion to dismiss.[323]

---

[319] 2010-0352, p. 2 (La. 6/4/10); 38 So. 3d 241.

[320] *Id.*

[321] Rec. Doc. 40 at p. 64 (citing Rec. Doc. 1 at p. 6).

[322] *Id.* at 65.

[323] Rec. Doc. 85.

In this case, NUSSLI alleges that the Chouest Defendants were "enriched and directly benefited from the allocation of $3.4 million of the State funds by using the funds to make general capital track improvements to NOLA Motorsports Park, not limited to those improvements required by INDYCAR . . ." and this "ultimately affected the *Lessee Parties'* ability to perform under its Agreement with NUS."[324] NUSSLI alleges that it has no other remedy under the Lease Agreement for the actions of the Chouest Defendants with respect to the allocation of these state funds and that no legal cause exists to justify the enrichment of the Chouest Defendants at NUSSLI's expense.[325]

NUSSLI claims that it suffered an impoverishment when it was not paid the amount it was due pursuant to the Lease Agreement. NUSSLI does not allege that it was deprived of any other funds other than those it was entitled to pursuant to the Lease Agreement. Although NUSSLI does not have a breach of contract claim against the Chouest Defendants, NUSSLI has pled a breach of contract claim against NMHC. There is no requirement that NUSSLI's remedy at law be against the Chouest Defendants specifically.[326] In *Ferrara Fire Apparatus, Inc. v. JLG Industries, Inc.*, the Fifth Circuit held that the availability of a claim for breach of contract precludes a claim of unjust enrichment.[327] Therefore, NUSSLI has another remedy at law to recover for this impoverishment.

---

[324] Rec. Doc. 84 at 40.

[325] *Id.*

[326] *See II Fire Records, L.L.C., v. Clouden*, 2006-CA-0763 (La. 4 Cir. 1/31/07); 951 So. 2d 1272, 1280 ("In the instant case, it is clear that the fifth requirement for proving unjust enrichment cannot be met, because II Fire had a remedy against Mr. Clouden. . . . We need not determine whether Forefront and Inner City were unjustly enriched at the expense of II Fire, because II Fire's remedy was against Mr. Clouden. It is clear that Mr. Clouden was the party who was contractually obligated to II Fire. Had he complied with the II Fire Contract, Forefront and Inner City would not even be involved in this lawsuit.").

[327] 581 F. App'x 440, 444 (5th Cir. 2014).

As such, NUSSLI cannot state a claim against the Chouest Defendants for unjust enrichment.[328]

## D.     *Fraud*

The Chouest Defendants also move to dismiss NUSSLI's fraud claims on the grounds that NUSSLI cannot plead two essential elements of fraud, duty and proximate cause, and that NUSSLI fails to plead its claims with the specificity required by Federal Rule of Civil Procedure 9(b).[329] In opposition, NUSSLI contends that the Chouest Defendants had a duty to tell the whole truth and because Andretti acted as the agent of the Chouest Defendants, the Chouest Defendants are liable for the misrepresentations of fact that NUSSLI received through their agent, Andretti.[330]

"The elements of a Louisiana delictual fraud or intentional misrepresentation cause of action are: (a) misrepresentation of a material fact, (b) made with the intent to deceive, and (c) causing justifiable reliance with resultant injury."[331] In Louisiana "[a]lthough a party may keep absolute silence and violate no rule of law or equity, . . . if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to [disclose] the whole truth."[332]

NUSSLI does not allege anywhere in its first amended complaint that any of the Chouest Defendants made any material misrepresentations directly to NUSSLI. Instead, NUSSLI asserts that there was an express principal-agent relationship between the Chouest Defendants, as "Lessee Parties," and Andretti, pursuant to the Lease Agreement. NUSSLI contends that because Andretti

---

[328] Rec. Doc. 40 at p. 64.

[329] Rec. Doc. 65-1 at pp. 16–18.

[330] Rec. Doc. 68 at p. 28.

[331] *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 627 (5th Cir. 1999).

[332] *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412 (5th Cir. 2008) (quoting *Am. Guar. Co. v. Sunset Realty & Planting Co., Inc.*, 23 So. 2d 409, 455–56 (La. 1944)).

acted as the agent of the Chouest Defendants, the Chouest Defendants are liable for the misrepresentations of fact that NUSSLI received via Andretti.[333]

NUSSLI alleges that Andretti was authorized and designated by the Lessee Parties to be its agent for all notices and invoices.[334] However, as the Court discussed in connection with the motion to dismiss the breach of contract claims, the Lease Agreement is clear that the contract was between NMHC and NUSSLI, and that the Chouest Defendants named as "Lessee Parties" were not contractually obligated under the contract. Furthermore, despite NUSSLI's attempt to lump all of these parties together, the "Invoices and Notices" section, upon which NUSSLI relies as proof that Andretti was designated an agent of the Lessee Parties, states only that Andretti should be notified if invoices or payments need to be sent to the Lessee, not the Lessee Parties.[335] Therefore, NUSSLI has failed to plead any basis for its assertion that the Chouest Defendants can be held liable for misrepresentations made to them by Andretti. NUSSLI alleges no other misrepresentations made to it directly by any of the Chouest Defendants. Nor does NUSSLI plead any of the circumstances surrounding how it even learned of these misrepresentations allegedly made first to Andretti, in order for NUSSLI to show that it justifiably relied upon these statements. Accordingly, the Court grants the Chouest Defendants' motion to dismiss NUSSLI's fraud claims.

**E.     LUTPA**

The Chouest Defendants move to dismiss the LUTPA claims against them on the grounds that NUSSLI has not alleged any acts or misrepresentations made by any of the Chouest Defendants

---

[333] Rec. Doc. 68 at p. 28.

[334] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 19.

[335] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47-2 at p. 7.

against NUSSLI.[336] In opposition, NUSSLI contends that it has stated a LUTPA claim against the Chouest Defendants because "[e]ach of the Chouest Defendants engaged in unfair or deceptive conduct in making false and misleading statements to Andretti, and sending Andretti out to contract on their behalf with NUSSLI based upon those misstatements."[337] NUSSLI asserts that it has pled that the Chouest Defendants misrepresented the financial backing behind the Indy Race and improperly distributed the $4.5 million appropriated under the Cooperative Endeavor Agreement and failed to distribute the full amount that had been appropriated for the grandstand build.[338] Furthermore, NUSSLI contends that the orchestration of the Event as a non-profit enterprise, along with the Chouest Defendants' dishonest representations, constitutes an unfair trade practice.[339]

LUTPA, Louisiana Revised Statute § 51:1401, declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." LUTPA affords a cause of action to any natural or juridical person "who suffers any ascertainable loss of money or moveable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by [Louisiana Revised Statute] 51:1405."[340] The Louisiana Supreme Court has stated that the goals of LUTPA include "halting unfair business practices and sanctioning the businesses which commit them, preserving and promoting effective and fair competition, and curbing business practices that lead

---

[336] Rec. Doc. 65-1 at p. 14.

[337] Rec. Doc. 68 at p. 33.

[338] *Id.* at p. 34.

[339] *Id.*

[340] *Cheramie Serv., Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633,  p. 6 (La. 4/23/10); 35 So. 3d 1053 (quoting La. Rev. Stat. 51:1409).

to a monopoly and unfair restraint of trade within a certain industry."[341] What constitutes an unfair trade practice is to be determined by the courts on a case-by-case basis.[342] Under LUTPA, a business action is deemed "unfair" when it offends established public policy and when it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."[343] A business action is "deceptive" when it amounts to fraud, deceit, or misrepresentation.[344] Ultimately, however, "the range of prohibited practices under LUTPA is extremely narrow."[345]

As discussed above, NUSSLI has not pled any false or misleading statements made directly to NUSSLI by any of the Chouest Defendants. This claim also appears to rely upon Andretti acting as the agent of the Chouest Defendants. The Court has concluded that NUSSLI has failed to plead sufficient facts to show that Andretti was acting as the agent of the Chouest Defendants when it communicated allegedly false statements to NUSSLI. Therefore, the Court grants the Chouest Defendants' motion to dismiss the LUTPA claims as well.

## F.  *Conversion*

The Chouest Defendants also move to dismiss the conversion claims against them on the grounds that NUSSLI cannot plead any wrongful exercise or assumption of authority over the grandstands by the Chouest Defendants.[346] In opposition, NUSSLI asserts that NMHC, in

---

[341] *Quality Envtl. Processes, Inc. v. I.P. Petrol. Co., Inc.*, 2013-1582 (La. 5/7/14); 144 So. 3d 1011, 1025.

[342] *Cheramie Serv., Inc.*, 2009-1633 at p. 10.

[343] *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1332 (5th Cir. 1994).

[344] *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 553 (5th Cir. 2015).

[345] *Quality Envtl. Processes, Inc.*, 144 So. 3d at 1025.

[346] Rec. Doc. 65-1 at p. 20.

coordination with the Chouest Defendants, diverted money allocated for the grandstand build under the Cooperative Endeavor Agreement to other recipients, rather than paying NUSSLI.[347]

In order to state a claim for conversion under Louisiana law, a plaintiff must show one of the following: "(1) possession is acquired in an unauthorized manner; (2) the chattel is removed from one place to another with the intent to exercise control over it; (3) possession of the chattel is transferred without authority; (4) possession is withheld from the owner or possessor; (5) the chattel is altered or destroyed; (6) the chattel is used improperly; or (7) ownership is asserted over the chattel."[348] NUSSLI asserts that the tort of conversion applies to the wrongful exercise of dominion over money.[349] However, NUSSLI's claim is that NMHC diverted funds, not that any of the Chouest Defendants did so, and NUSSLI does not allege that any of the Chouest Defendants ever exercised any dominion over the money NUSSLI claims that it was owed. Upon review of NUSSLI's first amended complaint, it appears that NUSSLI relies upon the application of the single business enterprise and alter ego doctrines in order to state a conversion claim against the Chouest Defendants.[350] In light of the Court's ruling that NUSSLI has failed to plead sufficient facts to support the application of either of these doctrines, the Court grants the Chouest Defendants' motion to dismiss the conversion claims.

---

[347] Rec. Doc. 69 at pp. 13–14.

[348] *Dual Drilling Co. v. Mills Equipment Invs.*, Nos. 98-C-0343, 98-C-0356 (La. 12/1/98); 721 So. 2d 853, 857.

[349] Rec. Doc. 69 at p. 13 (citing *Broussard, Bolton, Halcomb & Vizzier v. Williams*, No. 01-0219 (La. App. 3 Cir. 10/03/01); 796 So. 2d 791, 796).

[350] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 34.

G.      *Private Works Act*

The Chouest Defendants also move to dismiss the Private Works Act claims on several grounds: (1) the PWA does not apply because the Event was not a construction project within the meaning of the PWA; (2) the PWA does not apply because NMHC is not a contractor nor is NUSSLI a subcontractor within the meaning of the PWA; (3) NUSSLI has failed to plead that it delivered the notice required by the PWA; and (4) at most, the privilege would apply to NMHC's lease rights, not the land itself.[351] In opposition, NUSSLI contends that: (1) the modifications and physical changes to the land in connection with the Indy Race were clearly within the scope of the PWA; (2) NUSSLI's claim and privilege is valid against all of the Chouest Defendants; and (3) the notice required under Louisiana Revised Statute § 9:4802(G)(1) was provided.[352]

Pursuant to Louisiana Revised Statute § 9:4802, "[t]he following persons have a claim against the owner and a claim against the contractor to secure payment of the following obligations arising out of the performance of work under the contract: (1) Subcontractors, for the price of their work. . . . (4) Lessors, for the rent of movables used at the site of the immovable and leased to the contractor or a subcontractor by written contract." Pursuant to Louisiana Revised Statute § 9:4801, "[t]he following persons have a privilege on an immovable to secure the following obligations arising out of a work on the immovable: (1) Contractors, for the price of their work . . . (4) Lessors, for the rent of movables used at the site of the immovable and leased to the owner by written contract." NUSSLI asserts that as a lessor seeking payment for the rent of a movable (the grandstands) placed on an immovable, its claim falls squarely within the terms of the PWA and it

---

[351] Rec. Doc. 65-1 at pp. 21–25.

[352] Rec. Doc. 68 at pp. 20–27.

68

is entitled to payment from the owner and the contractor, and a privilege against the immovable, the NOLA Motorsports Park.[353]

NUSSLI and the Chouest Defendants disagree over whether the lease of the grandstands was part of the "performance of work" as defined in the PWA. Louisiana Revised Statute § 9:4808 defines work as "a single continuous project for the improvement, construction, erection, reconstruction, modification, repair, demolition, or other physical change of an immovable or its component parts." The Chouest Defendants assert that there is no "work" at issue in this case as the grandstand rental was part of a finite, three-day event.[354] In opposition, NUSSLI contends that there can be little doubt that the various constructions and modifications required with respect to the NOLA Motorsports Park "consisted of improvement, modifications, repairs, and other physical changes to the Property."[355] In NUSSLI's complaint, it alleges that NMHC agreed in the Cooperative Endeavor Agreement with the State of Louisiana to "use appropriated funds to support planning, operations, and production of the Indy Prix of Louisiana and to build the required track improvements and safety upgrades to the NOLA Motorsports Park required by IndyCar in order to host the Event."[356] NUSSLI has therefore alleged that there were track improvements and safety upgrades constituting "work" within the meaning of the PWA.

However, what remains to be determined is whether NUSSLI has alleged that its provision of the grandstands was part of the performance of that work. In the Lease Agreement, under "NUS'S

---

[353] *Id.* at p. 20.

[354] Rec. Doc. 65-1 at p. 22.

[355] Rec. Doc. 68 at p. 21 (citing Rec. Doc. 47 at p. 27).

[356] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 27.

OBLIGATIONS," NUSSLI agreed to the following activities: "(a) lease, supply, install and thereafter remove the Equipment at the Event, in accordance with the time frames specified on Schedule A hereto, (b) install the Equipment during or before the Installation Period, and (c) remove the Equipment before or during the Removal Period."[357] NUSSLI alleges that the Equipment discussed in the Lease Agreement were grandstands.[358] NUSSLI does not allege anywhere in its first amended complaint that the lease of the grandstands was part of the track improvements or safety upgrades, or otherwise associated with any physical change to the immovable or its component parts. Therefore, NUSSLI does not have a claim or privilege under the PWA.[359] Accordingly, the Court grants the Chouest Defendants' motion to dismiss NUSSLI's claims under the PWA.

## H.    *Request for Leave to Amend*

Finally, in the event that the Court grants the Chouest Defendants' motion to dismiss as to one or more of its causes of action, NUSSLI requests that it be granted leave to amend its first amended complaint in accordance with the Court's ruling.[360] Other than making such a general request, NUSSLI fails to explain exactly what amendments could be made to address the deficiencies in the complaint. Pursuant to the Court's Scheduling Order, "[a]mendments to pleadings, third-party actions, cross claims, and counterclaims shall be filed no later than January

---

[357] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47-2 at p. 1.

[358] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47 at p. 19.

[359] The Chouest Defendants assert several other arguments in support of its motion to dismiss the PWA claims. In light of the Court's ruling that NUSSLI does not have a claim or privilege because it did not perform any "work" as defined in the PWA, the Court need not address these additional arguments.

[360] Rec. Doc. 68 at p. 35.

8, 2016, in accordance with the Federal Rules of Civil Procedure and Local Rule 7.6."[361] Federal district courts have the inherent power to enforce their scheduling orders,[362] and Federal Rule of Civil Procedure 16(b) provides that a scheduling order "may be modified only for good cause and with the judge's consent."[363]

NUSSLI has already amended its complaint once, following the motions to dismiss filed by the Chouest Defendants and NMHC.[364] At the time it amended its complaint, the Court had already issued Orders on the motions to dismiss filed by Defendants NOLA Motor, Chouest, and NMHC in *Andretti*, a case which is consolidated with the instant case for the purposes of discovery.[365] The claims in the *Andretti* action overlap with many of the claims at issue in this case, and the parties here repeatedly reference the Court's Orders on the motions to dismiss in *Andretti*. Therefore, NUSSLI was on notice regarding the Court's likely rulings on certain legal arguments and claims maintained here. Furthermore, NUSSLI has not alleged, nor does the Court perceive, what amendments could be made to address the deficiencies in NUSSLI's complaint. Therefore, the Court concludes that NUSSLI has failed to demonstrate good cause and NUSSLI's request for leave to amend its complaint is denied.

---

[361] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 39 at p. 2.

[362] *See Flaska v. Little River Marine Const. Co.*, 389 F.2d 885, 887 n.3 (5th Cir. 1968) (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 630 (1962)); *see also Finisar v. DirecTV Group, Inc.*, 424 F. Supp. 2d 896, 899 (E.D. Tex. 2006).

[363] Fed. R. Civ. P. 16(b)(4).

[364] *NUSSLI US, LLC v. NOLA Motorsports Host Committee, Inc.*, No. 15-2372, Rec. Doc. 47.

[365] Rec. Docs. 40, 42.

## IV. Conclusion

For the foregoing reasons, the Court concludes that NUSSLI has failed to state a claim upon which relief can be granted against the Chouest Defendants. Accordingly,

**IT IS HEREBY ORDERED** that the Chouest Defendants' "Rule 12(b)(6) Motion to Dismiss"[366] is **GRANTED**.

**IT IS FURTHER ORDERED** that NUSSLI's request for leave to amend its complaint is **DENIED**.

**NEW ORLEANS, LOUISIANA,** this 29th day of July, 2016.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[366] Rec. Doc. 65.

72